IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

| | |
|---|---|
| RAMACO CARBON, LLC; RAMACO RESOURCES, INC. , | DOCKET NO. 26-CV-104-KHR |
| Plaintiffs, | |
| vs. | Cheyenne, Wyoming April 7, 2026 9:03 a.m. |
| ALEX J. MOYES, | |
| Defendant. | |

---

**TRANSCRIPT OF HEARING PROCEEDINGS**
**MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

**BEFORE THE HONORABLE KELLY H. RANKIN**
**CHIEF UNITED STATES DISTRICT JUDGE**

*JANET DAVIS, RDR, FCRR, CRR*
*Federal Official Court Reporter*
*2120 Capitol Avenue, Room 2226, Cheyenne, WY  82001*
*307.433.2154 * jbd.davis@gmail.com*

*Proceedings reported by realtime stenographic reporter;*
*transcript produced with Computer-Aided Transcription.*

APPEARANCES:

For the Plaintiffs:      Dorsey & Whitney LLP
                         BY:   BRETT L. FOSTER
                               MARK A. MILLER
                         111 South Main Street, Suite 2100
                         Salt Lake City, UT  84111
                         BY:  STEVEN T. WATERMAN
                         136 South Main Street, 10th Floor
                         Salt Lake City, UT  84101
                         BY:  CAITLIN L.D. HULL
                         50 South Sixth Street, Suite 1500
                         Minneapolis, MN  55402

For the Defendant:       Haynes and Boone LLP
                         BY:   JASON R. ELLIOTT
                         2801 North Harwood Street, Suite 2300
                         Dallas, TX  75201
                         BY:  BRENT R. OWEN
                         675 15th Street, Suite 2200
                         Denver, CO   80202

3

(Proceedings commenced 9:03 a.m., April 7, 2026.)

THE COURT:  Thank you.  Please be seated.

Good morning.  We are on the record in the matter of Ramaco Carbon, LLC, versus Mr. Moyes, Alex J. Moyes.  Case Number is 26-CV-104-R.

I understand we have a number of people at counsel table.  Mr. Mark Miller is present; Evan Jenkins who is the company representative, I understand -- good morning, sir -- Brett Foster, Steven Waterman; also Caitlin Hull is present and Sherri Stutki assisting the plaintiffs' team this morning.

For the defendants Mr. Brent Owen is present; Alex J. Moyes, the defendant in the matter, and Jason Elliott.

We are scheduled today for a hearing on the plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order.

We had a status conference and a discussion last week, late last week, and I indicated that we would give each side two and a half hours, or 150 minutes.  I anticipate the plaintiffs will begin, and then, while you're on your feet, we'll go ahead and run the clock.

I anticipate we will take a morning break of some sort, so you don't have to -- and if you need a break sooner than I exercise, please let me know.  And then we'll also break for lunch, unless things move quicker than anticipated.  If we need to just kind of work through a little bit of the lunch

4

hour to complete our effort, then we can do so.

So housekeeping-wise, that's what you can envision.

Let me -- let me just check in and see if there are any preliminary matters that we need to discuss before we dive in.

For the plaintiffs, anything this morning?

MR. FOSTER:  No, Your Honor.  Thank you.

THE COURT:  All right.  Very well.  Thank you, Mr. Foster.

How about for the defense?  Mr. Elliott?

MR. ELLIOTT:  No issues, Your Honor.

THE COURT:  Okay.  I think we had a brief discussion about whether you want to make an opening statement.  I'm happy to hear any opening statements.  It is your time, your presentation, so whatever you wish to do.

I'll turn it over to the plaintiff.  Mr. Foster.

MR. FOSTER:  Thank you, Your Honor.

First, I'd like to identify Ramaco company representatives that are present.

We have Randy Atkins in the back here.  He is the CEO and Chairman of Ramaco; Evan Jenkins is the Vice Chairman.

We have Mike Woloschuk, the Vice President for Critical Mineral Operations, and Drew Perry, Vice President of Information Technology and Cybersecurity.

THE COURT:  I've read some of their stories and their

OPENING - FOSTER                                                    5

declarations, but thank you for introducing them this morning.

MR. FOSTER:  Yes, of course.

The Court understands we're here for a TRO, preliminary injunction motion under the Defend Trade Secrets Act, 18 U.S.C. 1836, and the Wyoming Uniform Trade Secrets Act.

The reason for the motion and the need for immediate relief, Alex Moyes systematically misappropriated the company's highly confidential information in violation of company policy, in violation of the contractual obligations he had to the company, and in violation of the law.

The trade secrets at issue, the evidence will show, are extremely valuable, providing Ramaco an economic and competitive advantage in the marketplace.

The information Moyes took could be used by him and his new employer to provide a strategic advantage and competitive advantage due to unfair competition that would irreparably harm Ramaco.  Also, it could be used for others, if he were to go elsewhere.

The relief sought:  First, immediate preservation and court-directed independent forensic imaging of all electronic devices and storage devices Moyes has in his possession or control, including any desktops, laptops, cell phones, external hard drives, thumb drives, all other devices he possesses that can store or manage electronic information and devices, including those that he has with his current employer.

This is for the purpose of preserving any and all electronically stored information shared and preserving the electronic history of any modifying, access, use, deletion, or other spoliation of evidence by Moyes.

This evidence relates directly to our claims and is pivotal to the relief that we seek in this case.

Second, of course, we seek immediate injunctive relief. Moyes does not -- improperly acquired and has no right to possess and should not possess after the imaging has taken place any of Ramaco's trade secret information.

Third, we request a court order, given the unusual circumstances here, to require Moyes to certify whether or not he shared or used Ramaco's trade secrets and the information with USA Rare Earth, his current employer, or otherwise used Ramaco's trade secrets for his benefit or the benefit of USA Rare Earth.

A preview of the testimony, some of which is in the declarations, but some of which will be presented by supplemental testimony:  Mr. Atkins will -- again, is the Chairman and CEO.  Ramaco is a publicly traded company on NASDAQ.  It mines metallurgical coal in the eastern U.S. and is developing the Brook Mine for rare earth elements and critical minerals just north of Sheridan, Wyoming.  Ramaco has 900 employees.

Mr. Atkins will testify that Ramaco purchased the

OPENING - FOSTER                                                         7

Brook Mine 15 years ago, has spent millions of dollars developing the first new coal mine in Wyoming in 50 years and the first new rare earth element mine in 70 years.

The Brook Mine is permitted by Wyoming and the statement of -- Department of Environmental Quality.  Active mining began in June.  Rare earth elements were discovered in the Brook Mine by the National Energy Technology Laboratory, an arm of the U.S. Department of Energy.  We will call that NETL.  NETL and the U.S. Government have been directly involved in the Brook Mine due to the strategic importance of the rare earth elements to national security.

Atkins hired Moyes two years ago as a key leadership role.  Throughout his employment, Moyes was directly involved and participated in all aspects of operating the mine and developing a process to extract rare earth elements and critical minerals.

Moyes was a valued employee.  Mr. Atkins was disappointed when he found out he resigned and actively encouraged him to reconsider.  He was surprised when he left and took a new job with Ramaco's competitor because that was directly contradictory to what he had told them.

Mr. Atkins directed the review of Moyes's computer, email usage after Moyes left and showed -- that showed Moyes was in violation of the company agreements and policies and unlawfully forwarded to himself and acquired and possessed

Ramaco's confidential trade secrets and other proprietary information.

He will testify about the time and expense devoted to gathering and acquiring the valuable trade secret information that Moyes took and the irreparable harm that Ramaco would suffer competitively if an injunction does not issue.

Mr. Drew Perry, the IT expert for Ramaco, has decades of experience in information systems technology and cybersecurity.  He will testify the company has an email policy to -- for the -- to protect the company's confidential trade secret information.

He conducted an internal forensic review of Moyes' computer and email use upon his departure.  He reported that to Mr. Atkins and reported that he had forwarded large amounts -- I think the record shows 47 emails from the time the NDA was given to him by US Rare Earth up until October 10th when he had his last day.

Mike Woloschuk, the Executive Vice President for Critical Minerals, has decades of experience in the rare earth element and critical mineral industry.  Prior to joining in 2005, he was Global Executive Director of Critical Minerals at Fluor International, one of the world's leading engineering firms.  He had worked directly on the Brook Mine Project while at Fluor, directing a team that helped test, engineer, design, and support Ramaco's Brook Mine Project.

OPENING - FOSTER                                                    9

He worked with Moyes both while at Fluor and then as a co -- co-worker with Moyes at Ramaco after Mr. Moyes began.

He will describe in detail the science behind extracting critical elements and rare earth elements -- critical minerals and rare earth elements.  He will describe in detail how the process discovered at Brook Mine Project can be used by others to develop critical and rare earth projects.  He will describe the competitive advantage Ramaco has by having purchased -- by having the trade secrets at issue and the irreparable harm risk of having that continue to be in the hands of a vice president of a competitor.

He will also describe how Moyes could use Ramaco's trade secrets to benefit himself, his new employer, and any future employer in this industry.

He will also describe how he could use -- we'll also put on Mr. Moyes in our case.  We will show at this hearing that the factual foundation for his defenses will crumble, and we'll show that he has not provided credible testimony on the critical issues in this court -- to this Court.

In closing, Moyes, the vice president of Ramaco's competitor, wrongly took Ramaco's trade secrets.  He did so in violation of Ramaco's agreements and policies.  He has no lawful basis for acquiring it.  He has no lawful basis for maintaining possession and control of it.  We will suffer irreparable harm if there isn't an injunction.  This is an

extraordinary case that requires the preservation and immediate injunctive relief we're seeking.

We appreciate the Court's time, look forward to being here. We appreciate the quick calendar appearing the Court was able to give us so we can put on our case and seek -- seek relief from the Court. Thank you.

THE COURT: Very well. Thank you, Mr. Foster.

Mr. Elliott, do you wish to offer an opening statement at this time?

MR. ELLIOTT: Yes, Your Honor. Thank you.

THE COURT: Thank you.

MR. ELLIOTT: May it please the Court.

THE COURT: Mr. Elliott.

MR. ELLIOTT: I'm Jason Elliott, and I represent the defendant, Alex J. Moyes, in this case.

I would like to start with a discussion specifically about the relief that was requested in the motion here. Plaintiffs' counsel reiterated this during their opening as well, but the three items that they have specifically asked the Court to offered are, one, a forensic imaging of Mr. Moyes' electronic devices; two, an injunction that precludes him from prohibiting [sic] Ramaco's trade secrets; and, three, certification to the Court as to whether Ramaco's trade secret information has been shared with USAR.

In the proposed order and some of the discussions,

plaintiffs have attempted to enlarge this relief to include vastly more intrusive discovery, which is unwarranted.

However, the relief requested just on its face here is not going to be warranted because the plaintiffs' evidence will not establish the burden that must be met for the entry of a preliminary injunction.

And we've also noted through our submissions that on this list here, Item Number 1 is essentially already done, even if it is inappropriate relief that's being requested. Dr. Moyes has fully preserved all of his information and including creating images of the electronic devices.  There is no need for someone else to redo that work.

And, third, the Number 3 item on this list has already been covered through the submission that Dr. Moyes has provided to the Court that he has not shared any of the information that's at issue in this case.

We do not concede, and Dr. Moyes won't concede either, that any of the information sought here qualifies as a trade secret, but, nonetheless, he will testify that no information has been shared.

The Court is certainly, I'm sure, familiar with the burden for entry of a preliminary injunction on a claim for misappropriation of trade secrets.  There is no substantial likelihood of success on the merits, as is required to be shown, by the plaintiffs.

We will show that there is no trade secret that is at issue here.  The plaintiffs may well be able to demonstrate that some of their information is confidential and they treat it as confidential, but we will show that it is not, in fact, a trade secret.

Second, there has been no improper acquisition of any trade secret information.  Dr. Moyes obtained all information that is at issue and complained of in this case, which amounts to, essentially, I think, five Excel spreadsheets and one Preliminary Economic Analysis report.  He obtained all of that information in the course of his work duties for Ramaco.

There's also going to be no evidence that Mr. Moyes has made any disclosure of this information, whether it is trade secret or not, to anyone.

Number two, there is no substantial likelihood of success on the merits of the plaintiffs' breach of contract claim.  The only contract that they've introduced to the Court here is a mutual nondisclosure agreement.  And the Court will hear testimony about that agreement, but on the face of the contract itself, there is no prohibition on having information in his possession or in his personal email account in the course of his work, provided that he does not use or disclose that information to others, which he will testify that he hasn't done.

Ramaco's allegations to the contrary are completely

speculative.  There is no supporting basis for their contention that he shared information with anyone.

And, third, the standard that's probably the most important is that no irreparable harm will be shown.  None of the documents that have been identified by Ramaco as confidential or trade secret in this case would be of any value whatsoever to Dr. Moyes or to his current employer, USA Rare Earth.  The testimony will demonstrate that whatever work Mr. -- Dr. Moyes was doing while he was at Ramaco is of no consequence and no relevance and no similarity to any of the work that he's currently doing for USA Rare Earth, nor could it be.

The Court will hear testimony that during Dr. Moyes' employment with Ramaco, Ramaco never produced any rare earth elements, never sold any rare earth elements, never mined any rare earth elements, and only had plans, and their plans have changed.

The discussion in this case is specifically about one location where Dr. Moyes was employed.  That's the Brook Mine in Wyoming.  The Brook Mine -- as the Court will hear some testimony about mineralogy and rare earth elements, rare earths are found in clay and shale rocks that does not have a common mineralogy with USAR's only rare earth mining project, which is the Round Top Project which is composed of a igneous rock, a completely different mineralogy and a completely different

OPENING - ELLIOTT                                                    14

process for extracting any rare earth elements, in addition to the rare earth elements not being the same.

Your Honor, the Court in this case will hear that there are no trade secrets at issue. Ramaco commissioned a Preliminary Economic Analysis, which will be referred to as a PEA, by the consulting firm Fluor. And the purpose of this report was to evaluate the technical and economic feasibility of producing certain rare earth elements from the Brook Mine.

Dr. Moyes will testify that he worked with Fluor on the PEA. PEAs are documents that are routinely made public in the mining industry, including documents that are of apparently central interest in this case, process flow sheets and economic models. The Court will hear testimony that USA Rare Earth has publicly published all of its preliminary economic analysis that it has commissioned for its own work as well as others in the industry. USAR has never withheld information from its PEAs.

To be a trade secret, the plaintiffs are required to demonstrate that whatever information they're claiming is the trade secret derives independent economic value, actual or potential, for not being known or not being readily ascertainable by proper means by another person who can obtain economic value from the disclosure of that information. Just because Ramaco claims information is a secret or calls it a trade secret does not mean that it is protected by statute.

OPENING - ELLIOTT                                                    15

Here, the items at issue are Ramaco's PEA and a few Excel spreadsheets that were used, allegedly, to generate the work for the PEA.  Those have no value because of their secrecy.  The value of those documents do not depend on being secret and the evidence will establish that.

It is also important here to establish the timeline of this case.  Although this has been presented to the Court as a very urgent and important matter, the timeline begs to differ.

The testimony will be undisputed that Dr. Moyes's last day with Ramaco was October 10th, 2025.  On October 23rd, 2025, an outside research firm published a report regarding Ramaco's Brook Mine.  It was very critical of the company's statements regarding that, including calling them fraudulent.

On December 17th, 2025, Ramaco issued Dr. Moyes a threat by way of a letter alleging that he was guilty of misappropriation, although they did not specify exactly what or why.  The letter that Dr. Moyes received, which he will discuss during his testimony, included no demand for return of information or documents.  The letter on its face contained no demand that Dr. Moyes release his emails or delete them.  There was no request in the letter to Dr. Moyes that he provide any sort of response whatsoever.  He was instructed solely to preserve evidence, which he will testify that he has done.

On January 30th, 2026, a securities lawsuit was filed against Ramaco, including Mr. Atkins.  The lawsuit referenced

OPENING - ELLIOTT                                                        16

the Wolf Pack Research Report in its allegations.

No action was taken against Dr. Moyes regarding the threatened letter that they had sent in mid-December until March 16th, 2026, when Ramaco filed this suit.

Under Dr. Moyes's confidentiality agreement or the MNDA, he was authorized to access confidential information. He was not authorized to use it for his own benefit or disclose it to others.

The MNDA does not say anything about the use of personal email. The use of the personal email, you will hear from Dr. Moyes, was a common practice at Ramaco. Dr. Moyes has not used the Fluor PEA nor any of the few spreadsheets that have been identified in this case, and Dr. Moyes will testify he has not disclosed this information to anyone.

Finally, there's no harm, irreparable or otherwise. USAR's PEA and its flow sheets for the Brook -- I should say -- yeah, for the Round Top Mine is a public document, so there's no connection to Ramaco's Brook Mine process flow sheet or its PEA, and if there was a connection, they should be able to show the Court.

The Fluor PEA has been essentially disavowed or abandoned by Ramaco. You will hear testimony about that.

Ramaco's test plans that they've presented to the Court as containing trade secrets have no usable data and no tests were run during Dr. Moyes's employment.

Ramaco's PEA, which was created in July of 2025, is already outdated, and you will hear testimony that it is currently under revision and the processes that underlie the economics have changed.

Ramaco's speculation that USAR has diverted investments that apparently it claims that it should have gotten has no basis in fact beyond speculation.

Finally, Your Honor, we want to address briefly the proposed order that was submitted, which included a number of terms that would meet the definition of a mandatory injunction.

As the Court is likely aware, the Tenth Circuit considers mandatory injunction to be a disfavored category of injunction under the case of *Schrier versus University of Colorado*, and plaintiffs in this case will not meet the burden that they need for a preliminary injunction in this case for any kind, preliminary or mandatory, but this higher standard clearly will not be met here.

In addition, as I mentioned at the outset, Moyes has -- Dr. Moyes has already made the certification that they seek.  He's already undertaken the action regarding imaging of documents through devices that Ramaco is requesting.  And Ramaco's proposed access to Dr. Moyes's computers and his data, which would be a highly invasive and unwarranted intrusion into the normal discovery process, is not really even an issue that is before the Court on their motion, but, in any event, courts

OPENING - ELLIOTT                                                    18

considering similar circumstances routinely deny those and allow the parties to conduct discovery in the normal course.

THE COURT:  That's what we would request the Court do here.

And with that, that's the end of our statement, Your Honor.

THE COURT:  Thank you, Mr. Elliott.

Mr. Foster, you may call your first witness.

MR. MILLER:  Your Honor, plaintiffs call Mr. Michael Woloschuk.

THE COURT:  Mr. Woloschuk, please come forward to be sworn.

(Witness sworn.)

MR. MILLER:  Your Honor, first off, some housekeeping. We have -- the parties exchanged some additional exhibits that may be discussed that haven't been filed with the briefing yet, Sunday night.  I do have a binder that has all of Plaintiffs' Exhibits 1 through 31 if the Court wants one.

May I approach?

THE COURT:  You may.

MR. MILLER:  And for purposes of this hearing, would the Court like us to formally move to admit exhibits or when we bring them up?

THE COURT:  Unless wholesale they're agreed to, then we can kind of do it in that fashion, but if there's some concern about objections to individual exhibits, then we'll

WOLOSCHUK - DIRECT                                                19

have to take them one at a time.  If there is some agreement that, for instance, the binder of Exhibits 1 through 31 offered by the plaintiff are not opposed or objected to, we can do it that way as well.

MR. MILLER:  Maybe what we could propose is at the end of the hearing -- after the hearing we can file with the Court a notice of supplemental exhibits that were addressed, and then it is in the docket.

THE COURT:  That would be fine.  And you'll want to offer the exhibits at some point during the course of today's proceeding.

MR. MILLER:  Okay.  Will do.  Thank you, Your Honor.

THE COURT:  Thank you.

**MICHAEL WOLOSCHUK, PLAINTIFFS' WITNESS, DIRECT EXAMINATION**

**BY MR. MILLER:**

Q.  Mr. Woloschuk, will you introduce yourself to the Court.

A.  Sure.  Michael Woloschuk.  I'm the executive vice president --

THE COURT:  One moment, please.  Let's make sure your microphone is on.

I beg your pardon.  Sorry for the interruption.

A.  Michael Woloschuk, Executive Vice President of Critical Minerals Operations for Ramaco.

**BY MR. MILLER:**

Q.  Mr. Woloschuk, you signed a declaration under oath in

WOLOSCHUK - DIRECT                                                    20

connection with Ramaco's motion for preliminary injunction.

Do you recall that?

A.   I did, yes.

Q.   And in that declaration, you discussed Exhibits 15 through 21 that were attached to your declaration.

Do you recall that?

A.   I do.

Q.   And do you adopt that testimony about those exhibits as your testimony in this proceeding?

A.   Yes, I do.

MR. MILLER:  So we offer the declaration as already stated, Your Honor.

THE COURT:  Very well.  Is that marked separately as an exhibit, or is it just the declaration that's in the record?

MR. MILLER:  The declaration is ECF Number 8, and then the exhibits are just the attached exhibits to his declaration.

THE COURT:  I understand.  Thank you.  You may proceed.

BY MR. MILLER:

Q.   So I have some supplemental questions to talk to you about, Mr. Woloschuk.

In your declaration you attached some emails that Ramaco had discovered of Mr. Moyes sending information to his personal GMail account.

Do you recall that?

WOLOSCHUK - DIRECT                                                    21

A.  I do.

        MR. MILLER:  Ms. Stutki, will you pull up Exhibit 21.

BY MR. MILLER:

Q.  Can you see it on the screen there, Exhibit 21?

A.  Yes, I can.

Q.  And this is the email Mr. Moyes sent to himself on October 10th, 2025.

        Do you see that?

A.  Yes.

Q.  Was that Mr. Moyes's final day of work?

A.  No, it wasn't.

Q.  What?

A.  July -- sorry?  October 10th?  Yes.

Q.  October 10th, the top email.

A.  I see October 10th.  Yes, it is.

Q.  And it looks like he forwarded an email he had previously sent in July.

        Do you see that?

A.  I see that, yes.

        MR. ELLIOTT:  Objection, Your Honor; leading.

        THE COURT:  Overruled.

BY MR. MILLER:

Q.  What did -- the attachment here in Exhibit 21, what -- do you recognize the file name of that attachment that starts "PEA Report"?

WOLOSCHUK - DIRECT                                                        22

A.   Yes, I do.

Q.   And what is that attachment?

A.   That was the complete Fluor Preliminary Economic Analysis with the attachments that contain all of the work that was conducted, including the test work, the design criteria which was used to design the flow sheet, the mass and energy balances, the economics, the financial model.  So the complete design of the Ramaco PEA was contained in those files.

Q.   Now, you just heard my colleague say that PEA reports are routinely made public and that that's why this PEA Report shouldn't have been made confidential; this is -- it is routinely a public type of document.

How do you respond to that?  Why is this PEA considered confidential?

A.   PEAs are published.  However, it is very common to redact trade secrets, proprietary IP, and there's examples in the industry where that happens.

So we went through exceptional effort to ensure that the public version of our PEA had all of our trade secret information removed from the document.

MR. MILLER:  Okay.  Starting at this part of the transcript, we'd like to designate this part confidential, attorney's eyes only, and to be sealed once the transcript is made.

THE COURT:  Any objection, Mr. Elliott?

MR. ELLIOTT:  No objection, Your Honor.

THE COURT:  This portion of the discussion and record will not be available to the public and remain sealed.

And then, Mr. Miller, I will invite you to let me know when that changes.

MR. MILLER:  Will do.

THE COURT:  You may proceed.

MR. ELLIOTT:  Your Honor, may I?  If this is attorney's eyes only, we would -- we would object to Mr. Moyes being excluded.  He will be testifying on the same subject matter.

THE COURT:  Any objection to that, Mr. Miller?

MR. MILLER:  Not for this part, but there is a section where we are going to ask it to be truly attorney's eyes only and exclude Mr. Moyes later in the testimony.

THE COURT:  When we get to that -- I'm sorry.  When we get to that, alert us, and then Mr. Elliott can weigh in.

WOLOSCHUK - CONTINUED DIRECT                                    55

THE COURT:  Mr. Moyes, welcome back.

Mr. Miller, you may proceed.

MR. MILLER:  Thank you, Your Honor.

**CONTINUED DIRECT EXAMINATION**

BY MR. MILLER:

Q.  Mr. Woloschuk, the creation of the PEA Report in collaboration with Fluor, you referred to the head of global mineralogy or somebody who helped prepare some of those project flows.

Was that you at Fluor?

A.  So we have a subject matter expert at -- I'm sorry -- saying "we" because he now works for Ramaco.  He was the global subject matter expert for rare earths.

Q.  Okay.  And who was that?

A.  Martin Van Wick.

Q.  And then you were at Fluor at the time of the creation of the PEA Report as well, right?

A.  Yes, correct.

Q.  And then when were you hired by Ramaco?

A.  I was hired in May 2025, and I started in mid-June.

Q.  Okay.  And while at Ramaco you worked with Mr. Moyes?

A.  Correct.

Q.  And you worked with him while you were at Fluor on preparation of the PEA Report as well, right?

A.  I did.

WOLOSCHUK - CROSS                                                    56

Q.   When you reviewed Mr. Moyes' declaration, did you review the part where he said that he sent that PEA Report to his personal account on his last day of work because he wanted to keep it as a part of his personal portfolio and that that's a common practice in this area?

Do you remember seeing that?

A.   I saw that, yes.

Q.   Do you agree that it is common practice to keep reports and testing and test data like that for a personal portfolio when you leave a company?

A.   To the contrary, it is never acceptable, and it is -- it is not -- it is not done in the industry.

Q.   Do you have a personal portfolio of all the prior projects you've done for prior companies?

A.   I do not.

MR. MILLER:  I have no further questions, Your Honor.

THE COURT:  Thank you, Mr. Miller.

Cross-examination, Mr. Elliott?

MR. ELLIOTT:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. ELLIOTT:

Q.   Good morning, Mr. Woloschuk.

A.   Morning.

Q.   I understand you previously worked for Fluor before you came to Ramaco; is that right?

A.   That's correct.

Q.   And why did you leave Fluor?

A.   I left Fluor on about June the 12th, 2025.

Q.   And what was the reason why?

A.   Because I was offered a position with Ramaco that I accepted.

Q.   Okay.  Does Ramaco still work with Fluor?

A.   Not on this project currently.

Q.   I would like to ask you about some of the statements in the declaration that you submitted as part of this case.

In paragraph 12 of your declaration, you stated that you "personally reviewed the emails and attachments that we discovered Moyes had sent from his Ramaco email to his personal email, employment between July 8, 2025, and October 10th, 2025."

Your declaration implies that Dr. Moyes first started sending emails to his personal email account on July 8th.

That's not true, is it?

A.   Those are the emails that I saw.

Q.   Okay.  But it is not true that he started sending emails to his personal account on July 8th, is it?

A.   I wouldn't know.

Q.   You didn't ask?

A.   I think the comment I made was that what I saw, the list of documents sent to himself, was between those periods, those

WOLOSCHUK - CROSS                                                    58

dates.

Q.   Okay.  And do you have an explanation for why you chose that date to start looking at emails?

A.   I was asked to review the documents that were sent between those dates.

Q.   Okay.  So someone else sent documents to you to review?

A.   Yes.

Q.   Who was that?

A.   Drew Perry.

Q.   Do you know why Drew Perry chose July 8th as the date for you to start reviewing emails?

A.   I don't know.

Q.   So as you sit here today, do you know whether it is true that Dr. Moyes started forwarding business emails to his account, his GMail account, on July 8th?

A.   The period in question was from July 8th.  Those documents were sent from July 8th.

Q.   My question to you is a little bit more basic.

A.   Sure.

Q.   It is just whether you know as you sit here today whether Dr. Moyes had sent any business emails to his personal account before July 8th.

A.   I wouldn't have any knowledge of that.

Q.   You have no idea?

A.   No.

WOLOSCHUK - CROSS                                                            59

Q.   Have you ever asked anyone?

A.   No.

Q.   Okay.  So if Dr. Moyes says that it was his practice to forward business emails to his personal account for work from home purposes throughout his entire employment, you would have no basis to dispute that?

A.   I wouldn't know, correct.

Q.   Okay.  So based on your own personal knowledge, you have no information that would suggest that anything about his practices with respect to personal email changed on July 8th, right?

A.   Correct.

Q.   Okay.  Mr. Woloschuk, are you a party to a nondisclosure agreement with USA Rare Earth?

A.   I am.

Q.   In your testimony today -- well, let me back up.

     Subject to that nondisclosure agreement with USA Rare Earth, did you receive confidential information from that company?

A.   Yes.

Q.   Have you relied on any of that confidential information in providing testimony today?

A.   I have not.

Q.   Mr. Woloschuk, to your knowledge did Dr. Moyes have a noncompete agreement with Ramaco?

WOLOSCHUK - CROSS                                             60

A.   I never saw his employment account, so I wouldn't know.

Q.   You don't know?

A.   I don't know.

Q.   Do you have a noncompete agreement with Ramaco?

A.   I do not.

Q.   Was Dr. Moyes free to resign his employment at any time?

A.   To my -- to my knowledge, yeah.  I'm not the, I guess, HR person to ask that question, so -- and he didn't report to me, so, you know, I don't know.

Q.   Okay.  So -- but you don't have a contract with Ramaco for any specific term, do you, or do you?

A.   No, I don't.

Q.   No?  So you could resign whenever you want?

A.   Correct.

Q.   Okay.  And you're free to accept employment with any -- any employer, including a competitor?

A.   Correct.

Q.   And would you assume the same would be true for Mr. Moyes?

A.   Could assume so.

Q.   As you sit here today, putting aside the issue of the documents that were sent to Dr. Moyes's GMail account, do you have any knowledge, personal knowledge, of Dr. Moyes using any confidential information from Ramaco that he obtained without Ramaco's authorization?

A.   No, not this -- other than the email that -- emails, I

WOLOSCHUK - CROSS                                                    61

won't know.

Q.  So other than the fact he has documents in his email folder, you have no information suggesting that that's been disclosed or distributed to anyone else?

A.  I don't have any information, correct.

Q.  Do you know if Ramaco has ever searched your emails for files being sent to your personal account?

A.  I don't know if they have, but they are -- they are -- you know, they have the right to do so, so I behave accordingly.

Q.  So would you find it unusual if Dr. Moyes had a practice of forwarding business documents to his personal email account for his entire employment and the company never said anything about it, said it was wrong, said he shouldn't do it?

A.  It's not normal practice to forward business-sensitive email to personal accounts in any employer I've ever worked for, so I wouldn't say it is normal practice.

Q.  Does Ramaco's email policy state that it monitors email use?

A.  They have the right to do so, yes.

Q.  Do you know whether the policy states that they actually do engage in that?

A.  I don't know.  That's probably a question for our IT VP.

Q.  Have you ever heard of any employee at Ramaco being disciplined for forwarding email to their personal account?

A.  Not in the period I've been employed there.

WOLOSCHUK - CROSS                                                    62

Q.  Okay.  And you supervised Dr. Moyes; is that right?

A.  We worked together, but he wasn't my direct report.

Q.  Okay.  Did you work closely with him?

A.  Yes.

Q.  And did the subject of use of personal email ever come up during your discussions with him?

A.  Not that I recall.

Q.  And while he was employed, did you know or did you not know that Dr. Moyes would use his personal GMail to access documents from his home computer?

A.  I had no knowledge of that.

Q.  In paragraph 13 of your declaration, you stated that on July 8th, Dr. Moyes forwarded a confidentiality agreement that he received from USAR to his personal email account; is that correct?

A.  Yes.

Q.  And that confidentiality agreement was not any sort of secret that belonged to Ramaco, was it?

A.  No.

Q.  Okay.  I would like to ask you some questions specifically about the PEA that was prepared by Fluor.

        Is it correct that everything in the PEA Report from Fluor was specifically related to a preliminary economic and technical assessment of the feasibility of producing rare earth elements from Brook Mine?

A.   Yes, correct.

Q.   And there is nothing in Fluor's work related to that that was in the PEA that evaluated the economic assessment of other mines or producing rare earths from any other location, was there?

A.   That's correct.

Q.   Okay.  And you admit that other companies do sometimes make their full PEA documents publicly available; is that right?

A.   Not the details of the attachments.  They make the reports available when there's no trade secrets or proprietary information that they don't want in the hands of the public.  So that's correct.

Q.   So you did review USAR's PEA, correct?

A.   I did.

Q.   Okay.  And did you identify parts of that report that you believed had been withheld?

A.   It wasn't apparent that there was anything withheld from that, correct.

Q.   Okay.  So you have no basis to say that USAR withheld anything from that document?

A.   Not to my knowledge.

Q.   Okay.  Did you use any part of USAR's PEA in the development of the Fluor PEA for Brook Mine?

A.   No, I did not.

Q.   Why not?

WOLOSCHUK - CROSS                                                      64

A.   Because we had our own test work to develop the flow sheet for our project.

Q.   So there wasn't any competitively sensitive information that you thought would be useful or relevant to Ramaco in the preparation of its own PEA?

A.   Yeah.  And there's all kinds of competitors out there, 25 of them, that may have reports.  You know, these are -- these are designs you generate internally, which is what we did.

Q.   Okay.  So as part of the development of the Fluor PEA for Brook Mine, did you refer to or rely on PEAs that were generated by any other mining company?

A.   We didn't rely on the PEAs.  We relied on experience, and there's -- despite all of the geological differences, there are some similar processing routes.  We tried that for the Brook Mine.  As mentioned, we had some success, but we didn't have entire success, so we -- you know, that information we do look at sometimes.  When people report PEAs, we do look at it, you know.  We look at, you know, costs or grades or other things. And we have internal benchmarks of all of the rare earth assets out there because the truth is we are competitors.

Q.   So let me make sure that your testimony is clear on this.

     When you engaged Fluor and were working with Fluor to prepare the PEA for Brook Mine, there wasn't any reference or use of PEAs that had been previously prepared by other mining companies; is that right?

WOLOSCHUK - CROSS                                              65

A.   Yeah, that's right.

        THE COURT:   Mr. Elliott, pardon the interruption.
Unless you have a quick follow-up, I was going to offer to take
our morning break at this time.

        Go ahead.

        MR. ELLIOTT:   Yeah.   Can I ask, like, two questions
quickly?

        THE COURT:   You may.

BY MR. ELLIOTT:

Q.   Along the same lines here, Mr. Woloschuk, for your other
mining companies' PEAs, would it also be the case, similar to
the one that Fluor prepared for Brook Mine, that those reports
would include a description of their successes and the tests
and expectations, mineral composition, that sort of thing?

A.   Yes, that's common.

Q.   Okay.   And but it didn't -- it didn't strike anyone -- you
or anyone at Fluor that those other competitors' PEAs that were
publicly available would be useful or relevant to Ramaco's
effort to produce rare earth elements from the Brook Mine?

A.   Yeah, we didn't rely on other people's processing PEAs.
Yep.

Q.   Okay.   And one question before we take our break here.   I
wanted to ask -- you -- during your prior testimony, I believe
you said it was common for pricing information to be excluded
from public versions of PEAs.

Did you say that?  Is that your testimony?

A.  Yes.

Q.  Okay.  Can you, as you sit here, think of any PEA that you have seen other than Ramaco's that did not disclose pricing information?

A.  Yes.  There's -- there's some other rare earth projects.  I believe Arafura, they don't disclose grade.  That's a rare earth project in Australia that talks about total rare earth oxide grade.  They don't go into the granularity.  They don't -- they talk about basket pricing like we do.  So that's one example.

Q.  So you're saying that that one example you gave, they -- that company did not include pricing information in their PEA?

A.  Yeah.  And I think along the pricing lines, you know, the development of pricing, over the last year, we've had a bifurcation of pricing, so there's been a lot of intel developed in Ramaco about what are these metals actually trading for in the West, whereas other companies have sourced Chinese pricing, which we know is not relevant in western development projects.

So some of that intel, you know, is why we didn't disclose pricing, because they were on actual trades made and on conversations we're having with defense primes and others that we didn't want to make public.

People who do make public in the past and, in fact,

WOLOSCHUK - CROSS                                                      67

perhaps, you know, the Round Top Project, are using historical Chinese pricing, so something from 2019 is no longer current and no longer relevant on the pricing front.

Q.   Okay.

MR. ELLIOTT:  Your Honor, I'm okay with taking a break right now.

THE COURT:  Okay.  Very well.  Thank you, Mr. Elliott.

Why don't we take a ten-minute break, and we will come back and continue.  So ten minutes.

(Recess taken 10:38 a.m. until 10:50 a.m.)

THE COURT:  Please be seated.

Note the presence of the party representatives and counsel for both sides.

Mr. Elliott, you may continue your cross-examination of Mr. Woloschuk.

MR. ELLIOTT:  Thank you, Your Honor.

BY MR. ELLIOTT:

Q.   Before our break, Mr. Woloschuk, we were discussing prices regarding rare earth elements.

To your knowledge, have prices changed with respect to rare earth elements since July of 2025?

A.   Yes, they have.

Q.   Okay.  And would you say that would be true with respect to all rare earth elements, or are some of them the same?

A.   Some have changed marginally; others have changed by orders

WOLOSCHUK - CROSS                                                          68

of magnitude.  So yes.

Q.  How would you characterize the change in the price of gallium?

A.  The price of gallium has gone up significantly, so, yeah, that's one that's gone up appreciably from a year ago.

Q.  Okay.  So prices that may have been quoted in July of 2025 with respect to the PEA that was produced then would be out of date at this point?

A.  Yes.

Q.  Earlier you had testified that you had signed a nondisclosure agreement with USA Rare Earth --

A.  Yes.

Q.  -- and that you have not disclosed any of their confidential information.

     Is that right?

A.  Correct.

Q.  Okay.  Subject to that nondisclosure agreement, were you given access to USA Rare Earth's experimental tests?

A.  Not to my knowledge.  I don't recall.

Q.  Okay.  Did you have access to their lab?

A.  No.  I never visited the lab.

Q.  Okay.  All right.

     With respect to the confidential information that you have, has your phone ever been imaged or your computer ever been imaged to confirm that you haven't disclosed it?

WOLOSCHUK - CROSS                                                        69

A.  No, it hasn't.

Q.  Okay.  How do you think that USA Rare Earth should trust or confirm that you will not, in fact, disclose that information?

A.  USA Rare Earth was trying to hire me, and, you know, I made a decision not to do so.  That was -- that was a year ago, so, yeah, I can't answer for them.

Q.  So a year is a long time and they should just trust that you're not going to disclose their confidential information?

A.  I have no reason to disclose it.

Q.  And do you -- do you have some reason why you think that Dr. Moyes is more likely to disclose Ramaco's information than you would be to disclose USA Rare Earth's confidential information?

A.  Yes, because there's relevance in the ability for them to improve on what they're doing now that would be materially beneficial to them and would be detrimental to us.

Q.  Okay.  So what you learned from USA Rare Earth a year ago isn't relevant, but what Dr. Moyes learned a year ago from Ramaco is relevant.

        Is there some distinction I'm missing there?

A.  When I -- the reason I signed an NDA with USA Rare Earth is because before I was going to make a move from a global engineering company like Fluor, I wanted to ensure there was technical and economic viability for their project.

Q.  Okay.

WOLOSCHUK - CROSS                                                      70

A.   And I came to the conclusion that there wasn't, and that was the reason why the process stopped.

Q.   Okay.  So you concluded that USA Rare Earth's process isn't viable?

A.   At the time, correct.

Q.   Okay.  Do you know whether they've changed their process?

A.   So in the earnings released, the CFO, Mr. Steele, at the end of January, if you look at the transcript, he's said that the process now isn't what they were planning to do in the PEA that was filed with the Court.  So my understanding is their process has changed from the PEA.

Q.   Okay.  Do mining companies sometimes change their process flow sheets?

A.   They do.

Q.   Okay.  And isn't it true that since the Fluor PEA in July of 2025, Ramaco has rolled out an alternative flow sheet designed for the processing of its rare earth elements and critical minerals from coal deposits?

A.   That's correct.

Q.   So the flow sheets that were included in the PEA from last year are not the operative flow sheets that Ramaco is currently using?

A.   That's correct.

Q.   Okay.

          MR. ELLIOTT:  Your Honor, may I approach?

WOLOSCHUK - CROSS                                                          71

THE COURT:  You may.

BY MR. ELLIOTT:

Q.  I'm going to hand you a set of documents.  This is a press release issued by Ramaco dated February 25th, 2026, and it is marked as Defendant's Exhibit V, as in Victor.

Do you recognize Exhibit V?

A.  Yes.

Q.  And is this, in fact, a press release that Ramaco issued approximately a month and a half ago?

A.  This is a report from the full year earnings, yes.

Q.  But it was released to the public by Ramaco?

A.  Yes.

Q.  Okay.  And this would have been issued approximately four months after Dr. Moyes left Ramaco, correct?

A.  Correct.

Q.  Is it correct that Ramaco is currently pursuing patent protection for its new flow sheet process?

A.  That's correct.

Q.  And is it also correct that based on Ramaco's actions today that it believes that no other company can produce rare earth elements from these coal-based deposits that would be in a project similar to the Brook Mine?

A.  Using our patent-pending process, yes.  Correct.

Q.  That's represented in the new flow sheets?

A.  Yes.

WOLOSCHUK - CROSS                                                    72

Q.   Okay.  And isn't it correct that Dr. Moyes had no responsibility and no involvement with the creation of these new alternative flow sheet designs?

A.   That's correct.

Q.   So the new process that Ramaco is pursuing according to the press release here is a design that improves upon the solvent extraction processing techniques that were previously modeled and outlined in the Fluor PEA; is that correct?

A.   That's correct.

Q.   So as of February 25th, 2026, Ramaco announced to the world that it had a process that was better than what was in the Fluor PEA; is that right?

A.   We believe so, yes.

Q.   And that is a totally different process, isn't it?

A.   It uses different reagents in the process, but -- if that's your question, yes.

Q.   I believe the word -- and I'm going to try and pronounce it correctly -- is carbochlorination.

         Is that right?

A.   Yes, that's correct.

Q.   Was Dr. Moyes -- was any of his work related to a carbochlorination process that Ramaco was pursuing at the time that he was employed there?

A.   In the unredacted Fluor report, in the Recommendations, one of the recommendations was for Fluor to -- for Ramaco to pursue

WOLOSCHUK - CROSS                                                        73

a carbochlorination flow sheet.  So although he had no development in it, he was aware that this was an option.

Q.   It was an option that Ramaco did not mention in its public release?

A.   Correct, we did not mention it publicly.

Q.   Is there a reason that Ramaco wouldn't have mentioned that recommendation in their public release?  It seems like something that maybe the investors might be interested in if it was important.

A.   We didn't want to tip off potential competitors to take this flow sheet, pursue it, test it, file provisional patents, and then lock us out of using it.

Q.   But the flow sheet didn't exist in the preliminary economic analysis, did it?

A.   We hadn't conducted any testing, so we weren't aware of the potential recoveries or whether there would be a benefit versus the PEA flow sheet.

Q.   So carbochlorination was a process that Fluor said, Hey, essentially, you might want to try this, but it hadn't been tried at that point, right?

A.   We hadn't tested it, correct.

Q.   And the process that was detailed in July of 2025, would it be the case that Ramaco is no longer pursuing that process?

A.   It is not our plan A, but it is a process that is viable, technically and economically; however, we aren't pursuing it in

WOLOSCHUK - CROSS                                                          74

lieu of something we believe is better.  That's correct.

Q.  Okay.  So if I was to characterize that as not being abandoned but that you're not working on it right now, would that be accurate?

A.  That's correct, yes.

Q.  Okay.  Based on its press release that came out in February, Ramaco believes that the proposed product suite of critical minerals that were described in the Fluor PEA are going to be completely different; isn't that true?

A.  That's not true.  The products -- we're producing similar products, but we're producing additional products and in a slightly different form.  So we're still producing gallium, scandium, light rare earths, heavy rare earths, but in addition we're producing high-purity alumina, high-purity quartz, and we're producing a concentrate that contains rare earth; concentrates rather than separated oxides.

Q.  And based on this, Ramaco now expects to prepare, with the help of a new consulting agency called Hatch, a PEA that has yet to be released; is that right?

A.  That's correct.

Q.  And is it true that Dr. Moyes had no involvement with Hatch's work on the forthcoming PEA?

A.  That's correct.

Q.  So would it be further fair to say that the Fluor PEA does not fairly represent Ramaco's current thinking about its plans,

WOLOSCHUK - CROSS                                                    75

all of the products that it intends to produce, the feasibility of Ramaco's plans, and the economic estimates that were reflected in that report?

MR. MILLER:  Objection; compound.

THE COURT:  Sustained.

If you can just break that up, Mr. Elliott.

BY MR. ELLIOTT:

Q.  Mr. Woloschuk, would it be correct that the Fluor PEA does not represent Ramaco's current thinking about its plans?

A.  That's correct.

Q.  And is it correct that the Fluor PEA does not represent the products that Ramaco currently intends to produce?

A.  Correct.

Q.  And it is also correct that the Fluor PEA does not represent the current thinking on feasibility of Ramaco's plans?  Is that right?

A.  We are going to have a new economic assessment middle of the year.

And I just will correct one of the comments.  You talked about products suite.  There are some products that are the same, like scandium oxide.  So while we are producing a different form of products because of the new flow sheet, these elements in different form are still used for the same end users.  Whether they're a chloride or an oxide, if they're terbium, dysprosium, they go to the same end user.  So they are

WOLOSCHUK - CROSS                                                      76

really the same products.  And when I said "not the same," what I meant is not the same form of chemical, yeah.

Q.  Okay.  So the economic estimates that are reflected in the Fluor PEA would not represent the current economic estimates; is that correct?

A.  For the new flow sheet, that's correct.

Q.  So in your declaration I want to ask you about some of the documents that you've claimed are confidential and/or trade secrets here.

     This is a document that the plaintiffs have already introduced.

     MR. ELLIOTT:  Before I start this, Your Honor, Defense moves to admit Exhibit V into the record.

     THE COURT:  Any objection to Defense Exhibit B?

     MR. MILLER:  No objection.

     THE COURT:  Excuse me.  Defense Exhibit V is received.

  (Defendant's Exhibit V received.)

     THE COURT:  And is the Court's only copy?  This is "the" copy?

     MR. ELLIOTT:  Yes, Your Honor.

BY MR. ELLIOTT:

Q.  The document that I have pulled up on the screen that you can see in front of you is the Exhibit 18A representing a test plan that you testified about earlier.

     Do you recognize that?

A.   Yes, I do.

Q.   Okay.  And is it your contention that this file contains the results of actual tests that Ramaco has run?

A.   You'd have to page down for me to see the entire --

Q.   There are a number of tabs here, and I don't want to belabor this by going through each one, but as you sit here today, do you have any recollection of any tests that were run and recorded in this spreadsheet that you talked about earlier?

A.   Yeah.  This was the sequence of tests which, you know, helped and assisted us develop the PEA flow sheet, all of the conditions throughout different parts of the flow sheet.  So you can see the calcination conditions, how do you prepare it before the primary leach, what are the conditions in the leach, you know -- yeah, so this is the recipe.

Q.   So what I'm asking is -- there's a difference between a recipe and actually baking a cake.

     Is this the recipe or is this the results of your baking the cake?

A.   If you don't have a recipe, you don't have a cake.  So, you know, these go hand in hand.  I wouldn't argue that there's a separation between the recipe and the cake.  It's -- it's the same thing.

Q.   So baking a cake and the recipe are the same thing, but if you have a recipe and then you try to bake the cake and it falls flat, the recipe didn't really work.

WOLOSCHUK - CROSS                                                    78

So my question here is does this spreadsheet or anything in it represent data from actual test results, in other words, after you baked the cake, or is this just plans to bake the cake?

A.   This particular worksheet that you have up is the recipe, but there is a whole lot of tabs, and you'd have to -- you'd have to scroll through the entire spreadsheet for me to see what's in it to answer that question.

Q.   Okay.  The first tab has notes.

Are there any testing results there that you can see?

A.   These are grades, so this is -- this is like a recipe.

Q.   And grinding test work tab, you see that?

A.   Yep.

Q.   Any test results there?

A.   Not on that sheet.

Q.   Okay.  Calcination optimization tests, are those -- those test results or just recipes?

A.   Yes, there's some results.  So it talks about the -- you know, the amount of solids being used, the ratios, you know, what's the solids SG, what's the density of the slurry.  Those are -- those are actual measurements that have been calculated.

Q.   They have been calculated, but have the tests been run in real life?

A.   Yes.

Q.   Okay.  And were those tests run before Dr. Moyes left?

WOLOSCHUK - CROSS                                                    79

A.   Yes.  To my knowledge, yes.

Q.   So the tests described here, whether there are results on any given page or not, these were used to create the process flow sheets that were reflected in the Fluor PEA, correct?

A.   That's correct.

Q.   And those process flow sheets are what you referred to earlier as the Coca-Cola recipe, right?

A.   Yes.

Q.   And the Coca-Cola recipe has changed at this point; the flow sheets are -- have been revised and the ones that were in effect in July 2025 are no longer being pursued?

A.   Partially.  So you've got calcinate -- calcination optimization tests.  Both flow sheets have calcination, so what you're looking at here is relevant to what we're doing in the improved flow sheet.

Q.   I want to refer you to another of the documents that Dr. Moyes forwarded to his personal email.  This is a spreadsheet that was introduced as Exhibit 19A.  It was called an "upside case."

        Do you recognize this one?

A.   I do.

Q.   Okay.  And are the -- the column under column B that says "PEA," is that information that was drawn from the Fluor PEA?

A.   It appears so, yes.

WOLOSCHUK - CROSS                                                    80

Q.   Okay.  And then all of the other columns to the right of that are essentially derivatives of that PEA column; is that right?

A.   That's correct.

Q.   Okay.  And so the numbers that would be reflected in the PEA column are no longer current; is that correct?

A.   Well, they're current for the PEA published.  Those still are valid for that flow sheet.  We don't have a current set of numbers for the current flow sheet.

Q.   Okay.  But the reality of -- based on what Ramaco's doing right now would be not reflected in those numbers; is that true?

A.   Yeah, that's correct.

Q.   Okay.  I'm going to refer you now to Exhibit 20A, Plaintiffs' Exhibit 20A, that was introduced earlier.

     And this was a model that I believe you testified was created by Dr. Moyes; is that correct?

A.   Yes.

Q.   Okay.  And was Dr. Moyes's model used in the creation of Fluor's PEA?

A.   No, it wasn't.

Q.   Was it rejected?

A.   It was an internal tool that kind of became superseded by the other model that was presented earlier.

Q.   Okay.  So this model does not reflect anything that is in

WOLOSCHUK - CROSS                                                    81

the public or the nonpublic version of the July 2025 PEA?

A.   It contains a lot of information that's still relevant, such as grades, such as reagents, all of those things.  There's a lot of sensitive information in this model.  Just because it isn't in the PEA economics, there's a lot of sensitive information in here.

Q.   What would you say is the most sensitive information in this Exhibit 20A?

A.   Um, you know, if you could go through each, again, worksheet -- and I can point them out -- but information on, you know -- so here it is.  You know, we didn't publish the reagents we were using.  You saw earlier the caustics, the acids that we're precipitating with soda ash; we didn't mention that stuff.

     The ore inputs themselves, if you go to ore inputs, that worksheet, all of the information on our, you know, recoveries are in there, you know, extractions by element, recovery by area of the flow sheet.  This is all -- this is all trade secret information.

Q.   So has Ramaco ever produced for sale any rare earth elements?

A.   We're a developer; we're not a producer.

Q.   Okay.  So at this point Ramaco has not ever produced any rare earth elements; is that right?

A.   As a final product, we have not yet.

Q.   Does Ramaco have any contractual commitments to provide rare earth elements to any customer?

A.   We are negotiating those agreements.

Q.   None have been signed yet, though?

A.   That's not my area, but -- to my knowledge not, but a lot of conversations.

Q.   I want to look at the final spreadsheet.  This is Plaintiffs' Exhibit 20B.  There are a number of tabs here.

But your testimony earlier was that this was a financial model that was used in the Fluor PEA in July of 2025?

A.   Yes.

Q.   And can you describe just sort of in simple terms what the purpose of this model is?  What is it used for?

A.   Financial models -- in the mining industry, mining assets are valued by discounted cash flow.  So this model is a discounted cash flow model which has what we call "physicals" in there, so how much ore are you feeding to the plant, what's the grade of the ore, what are the recoveries by element, and then you also have the revenue, the pricing.

So we have pricing by element.  We have the operating and capital costs build-up.  We have, you know, any potential tax credits.  So it gives you the entire financials of a project.  This is probably some of the most sensitive information that is almost never shared between different companies and assets because it is sensitive.

WOLOSCHUK - CROSS                                                    83

Q.  I want to ask you specifically about that.

In the column on the sheet that we're looking at, it looks like there's some element symbols:  SC, that's scandium?

A.  Yes.

Q.  And GA, gallium; is that right?

A.  It is.

Q.  And GE, what is that, germanium?

A.  Yes.

Q.  I don't know all of these.  I haven't taken a science class in a while.

But this was, essentially, Ramaco's estimate about the reserves or resources that were held at Brook Mine at the time of the -- the PEA was generated; is that an accurate statement?

A.  We had -- in fact, if you look at a different column and go down, we -- we inserted the grades, the mining grades, in terms of the model, so this is a more accurate reflection year by year, if you just page up.

So between rows 28 or something -- if you keep going down -- in those shaded areas, 39 -- 39 downward, those are the grades.  If you page over to the left to column A, you can see what the species are; gallium grade, all of that, yes.

Q.  I see.

And based on the changes that Ramaco announced in February of this year, these figures here, are they -- are they the same as they were back in July of 2025, or would they have

WOLOSCHUK - CROSS                                                    84

changed?

A.   Which figures are you referring to?

Q.   The figures related to the -- I guess the reserves of each of the elements that are represented in that row 3.

A.   So the row 3 numbers look to be an historic number.  So what I showed you below from row 39 downward, those were the feed grade that were being sent to the plant.  So a resource is -- is one number, but the mineable feed to a plant could be different.  So our mineable feed is in the financial model populated in the 39 downward.

Q.   Okay.  In your February 2026 release and the note, there were specific statements about scandium, I believe, being de-emphasized -- and I will refer back to that statement, Defendant's Exhibit V -- is that correct?

A.   Yeah, I see that.

Q.   And at the bottom of the first page, Ramaco wrote:  *We now anticipate the largest amount of our revenue will be from a product slate of high-purity gallium, high-purity alumina, and high-purity quartz.*

        Is that -- is that the current plan that Ramaco has?

A.   We haven't finished the PEA and the economics, so that's an anticipation.

Q.   Okay.  But that's what you anticipate right now?

A.   Yes.

Q.   Okay.  And so that hasn't changed since February.

WOLOSCHUK - REDIRECT                                          85

Was that -- was that anticipation regarding the sources of revenue reflected in the Fluor PEA?

A.   No, it wasn't.

Q.   And did the Fluor PEA discuss high purity alumina or high purity quartz?

A.   It did.  High purity alumina, again, was in one of the recommendations to look at potentially pursuing that as a product because this ore body contains significant amounts of the precursor to high purity alumina which is kaolinite.

Q.   But there was no feasibility study that was done in terms of determining the economics of actually producing those elements as part of the July 2025 PEA?

A.   That's correct.

MR. ELLIOTT:  No further questions.

THE COURT:  Thank you, Mr. Elliott.

Redirect, Mr. Miller.

MR. MILLER:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. MILLER:

Q.   Mr. Woloschuk, you were asked whether you're free to resign and go to a competitor by counsel and you said you were?

A.   Sure, yes.

Q.   If you were to resign to go work for a competitor, would you keep Ramaco's PEA reports and these spreadsheets and other documents about Ramaco's Brook Mine with you and on your

personal devices?

A.   No.   The information is owned by the company, not by the employee, so it is not mine to take.

Q.   So you've been asked a lot about your updated flow sheet process that Ramaco is currently pursuing, correct?

A.   Yes.

Q.   And I think when I was asking you questions, you referred to the Fluor PEA as a stepping stone in that direction?

A.   Correct.

Q.   If a competitor had that stepping stone, would that give them any sort of a benefit to developing your current process?

A.   It would give them a stepping stone to potentially developing their own process and potentially understanding that there -- there may be ways to do something else based on what we learned.   So the whole chronology of our flow sheet development could have certainly been, you know, understood by someone else, yeah.

Q.   They wouldn't have to duplicate all of the work that went into the original Fluor PEA testing?

A.   No.   I mean, we spent eight months of testing, and basically the recipes that we put together were -- were -- basically took that amount of time, so you would have an, obviously, advantage of starting from eight months of knowledge on testing.

         MR. MILLER:   Thank you.   No further questions.

WOLOSCHUK - REDIRECT                                          87

Actually, one housekeeping thing, Your Honor.  I believe one of the emails that Mr. Woloschuk talks about in his declaration attached the PEA Report -- there were two that said the PEA Report.  I got Exhibit 21A admitted, but the attachment to the email identified as Exhibit 17 -- it is the same document, but it is Exhibit 17A, and I want to move to admit that if counsel doesn't object.

THE COURT:  Any objection to Plaintiffs' Exhibit 17A?

MR. ELLIOTT:  No objection, Your Honor.

THE COURT:  Very well.  Plaintiffs' Exhibit 17A is received.

(Plaintiffs' Exhibit 17A received.)

MR. MILLER:  Then as a final point, the spreadsheets that have been brought up on the screen, they aren't in the -- they're just too big to print, so I do have a thumb drive that has those and all of our exhibits electronically, if I could provide them to the Court.

THE COURT:  Very well.  And they're attached to the various exhibits with the spreadsheets you've addressed?

MR. MILLER:  Yes.

THE COURT:  Thank you.

MR. MILLER:  No further questions.

THE COURT:  Thank you, Mr. Miller.

Cross -- Recross, Mr. Elliott.

**RECROSS-EXAMINATION**

BY MR. ELLIOTT:

Q.   Mr. Woloschuk, to make sure we are clear and understand what Ramaco's position is regarding the alternative process that is now being prepared and for which it is seeking a patent, is it your -- is it your contention that the process that was developed during Dr. Moyes's employment is a component of that new process flow?

A.   Yeah.  So some of the things that we -- we're doing in that flow sheet, we are also doing in the current flow sheet because, again, the feedstock is the same.  So the preparatory nature of how we alter the minerals, if you want to use that terminology, we are doing it in both flow sheets.

Q.   Okay.  So the old flow sheet, would you consider that to be part of Ramaco's current patent application process?

A.   It is not in the current patent.

Q.   Okay.

A.   But it still remains a trade secret because we developed something that unlocks significant value for gallium and scandium, which are very high-value critical minerals.

Q.   But you are attempting to patent a process that Ramaco believes is superior, correct?

A.   Correct.

Q.   And presumably no one else is going to be allowed to use

WOLOSCHUK - RECROSS                                          89

that process if you're successful in patenting it?

A.   That's the vision.

        MR. ELLIOTT:   Nothing further.

        THE COURT:   Thank you, Mr. Elliott.

        Mr. Woloschuk, thank you for your testimony, sir.  You may step down.

        THE WITNESS:   Thank you.

        THE COURT:   Plaintiffs may call their next witness.

        MR. MILLER:   Your Honor, plaintiffs call Drew Perry.

        THE COURT:   Mr. Perry, if you would please come forward to be sworn.

    (Witness sworn.)

        MR. MILLER:   Your Honor, before I begin, one thing was brought up to me.  We had that portion of the hearing that was sealed and attorney's eyes only with Mr. Moyes outside. There's not a standard protective order or a formal protective order in the docket for this case, so I just wanted to see if we could get clarity on the record the scope of that protective order to ensure that it prevents counsel from sharing it with Mr. Moyes or USA Rare Earth.

        THE COURT:   I certainly think that the AEO designation had that intent.

        Mr. Elliott, was that your understanding as well?

        MR. ELLIOTT:   Yes, Your Honor.  We will not be discussing with our client any of that testimony.

PERRY - DIRECT                                                    90

THE COURT:  All right.  Such a protective order is entered in accordance with your request verbally here, and we will direct that everyone comply with that protective order.

MR. MILLER:  Thank you, Your Honor.

**DREW PERRY, PLAINTIFFS' WITNESS, DIRECT EXAMINATION**

**BY MR. MILLER:**

Q.  Mr. Perry, will you introduce yourself to the Court?

A.  I'm Drew Perry.  I'm the Vice President of Information Technology and Cybersecurity for Ramaco.

Q.  Mr. Perry, you signed a declaration under oath in connection with Ramaco's motion in this case.

Do you recall that?

A.  Yes, I do.

Q.  And your declaration discussed Exhibit 14, which was a chart of the emails Mr. Moyes sent from July to October of 2025.

Do you recall that?

A.  Yes, I do.

Q.  Do you adopt that testimony from your declaration and about Exhibit 14 as your testimony in this proceeding?

A.  Yes, I do.

MR. MILLER:  We offer Mr. Perry's declaration and Exhibit 14 which are filed as ECF 7.

THE COURT:  It is part of the record, but any objection to Exhibit 14?

PERRY - DIRECT                                                                91

MR. ELLIOTT:  No objection, Your Honor.

THE COURT:  Very well, Plaintiffs' Exhibit Number 14 is received.

(Plaintiffs' Exhibit 14 received.)

BY MR. MILLER:

Q.  So I have just a few supplemental questions to go through with you, Mr. Perry.

First, I want to talk about security measures that Ramaco puts in place.

You mentioned that there were security systems at Brook Mine in Sheridan.

Do you recall that?

A.  Yes, I do.

Q.  What kind of security -- let's talk about physical security right now.

What kind of physical security systems does Ramaco have at Brook Mine?

A.  At the Brook Mine facility there is a video camera security system, a closed-caption video camera system, with network video recording that constantly records video of the facilities.

There are line-crossing detection thresholds where if after hours individuals cross specific thresholds into the building, I get an alert over it.  I also have the ability to remotely monitor and view live footage or historic footage.

PERRY - DIRECT                                                      92

We also have -- when I joined the organization, we began evaluating improvements for security, and in October of 2025, we installed a new physical security system that includes door locks, motion sensors, glass-break sensors, and door opening-closing sensors on all the exterior doors.

That's monitored by a local Sheridan, Wyoming company called D.B. Smart Homes & Security, and there's a call tree where if the alarm is ever set off, there's a local contact to receive notice and I receive notification as well.

Q.   Thank you.  And I'm going to ask you just for the benefit of the court reporter just talk slightly slower.

A.   Sure.  Okay.

Q.   Can you explain the security measures that are in place for Ramaco's computer systems?

A.   Certainly.  So our -- for our PCs, work stations, and servers, all of our users do not have what we call administrative access or elevated access to their machines. They're all treated as standard users.

We have a managed service provider called Netranom that has been the MSP providing computer support to Ramaco for several years.  They have remote access to manage all of our computers, and they can provide remote elevated access to users as needed.

As far as cybersecurity is concerned, on all of our work stations and servers we have a managed security service

PERRY - DIRECT                                                        93

provider called Arctic Wolf that has an agent that runs on all of our machines to monitor for malware, to monitor for inappropriate activities, evidence of compromise, and they also receive all of our computer logs and our environment or network logs into a system known as a Security Incident & Event Management System.  We call it a SIEM, or S-I-E-M.  And they use that information to correlate and determine if there are any external malicious threats and provide an alert and response appropriately.

We also on our user accounts -- so we are an organization that uses the Microsoft M365 online collaborative platform.  Our email, our Teams, our OneDrive, Sharepoint, all the tools we use to collaborate as an organization, are hosted there, and all access that employees have is granted on a need-to-know basis through a particular specific process of requesting and approving access at time of hire or role change. And all of those accounts are protected by not only password credentials, but also multi-factor authentification.

Q.   Thank you.

In your declaration you referred to an investigation of Mr. Moyes's email activity after Ramaco learned that he had been hired by USA Rare Earth.

Do you recall that?

A.   Yes, I do.

Q.   Can you explain how that investigation was undertaken?   How

PERRY - DIRECT                                                    94

long did it take?

A.   So on October 29th, after reading the notice of Mr. Moyes's hire by USA Rare Earth, I was instructed by Ramaco counsel to review if his -- if he had any inappropriate communications during the last weeks or months of his employment.

Very quickly I identified the email from July 8th that was a mutual nondisclosure agreement from USA Rare Earth, and I provided that to Ramaco counsel.

Then on November 11th, again at the direction of counsel, I worked with Arctic Wolf, our managed security service provider, to ask them to review the logs of access for not only our email system, but all of our Teams, OneDrive, Sharepoint, all of our file storage system, for Mr. Moyes's account to determine if there was any other inappropriate use of -- of company resources.

At the same time I also engaged Netgain, which is a managed service provider that we used at the time to provide backups of our email platform and our Microsoft 365 platform. I asked them to begin restoring the backups of Mr. Moyes's email for as long as we could go back to the beginning of his employment, if possible, to ensure we had a full and accurate representation of all the emails he had sent and received throughout the entirety of his career.

So that took a significant period of time to restore backups to ensure that we were looking at the entire holistic

PERRY - DIRECT                                                        95

population of his correspondence.

So as a result of that, then, on December 4th, we formally engaged Arctic Wolf to complete a separate forensic evaluation of Mr. Moyes's computer, to do a direct image of the device, provide them with that image, and have them evaluate, in addition to email, did Mr. Moyes copy out files locally from his computer to either a USB drive or upload them to another website, information that may have only been available on his device.

So on December 9th I received the laptop that was shipped to me from the Brook Mine facility and imaged the device at the direction of Arctic Wolf and provided that to them.

Q.   Okay.  And then Arctic Wolf performed their investigation?

A.   Yes.

Q.   And that was mid-December, you're saying?

A.   Yes.

Q.   Did you read the declaration Mr. Moyes submitted in this case?

A.   Yes, I did.

Q.   And so you're aware that he stated that he was never made aware of any email use policies at Ramaco.

Did you see that?

A.   I'm aware of his statement, yes.

Q.   Does Ramaco have a written email use policy?

PERRY - DIRECT                                                      96

A.   Yes, we do, the Acceptable Use of Email Policy.

          MR. MILLER:  Ms. Stutki, will you bring up Exhibit 28.

BY MR. MILLER:

Q.   Mr. Perry, is this Ramaco's email use policy that was in place at the time Mr. Moyes was hired?

A.   Yes, it is.

          MR. MILLER:  Ms. Stutki, if you go to the second page, and if you could blow up Section 4.1.8.

BY MR. MILLER:

Q.   Mr. Perry, will you read Section 4.1.8?

A.   *Users must not send, forward, or receive confidential or sensitive Ramaco information through non-Ramaco email accounts. Examples of non-Ramaco email accounts include, but are not limited to, GMail, Hotmail Mail, Yahoo Mail, and other email services provided by other Internet service providers.*

Q.   So when Mr. Moyes -- the emails that you discovered in your investigation of his activities, when he sent the PEA Report, as one example, to his GMail, did he receive that report using his GMail?

A.   Yes, he did.

Q.   And would that be a violation of this policy?

A.   Yes, it is.

Q.   Did Mr. Moyes sign or acknowledge this policy when he was hired?

A.   Yes, he did.

PERRY - DIRECT                                                        97

Q.   And how did you find that out?  Did --

A.   So working with our Human Resources Department to provide
to counsel a copy of his personnel record, there's a signatory
page of the policies that he acknowledges receipt and review of
on his hire.

          MR. MILLER:  Ms. Stutki, will you bring up Exhibit 31.

BY MR. MILLER:

Q.   Mr. Perry, is this exhibit what you're talking about,
Mr. Moyes's signature page for the company policies?

A.   Yes, it is.

Q.   And what's the date on this?

A.   The date on this is January 24th, 2024.

Q.   Is that when Mr. Moyes was hired?

A.   Yes, it is.

          MR. MILLER:  And, Ms. Stutki, if you could blow up the
first section with those -- with the first sentence and the
three bullet points.

BY MR. MILLER:

Q.   The Acceptable Email Use Policy, that third bullet point,
is that the policy we just reviewed in Exhibit 28?

A.   Yes, it is.

          MR. MILLER:  Your Honor, we move to admit Exhibit 28
and Exhibit 31.

          THE COURT:  Any objection to Plaintiffs' Exhibits 28
and 31?

PERRY - DIRECT                                                    98

MR. OWEN:  No objection, Your Honor.

THE COURT:  Plaintiffs' Exhibits 28 and 31 are received.

(Plaintiffs' Exhibits 28, 31 received.)

BY MR. MILLER:

Q.  So according to the Ramaco records you investigated, Mr. Moyes was made aware of an email use policy and he acknowledged and signed onto that policy?

A.  That is correct.

Q.  Mr. Perry, have you ever sent information -- have you ever sent an email from your Ramaco email to your personal account?

A.  Yes, I have.

Q.  And what kind of emails have you done that?

A.  Particularly event information or invites, if I'm going to a corporate event, so I have directions to get to there.  When I joined the organization, benefits enrollment information that I might need I forwarded to my personal email account.

I also in my function sometimes send test messages internally and externally to ensure that all of our systems are working appropriately -- we call them canaries -- to make sure everything is appropriate.  I will send those to and from my personal account.

Q.  Have you ever sent Ramaco business information -- test information, test results, reports, anything like that -- to your personal --

PERRY - DIRECT                                                              99

A.  No, no.

Q.  When you saw the report of the emails that Mr. Moyes had sent, how did you react to that?

A.  Um, many of them appeared to be -- well, I'm not an expert on the contents.  Many of them appeared to be in clear violation of our Acceptable Email Use Policy.

Q.  Are the emails --

        MR. MILLER:  Ms. Stutki, will you bring up Exhibit 14.

BY MR. MILLER:

Q.  Mr. Perry, Exhibit 14 is the exhibit that was attached to your declaration, and it shows emails starting in -- on July -- when does it start?

        THE COURT:  Can we blow that up?

        MR. MILLER:  There we go.

BY MR. MILLER:

Q.  -- July 8th through October 10th.

        Do you know why that period of time was focused on for this chart?

A.  The initial email that I identified that was the mutual nondisclosure agreement from USA Rare Earth that Mr. Moyes forwarded from his work account to his personal GMail account was the first message on the 8th.

        And so the scope of our initial review and evaluation was all of the emails sent from the time of that email to the end of his employment.

PERRY - DIRECT                                                      100

Q.   And that email was chosen -- that's the earliest you knew that he was in contact with a competitor?

A.   That's correct.

Q.   Okay.  Have you since looked back to find if he had sent other emails to his personal account before that time period?

A.   Yes.  Yeah.  After the initial focus on these emails, we evaluated the entirety of all emails sent to and from his account, from his work account to his personal account, beginning on his first day of employment and concluding on October 10th, 2025.

          MR. MILLER:  And, Ms. Stutki, will you bring up Exhibit 24.

BY MR. MILLER:

Q.   Are you familiar with this exhibit, Mr. Perry?

A.   Yes, I am.

Q.   What is it?

A.   This is a comprehensive list of all emails sent from alex.moyes@ramacometc.com to Mr. Moyes's personal GMail account.

          MR. MILLER:  Move to admit Exhibit 24, Your Honor.

          THE COURT:  Any objection to Plaintiffs' Exhibit 24?

          MR. OWEN:  No objection, Your Honor.

          THE COURT:  Plaintiffs' Exhibit 24 is received.

     (Plaintiffs' Exhibit 24 received.)

PERRY - DIRECT                                                        101

BY MR. MILLER:

Q.  Did you create any sort of a graphic to represent the cadence of his email use during this time period?

A.  Yes.  Upon reviewing all of these messages, I created a monthly chart from the beginning of his employment to the end to evaluate the volume of messages that he sent on a monthly basis.

MR. MILLER:  Ms. Stutki, will you pull up Exhibit 25.

BY MR. MILLER:

Q.  Is this the chart you were talking about, Mr. Perry?

A.  Yes, it is.

MR. MILLER:  Move to admit Exhibit 25, Your Honor.

THE COURT:  Any objection to Plaintiffs' Exhibit 25?

MR. OWEN:  Your Honor, the procedural posture we're in here, no.  I think -- no.  So no.

THE COURT:  Very well.  Plaintiffs' Exhibit Number 25 is received.

(Plaintiffs' Exhibit 25 received.)

BY MR. MILLER:

Q.  Mr. Perry, I see a spike in early '24, and then it goes down a little bit.

Did you gain any insight into why initially when he started work there's a bit of a spike?

A.  The majority of the messages sent during the first several weeks of his employment, similar to my own; he forwarded his

PERRY - DIRECT                                                          102

onboarding information, his benefits information, information about new employment at the organization for himself.

Q.   And then there's -- what are the next two highest months during his employment period of emails going to his personal email account?

A.   So after the spike in February, we can see something of a baseline of a standard about one a week email from the period from March into June of 2025.

In June of 2025 we see a spike that month of emails sent from Mr. Moyes's work email to his personal email, and, again, in September of 2025 we see the highest monthly volume of email.

Q.   And when was the email where Mr. Moyes received the nondisclosure agreement from USA Rare Earth?

A.   The email that he forwarded was July 8th.

Q.   Okay.  So that June spike was immediately prior to that?

A.   That's correct.

Q.   And what month did Mr. Moyes, if you recall, resign?

A.   September of 2025.

Q.   Okay.  And that October number -- when was his last day of work?

A.   His last day was October 10th, so he only worked ten days of the month.  So even though that number seems as a drop-off, it is actually a spike for the amount of time that he worked.

Q.   Do you recall that Mr. Moyes also said in his declaration

PERRY - DIRECT                                                           103

that one of the reasons he would send emails to his personal account was because he wasn't given adequate equipment and Ramaco refused to give him a laptop when he wanted one.

Do you recall that?

A.  I do, yes.

Q.  He talked about not having a big enough screen.

Do you recall that?

A.  I do recall that, yes.

Q.  Did you investigate that issue or look into that at all?

A.  Yes.

Q.  And what did you find out?

A.  On his hire Mr. Moyes requested a custom computer setup specific to his needs.  Most of our employees, the vast majority of Ramaco's employees, are given a standard laptop setup with a docking station and computers and monitors to perform their business functions.  Most employees take those laptops with them when they work from remote sites or move to other workplaces.

Mr. Moyes specifically requested a Microsoft Surface tablet and a docking station and two 23-to-25-inch monitors.

That was provided to him as per his unique request.

MR. MILLER:  Ms. Stutki, will you pull up Exhibit 22. And if you scroll down this exhibit to that page.

BY MR. MILLER:

Q.  Are you familiar with this email string from September of

PERRY - DIRECT                                                    104

2023, Mr. Perry?

A.   Yes, I am.   This string is a series of emails between Jeremy Sussman and Sabrina Duba, highlighting the specific request that Mr. Moyes had for his computer.

Q.   And who is Jeremy Sussman?

A.   He's the chief financial officer.

Q.   And in September of 2023, that was the month before Mr. Moyes officially started at Ramaco, correct?

A.   That's correct.

        MR. MILLER:   And go down to the next page, Ms. Stutki. All the way to the bottom -- the last page, actually.

        How about page 3?

BY MR. MILLER:

Q.   At the bottom of that page, that email from Jeremy Sussman, was that him offering -- this section that's now blown up on the screen is a statement from Jeremy to Alex saying:  *Whatever you need.*  He says:  *In terms of what you like, let me know your preferences on laptops, software, number of monitors, et cetera, and I'll make sure the team gets you set up.*

A.   Okay.

        MR. MILLER:   Okay.  Move to admit Exhibit 22.

        THE COURT.   Any objection to Plaintiffs' Exhibit 22?

        MR. OWEN:   Yeah, it is hearsay.   I would object.

        THE COURT:   Overruled.   Plaintiffs' Exhibit 22 is received.

PERRY - DIRECT                                                         105

(Plaintiffs' Exhibit 22 received.)

MR. MILLER:  Let's go to page 2, Ms. Stutki.

BY MR. MILLER:

Q.  In this email from Mr. Moyes on December 29th back to Mr. Sussman, this is where he requests his equipment.

MR. MILLER:  If you could blow up, Ms. Stutki, his -- before the graphics after "thanks," just his main email message.

BY MR. MILLER:

Q.  So, Mr. Perry, what type of equipment did Mr. Moyes request?

A.  He requested specifically a Microsoft Surface Pro 9 and the docking station that would enable him to run multiple monitors. He also requested two 23-to-25-inch monitors, but he stated he didn't care about the brand.

Q.  Did he request any specific software?

A.  He requested a specific suite, Decision Tools Suite by Palisade, that I believe is a Microsoft Excel add-on.

Q.  So Mr. Moyes had a tablet computer because he asked for a tablet computer?

A.  That is correct.

Q.  Was he given the two monitors?

A.  Yes, he was.

Q.  And were they 23 or 25 inches?

A.  Yes, they were 23-to-25-inch.  It is a categorical size of

PERRY - DIRECT                                                          106

monitors.

Q.   And were those set up in his office?

A.   Yes, they were.

Q.   Yes?  Okay.

     And did he get the Palisade Decision Suite software loaded on to the Surface Pro 9 that he requested?

A.   Yes, he did.

Q.   So when you started -- when did you start work at Ramaco?

A.   I started January 30th of 2025.

Q.   2025.  When you started did Mr. Moyes have this equipment and use this equipment?

A.   Yes, he did.

Q.   At any time did he come to you and say, This isn't cutting it.  I need something better?

A.   Not to my recollection.

Q.   Did you find anybody at Ramaco who could say that he came to them requesting a laptop because that tablet computer wasn't cutting it?

A.   Not for Mr. Moyes.  He did at one point request for members of his team to have improved hardware that was provided to them.

     MR. MILLER:  Ms. Stutki, Exhibit 23.

BY MR. MILLER:

Q.   Do you recognize Exhibit 23, Mr. Perry?

A.   Yes, I do.

PERRY - DIRECT                                                          107

MR. MILLER:  Let's go down to the bottom, the final page.

BY MR. MILLER:

Q.   What do you recall about this email?

A.   So this email is an email chain from Alex to both Sabrina Duba and Jeremy Sussman, the CFO, requesting enhanced and improved computers for Sebastian Skipwith and Grant Hazel who were geologists on Mr. Moyes's team.

They had both initially been provided with our standard laptops that we provide to the majority of the Ramaco workforce.  However, because of the enhanced needs of some of the CAD-type and geographic applications that they use, the standard machines were not powerful enough to operate for them. So he requested beefier machines, and they directly identified a specific model of a Hewlett-Packard machine that they felt would best benefit them.

Q.   Sebastian and Grant, did they directly report to Mr. Moyes?

A.   Yes, to my knowledge.  Yes.

MR. MILLER:  Next page up, Ms. Stutki.

BY MR. MILLER:

Q.   Was that request for better laptops for his team granted?

A.   Not only was it granted, it was granted in four minutes.

Q.   So this email on the bottom of page 2 where it states -- and this is Jeremy Sussman.  He's the CFO, again?

A.   That's correct.

PERRY - DIRECT                                                          108

Q.  He says:  *Alex, this is approved.*  That was four minutes after the email that Alex sent requesting it?

A.  That is correct.

        MR. MILLER:  Move to admit Exhibit 23, Your Honor.

        THE COURT:  Any objection to Plaintiffs' Exhibit 23?

        MR. OWEN:  No objection, Your Honor.

        THE COURT:  Plaintiffs' Exhibit 23 is received.

    (Plaintiffs' Exhibit 23 received.)

**BY MR. MILLER:**

Q.  Did Mr. Moyes in this email, which would have been -- so this is May of 2024, so how long had he been with Ramaco by this point?

A.  Approximately four months.

Q.  Okay.  Was there anything in this email where he requested a better laptop for himself?

A.  No, just his team.

Q.  Say that again?

A.  No.

Q.  Did you find any email in your investigation of his email communications where he requested a better laptop than the Surface Pro that he had previously requested?

A.  I did not.

Q.  Did you ever get requests from Mr. Moyes for software upgrades, licenses, or other computer-related equipment?

A.  I did.  His team had been evaluating throughout the past

PERRY - DIRECT                                                        109

year several applications from companies that specialize in mining software, and many of these evaluations had, by the time I was made aware of them, reached the expiry date and so we were at an immediate turnaround.  And at least twice I received an email from either Mr. Moyes or his team requesting purchase approval for a piece of software that had to be done that day.

So I performed an accelerated evaluation of the application to make sure it was safe and secure for us to even have in our environment.  Then I made the -- approved it, made sure the purchase went through, and had our managed service provider ensure that it was installed correctly.

Q.  Was there ever a software request from Mr. Moyes that was not approved?

A.  No, there was not.

Q.  Okay.  Did you ever talk to Mr. Moyes and his team about getting upgraded laptops yourself?

A.  In -- in August of 2025, I sent an email to Mr. Moyes -- because of the specific nature of the computers his team has fell outside of our standard scope of support -- the majority of our computers are Dell computers that our managed service provider has expertise with and we can purchase managed support contracts for.  I was attempting to move everyone who had a nonstandard device over to a standardized Dell platform so we could improve our pricing and improve support for the teams.

So I sent an introductory email to Mr. Moyes and our

PERRY - CROSS                                                    110

entire Dell representative team stating that not only Mr. Moyes and his team, but also some of our additional folks that work on AutoCAD, could benefit from enhanced systems in the Dell environment and was looking forward to whatever his request could be of the Dell team.

Q.  Did he ever respond to that email?

A.  He did not.

Q.  Do you have any suspicion why?  When was this, August of last year?

A.  It was approximately a month before his resignation.

Q.  Okay.  And you were proposing that because he had custom builds for his team and you were looking for equipment that could be under the Dell service program you had?

A.  That's correct.

Q.  Okay.

        MR. MILLER:  I have no further questions, Your Honor.

        THE COURT:  Very well.  Thank you, Mr. Miller.

        Cross-examination, Mr. Owen.

        MR. OWEN:  May I approach, Your Honor?

        THE COURT:  You may.

                    **CROSS-EXAMINATION**

BY MR. OWEN:

Q.  Good morning, Mr. Perry.

A.  Good morning.

Q.  You testified that you sometimes email your own personal

PERRY - CROSS                                                          111

email from your Ramaco address, correct?

A.  That's correct.

Q.  You said that's a canary, correct?

A.  That's correct.

Q.  Do you receive a notice?  Are you testing to receive a notice when you see that email goes?

A.  I'm testing to see whether or not I receive the message or the delay.

Q.  And so do you -- do you receive a notice when you send an email to your personal email address besides that?

A.  I do not.

Q.  Ramaco has never disciplined any employee for sending emails to their personal email address, correct?

A.  I have not been a part of any disciplinary actions of any other employees doing that, no.

Q.  And Dr. Moyes sent emails to his personal email account essentially from the first day he started working at Ramaco, correct?

A.  He did.

Q.  And, in fact, he sent over a hundred emails to himself before the July 8th date that you analyzed, correct?

A.  That's correct.

Q.  You testified that the July 8th email was an inappropriate email; is that right?

A.  That's correct.

PERRY - CROSS                                                              112

Q. Your testimony is that an NDA from USA Rare Earth constitutes an email that Dr. Moyes can't send to himself?

A. What I testified to is that the policy states that inappropriate or sensitive or secret information or confidential business information should not be sent to uncontrolled Ramaco emails, either GMail, Yahoo, et cetera.

Q. And is USA Rare Earth's NDA sent on July 8th Ramaco's confidential information?

A. That's not my -- my purview.

Q. Well, you said it is inappropriate, right?

A. Let me clarify. My testimony is that the policy states that it is only appropriate to send email to -- it is not appropriate to send email that is confidential or sensitive to GMail, Yahoo, et cetera.

Q. And is Dr. Moyes's NDA from USA Rare Earth Ramaco's confidential information?

A. Again, that is not my purview.

Q. Well, you said that email is inappropriate, so he shouldn't have sent it, is that your testimony?

A. My testimony is that's not my purview.

Q. So you have no opinion about whether he should have sent the July 8th email to his GMail account; is that right?

A. Correct.

Q. You testified that Arctic Wolf imaged Dr. Moyes's device, correct?

PERRY - CROSS                                                    113

A.   Yes.

Q.   You searched for inappropriate activities, correct?

A.   Correct.

Q.   And the only thing I've seen that has been identified are the emails that he forwarded to himself.

     Is that right?

A.   That's correct.

Q.   So you did not find any evidence that he put a USB in the drive and downloaded information, correct?

A.   That is correct.

Q.   Has that report been produced, do you know?

A.   No.

Q.   You did not find any evidence that he did anything besides send emails to his own GMail, correct?

A.   That is correct.

Q.   You found no evidence that he sent emails to anyone outside of Ramaco besides his GMail account, correct?

A.   That's correct.

Q.   And that's after you forensically imaged the device that you had, correct?

A.   That is correct.

Q.   And you enlisted a third-party expert to analyze that data, correct?

A.   Correct.

Q.   Did you review any other Ramaco emails to see if they sent

PERRY - CROSS                                                                114

emails to personal email accounts?

A.   I did not.

Q.   Have you ever?

A.   No.

Q.   Do you have any systems in place to know whether or not Ramaco employees are sending emails to their personal email accounts?

A.   What we have is the Microsoft M365 platform that allows administrative overview into emails that are sent or received. We have the ability to proactively evaluate messages that have been sent or received.  We do not proactively monitor for that type of activity.

Q.   So you don't know -- unless -- am I understanding it correctly that unless you go look at a Ramaco employee's email account, you don't know whether they've sent an email to their personal email account?  Correct?

A.   That's correct.

Q.   You discussed the screens, the monitors, that were purchased for Dr. Moyes.

        Do you recall that testimony?

A.   Yes.

Q.   Those monitors were at the office, right?

A.   Yes.

Q.   Those are not monitors at his home, correct?

A.   They are not.

PERRY - CROSS                                                    115

Q.   In your -- I think -- I apologize.  I want to get your title right.  You're Vice President of Information Technology and Cybersecurity, correct?

A.   Yes.

Q.   Do you do the sort of -- the analysis that we've heard testimony about this morning?  Do you do technical data analysis on mining?

A.   I do not.

Q.   So you don't work on the sort of spreadsheets that Dr. Moyes was working on, correct?

A.   That's correct.

Q.   So you couldn't tell us whether or not the Microsoft Surface Pro that he used would be adequate to manipulate the spreadsheets that, in fact, we couldn't even print for the Court today; is that fair?

A.   It is the machine and hardware setup that he requested specifically to do so.

Q.   But you don't use a Microsoft Surface Pro at all, right?

A.   That's correct.

Q.   Because you don't have the same sort of job as Dr. Moyes, correct?

A.   Correct.

Q.   And the equipment that we discussed was equipment that was at the physical office, correct?

A.   That is correct.

PERRY - CROSS                                                    116

Q.  You did not testify and you couldn't testify that you purchased additional monitors, for instance, for Dr. Moyes's home, correct?

A.  That is correct.

        MR. OWEN:  One moment, Your Honor.

        THE COURT:  You may.

        MR. OWEN:  Appreciate your time.  No further questions.

        THE COURT:  Thank you, Mr. Owen.

        Redirect, Mr. Miller.

        MR. MILLER:  No further questions, Your Honor.

        THE COURT:  Very well.

        Sir, thank you for your testimony.  You may step down, Mr. Perry.

        Well, this might be a logical time to recess for a lunch break.  Looks like we have two additional witnesses to go; is that correct?

        MR. FOSTER:  Correct.

        THE COURT:  Why don't we say 1:15 for a return, and then we'll continue with the presentation of the evidence.

        Anything else we need to address for the plaintiff at this time?

        MR. FOSTER:  Nothing from the plaintiff, Your Honor.

        THE COURT:  Very well.

        For the defendant?

117

MR. ELLIOTT:  Nothing for the defense, Your Honor.

THE COURT:  All right.  Have a nice lunch.  We will see you at 1:15.

(Proceedings recessed 12:00 p.m., April 7, 2026.)

(Proceedings reconvened 1:17 p.m., April 7, 2026.)

THE COURT:  Thank you.  Please be seated.

Well, welcome back.  Hopefully everyone had time to grab a bite to eat or walk around the block or whatever.

I think we're ready for the plaintiffs' next witness.

I do note the presence of counsel and the party representatives.

Mr. Foster, you may call your next witness.

MS. HULL:  We would like to call defendant next, actually, and we're okay with them doing the direct first and proceeding with cross or going directly into our examination.

THE COURT:  Any preferences, Mr. Elliott?

MR. ELLIOTT:  Your Honor, I think we'll go first.

THE COURT:  Okay.  Very well.

Ms. Hull, thank you.

Mr. Elliott, I'll let you call Mr. Moyes.

Mr. Moyes, if you would please come forward to be sworn.

(Witness sworn.)

COURTROOM DEPUTY:  Please state and spell your name for the record.

MOYES - DIRECT                                                    118

THE WITNESS:  Alex Moyes, A-l-e-x M-o-y-e-s.

**ALEX MOYES, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

**BY MR. ELLIOTT:**

Q.  Dr. Moyes, good afternoon.

Can you please provide the Court with a brief introduction of yourself?

A.  Yes.  I'm Alex Moyes.  I live in Wyoming with my wife and two children.  I currently serve as the Senior Vice President of Mining and processing for USA Rare Earth.

Q.  Where do you live?

A.  In Sheridan, Wyoming.

Q.  And is that also where you're employed?

A.  Where I'm employed now?

Q.  Yes.

A.  I -- I work from home, but mostly I spend most of my time in Denver where we have an office.

Q.  Okay.  And are you currently employed by USA Rare Earth?

A.  Yes.

Q.  And can you provide for the Court a description of what your role and responsibility is in your current job.

A.  Yeah.  In my current role I'm responsible for our upstream business unit, so I'm responsible for everything from mine planning, resource, geology, our process flow sheet design, responsible for our R&D lab, and anything that is involved with the development of the Round Top Mine.

MOYES - DIRECT                                                    119

MR. ELLIOTT:  Your Honor, a bit of housekeeping before I go further into my questions.  I failed to request for the witness to enter their declaration, so I'm going to do that at this time.

BY MR. ELLIOTT:

Q.  Dr. Moyes, prior to coming to court today, did you -- do you recall signing a declaration of your statement of your testimony?

A.  I do.

Q.  And let's see here.  I will pull that up here.

The document that you see on your screen here titled "Declaration of Alex J. Moyes," is that the declaration that you signed?

A.  Yes, it is.

Q.  And have you reviewed this declaration again before coming in here today?

A.  Yes, I have.

Q.  And does this declaration represent true and correct testimony, to the best of your knowledge?

A.  Yes, it does.

MR. ELLIOTT:  Your Honor, we would move for admission of the declaration of Alexander J. Moyes and the documents that are incorporated and attached to it.

THE COURT:  Is there an exhibit number attached to this one?  I know it is part of the record under CM/ECF

MOYES - DIRECT                                                    120

Document Number 30-1.  Is there also an exhibit number?

MR. ELLIOTT:  Your Honor, we can enter this as Defendant's Exhibit A.

THE COURT:  And I suspect that it is marked as a Plaintiffs' Exhibit already, is it not, or not?

MR. ELLIOTT:  I don't believe that it is, Your Honor.

THE COURT:  Okay.  Very well.

Defense Exhibit A, any objection?

MS. HULL:  No objection.

THE COURT:  Defense Exhibit A is received.

(Defendant's Exhibit A received.)

MR. ELLIOTT:  And I have marked copies, so I can provide those to the Court.

BY MR. ELLIOTT:

Q.  Dr. Moyes, when did you last work for Ramaco?

A.  October 10th, 2025.

Q.  And what has your employment status been since that date?

A.  Since that date I began employment with USA Rare Earth, I believe October 27th, 2025.

Q.  And did you have some brief period in between your two jobs?

A.  I did.

Q.  In earlier testimony that you heard today there was a lot of discussion about your computer equipment, what you had requested, and what Ramaco provided to you.

MOYES - DIRECT                                                    121

An email was shown at the very beginning -- or, actually, I believe it may have been even before your employment began that had a request for a Microsoft Surface Pro tablet that you had asked for Ramaco to provide.

Do you recall that testimony?

A.  I do, yes.

Q.  And did you at the time of your hire at Ramaco request a Microsoft Surface tablet computer?

A.  I did.

Q.  And did Ramaco provide you with the computer that you had asked for?

A.  They did.

Q.  Can you explain why you asked for Ramaco to provide you with that particular piece of equipment?

A.  Yes.  At the time I was living in Richmond, Virginia, and I was traveling almost every week to Sheridan, Wyoming, which is not a pleasant experience, lots of connections.  And so I was looking for the smallest possible computer that I could at least open spreadsheets and PowerPoints on, knowing that I was going to be moving full time to Sheridan after my children finished their elementary school in Richmond.  And so that's why I wanted that small computer.

Now, I was supplementing that with my own personal desktop.  In December of 2023, Mr. Atkins, among others, had forwarded me to my personal GMail account confidential

MOYES - DIRECT                                                      122

information marked "Confidential" from the Department of Energy which they asked me to review and download, and I did, and I kept that on my personal desktop.  And because I was under MNDA, I believed that it was protected and, of course, I wasn't going to be sharing it with anyone.

So for that time while I was traveling from Richmond to Sheridan and back and forth and back and forth, that is how I was able to supplement the extra work I needed to do from home.

Q.  So at the time you were hired by Ramaco, was the Microsoft Surface tablet computer sufficient for you to do the work that you needed to do at that time?

A.  Yes, it was.

Q.  And there was also testimony earlier today about a request for computing equipment that you had made on behalf of two employees who reported to you.

Do you recall that?

A.  I do.  And my interaction with those employees, they had made multiple requests that were not ever satisfied, and so because I was their new boss, they asked if maybe I had the power to get them the computers they needed.  At the time they were crashing.  They could barely run spreadsheets.  I believe that they were, you know, sending documents home so they could work from home as well.  I immediately saw that they needed to be able to perform their jobs so I requested, and Jeremy

MOYES - DIRECT                                                      123

fortunately obliged, and I was able to get those two employees new computers.

Q.  At any point in your employment was there a need that you had for different computer equipment other than what was provided to you at the time you were hired?

A.  Yes.  Beginning probably early 2025, we had a lot of -- a lot of -- a lot of things to fix, a lot of data to gather, a lot of work that needed to be done, and we started to get to a certain threshold of data and analytics that I was responsible for running.  And so a lot of that data started coming -- coming back.  The labs take notoriously long time to get the data.

So by early 2025, I was finding that my -- that my tablet was not operating as it should to run the intense power BI tools that I was running, and we were also bringing in much more sophisticated software.

So I began having conversations with Scott Kreutzer, our Chief Administration Officer, not only for a better computer, but for a plotter and also for a company truck.  I was taking my personal truck out to site almost every day.  And I was usually placated, We'll look into it.

Then when Drew came on, we had multiple conversations. I told him that, you know, we are running this, as he acknowledged, much more sophisticated software; I need a much more powerful computer to do my job.  And he acknowledged an

MOYES - DIRECT                                               124

email -- I can't remember if it was an email or Teams chat.  I said, Drew, we have talked about this multiple times.  I need more powerful computers not just for me but for my team.

And he said, Great.  The timing could work out.  I have got a meeting with Dell.  I will let you know how it turns out, and I never heard back.

Q.  There was a specific request you recall making for a laptop computer and you were told to, I guess, wait until a further response and you never got a further response?

A.  That's correct.

Q.  Okay.  And do you know whether that request was made by email or by some other means of communication?

A.  I don't remember.

Q.  Okay.  Can you explain how your work with USA Rare Earth differs from what you did at Ramaco?

A.  Yeah.  It differs significantly.  Basically, the work that we do at USA Rare Earth is all in support of the company that we are, which is a manufacturing company.  We manufacture permanent rare earth magnets and we also manufacture and make rare earth element specialty metal alloys, and the upstream side of the business is in support of that.

And unlike Ramaco, who is apparently planning to make a mixed rare earth carbonate among aluminum and other things, we actually make individually separated rare earth oxides that takes very sophisticated solvent extraction circuits, on the

MOYES - DIRECT                                                    125

order of several hundred specific pieces of equipment to make those separations, and USA Rare Earth has that capability and Ramaco does not.

Q.   And can you just provide a very sort of concise explainer for nontechnical listeners what a -- what is a rare earth element and what are they used for?

A.   Yes.   Yeah.   Rare earth elements are very important. They're in the news every day now.   You can't open a news app and not see something about them.   Primarily they're used in very special permanent magnets.   Certain rare earth elements make them incredibly strong.   They give them very powerful magnetic properties so they don't demagnetize when they get into extreme situations like steering the actuator of a guided missile system.   And so it is really a very complex technology.

And so rare earth elements are naturally formed in earth.   They're formed in various minerals and under various geological conditions.

Q.   Which rare earth elements did Ramaco produce when you worked there?

A.   They didn't produce any rare earth elements.   They -- yeah.

Q.   We've talked about the Brook Mine today.

What is the -- what's the Brook Mine?

A.   The Brook Mine is a coal mine located north of Sheridan, Wyoming.

Q.   And, to your knowledge, does Ramaco have any competitors

MOYES - DIRECT                                          126

who operate at Brook Mine?

A.   Not that I am aware of.

Q.   Where does USA Rare Earth operate with respect to rare earth elements?

A.   Yeah.  Our primary deposit is about hour and a half south of El Paso, Texas, on the Mexican border in a small town called Sierra Blanca.

Q.   Is that a coal mine?

A.   No, it is not a coal mine.

Q.   How would you compare or contrast the geologic makeup of the Brook Mine to the Round Top Mine Project where USA Rare Earth is operating?

A.   Yeah.  At the most basic description, they are completely and fundamentally different geologic systems.  The Brook Mine is -- is composed exclusively of what we call sedimentary rocks, rocks that are deposited via erosion, and you see them all over the place.  Sandstones, limestones, those are sedimentary rocks.

The Round Top Mine is what we call a magmatic igneous intrusion.  It is a very hard rock and it created a massive dome, and that is a primary difference geologically speaking is very different rocks, very different ages, but, most importantly, it is the minerals.  The rock is important, but the minerals are by far the most important.

The way that you're going to attack a rare earth

MOYES - DIRECT                                          127

elements or any other critical minerals and, say, a clay, or, in the case of Brook Mine, their dominant rare earth element is called micromonazite -- it is a phosphate mineral -- almost exclusively all of the rare earth elements that USA Rare Earth will be producing comes from a very unique mineral called fluoride, which is a calcium fluoride mineral.  Compositionally it is like an apple and a basketball.

Q.   Among the elements that have been discussed today, the element of gallium was mentioned.

Is USA Rare Earth attempting to produce gallium from the Round Top Mine?

A.   No, not initially.  So there is gallium associated with the Round Top deposit, but because we're exclusively focused on heavy rare earth elements, gallium does not report to our primary flow sheet.  So we view it as an opportunity to extract from waste at some point in the future.

And all of that work is either being done at a third party or we have experts on my staff who contribute to that third party, but it is not part of our upcoming PFS.

Q.   Okay.  So in terms of the -- let me take a step back here.

We've talked about PEAs.

Has USA Rare Earth produced a PEA?

A.   Yes, USA Rare Earth has produced a PEA.  Correct.

Q.   And you said that USA Rare Earth is not seeking to produce gallium.

MOYES - DIRECT                                                    128

If they change their mind about that and they wanted to produce gallium, would they have the know-how to do that based -- at the Round Top Mine?

A.   Yeah, absolutely.  I've got some of the world's best process engineers who work for me, approximately 15 of them, so yes, I'm confident that they have the knowledge and capabilities to come up with their own processes for gallium if we ever decide to pursue it.

Q.   Okay.  If they chose to pursue that, would they need any information that you learned from working at Ramaco?

A.   Absolutely not, because if we were to produce gallium -- it comes out of a waste stream.  I will try to not be too technical, but, again, Ramaco does not do anything with solvent extraction.  Gallium is what we call a waste stream from one of our solvent extraction circuits, and so it would be a very, very different approach to pulling the various quantities of gallium out of a solvent waste stream versus Ramaco is trying to produce it as a primary target.  Very different.

Q.   Another element that was mentioned today is scandium.

Is scandium found, to your knowledge, at Round Top Mine Project?

A.   There is zero scandium at Round Top, and we have thousands of assays to show that.

Q.   We've also heard about, I believe, high purity alumina, high purity quartz -- I may be missing some or leaving some

MOYES - DIRECT                                                    129

out, but is USA Rare Earth attempting to produce those elements from the Round Top Mine location?

A.   Absolutely not.

Q.   All right.  In filing this lawsuit, Ramaco alleged that you started sending emails to your personal email account after a groundbreaking event in July of 2025.

Is that a true statement?

A.   That's false.

Q.   Why is that false?

A.   I began forwarding myself work-related information prior to my employment beginning in December when I first got confidential information from Mr. Atkins, and, therefore, beginning in January of 2024, I continued the practice because it was very convenient for me to travel with my tablet and be able to come home and work on my much larger desktop for the analyses I was accomplishing at the time.

Q.   And at the time that you were hired by Ramaco, you -- as you saw earlier, there was an email policy, I think a lengthy document that the company had.

Do you recall seeing and signing that at the time you were hired?

A.   I do recall the series of documents, and I do recall signing it.

Q.   Okay.  And how closely did you study the content of that email policy?

MOYES - DIRECT                                                    130

A.   Candidly, I was -- I was excited to get started, so I skimmed it and believed that I was in compliance with -- with whatever it was that I signed and that had I not been in compliance, particularly with the email, the -- somebody from IT would have notified me and told me not to send documents to myself and, of course, I would have absolutely complied.

Q.   Prior to being hired by Ramaco, do you recall signing a mutual nondisclosure agreement with Ramaco?

A.   I do.

Q.   And what was the purpose of that agreement?

A.   The purpose of that agreement was to initiate an interview and discuss various aspects of the Brook Mine and see if it was an opportunity that would be mutually beneficial for both parties.

Q.   This exhibit has already been introduced into the record as Plaintiffs' Exhibit 1, and I will just ask if you recognize this document as the -- the MNDA that we're referring to here.

A.   Yes, it is.

Q.   Okay.  And after you signed this -- it looks like it was dated December 15th, 2023 -- how long after that until you actually came on board at Ramaco?

A.   It was approximately a month and a week.

Q.   And during that period between when you signed the MNDA and the time that you started at Ramaco, did you receive any confidential information from Ramaco?

MOYES - DIRECT                                              131

A.  I did, yes, to my personal email, as well as was involved in telephone calls to get up to speed on the confidential information.

Q.  And can you tell me who sent you the confidential information that you received?

A.  It was primarily from Mr. Atkins, as well as his brother, Charles Atkins.

Q.  And where was that confidential information sent to you?

A.  It was sent to my GMail account.

Q.  And were you ever told at any point that you needed to get rid of the documents that were sent to your personal email by the CEO of Ramaco?

A.  No.

Q.  Can you describe for me what kinds of confidential documents that you received from Mr. Atkins?

A.  Yeah.  I got a lot of documents.  The ones that stand out are documents that were generated and produced by the Department of Energy, National Energy Technology Laboratory, labeled as "confidential" for Ramaco eyes only.  And they were minerological analyses; they were assays; they were geological descriptions, core descriptions, core photos.  Many, many, many pages.

Q.  And did you ever disclose or provide copies of those documents that Mr. Atkins or his brother sent to you?

A.  Never.

MOYES - DIRECT                                                        132

Q.   There was a chart that was displayed earlier by the plaintiffs in this case showing the number of emails that went from your Ramaco email account to your personal email account.

Have you gone back to see, like, what sorts of emails you sent from your work account to your home account?

A.   Not in -- not in major detail, no.

Q.   Okay.  Were they all business confidential information, or were --

A.   No.

Q.   -- some of them personal?

A.   No.  It was a mixture of business, confidential business information that I could work on at home; it was personal, and then I also would send numerous public reports.  Oftentimes I would read a public report on my own phone and send it to my work email to finish it from there and vice versa, from USGS, from Department of Energy, whoever it might be.

Q.   So you were sending information for -- business-related information to your personal email address for the purpose of working on those documents from home; is that what you're saying?

A.   Correct.

Q.   And can you explain why you didn't just do that work at your office?

A.   Yeah.  So a lot of times when I would send myself stuff home -- I also had a job where I was out in the field quite

MOYES - DIRECT                                                    133

often, particularly pre-opening of the mine and post-opening of the mine. I was responsible for our drilling programs. I was responsible -- while -- while I was not directly responsible for the operations of the mine, I was basically put in that place because others were not coming out there to do it, so I was out at site two or three times a day. We had two drill rigs running.

I had requested hiring a geologist, which was denied, and so I found myself, you know, mostly in the field chasing rig, logging core, boxing core, moving core around. And so that left me very little time to do any kind of analysis to keep up with our plans to go forward, and so I would send stuff home so that I could keep up with it and work on weekends and evenings.

Q. Okay. So the record is clear here, of all the documents that were forwarded to your personal email account, how many of those have you provided to people at USA Rare Earth?

A. None of them.

Q. And how many Ramaco documents in your personal email account have you used in your job at USA Rare Earth?

A. None of them.

Q. One of the documents that is at issue in this case and that's been discussed extensively today is a full, unredacted version of a PEA Report produced by Fluor for Ramaco in July of 2025.

MOYES - DIRECT                                        134

As I understand Ramaco's claims, this PEA has information that they consider to be highly sensitive and would cause harm if it were to fall into the hands of a competitor.

What is your reaction to that allegation?

A.   I don't think that it would cause harm unless it was put into the hands of a competitor operating at the Brook Mine.

Q.   And based on your experience in the industry, are full Preliminary Economic Analyses generally released to the public or are they typically kept wholly or partially confidential?

A.   My experience is that when a company writes one of these SK1300-compliant reports that they release the full report. You can see that USA Rare Earth's was a hundred and some odd pages versus their 30, so . . .

Q.   And based on your understanding, why do companies release these full reports?

A.   They release them so that investors know exactly what is going into the -- into the financials so that they can make clear and informed decisions that -- that the information is coming together in a technologically sound way.

Q.   Based on your knowledge of what USA Rare Earth's business is and your role there, how beneficial would it be for you to use Ramaco's nonpublic version of their PEA that was created in July of 2025?

A.   Not beneficial at all, primarily because prior to me joining, USA Rare Earth had already developed their own flow

MOYES - DIRECT                                               135

sheet and they were already going forward with that.

Q.   So let me ask you about that.

Are USA Rare Earth process flow sheets publicly available?

A.   Yes.  We have our flow sheet available on our website.

Q.   Okay.  I'm going to hand you a document here that's going to be marked as Defendant's Exhibit W.

MR. ELLIOTT:  Your Honor, may I approach the witness?

THE COURT:  You may.

BY MR. ELLIOTT:

Q.   Mr. Moyes, do you recognize the document that's labeled as Defendant's Exhibit W?

A.   I do.

Q.   And what is this?

A.   This was a presentation I gave to approximately 50 of our investors.

Q.   Were you responsible for preparing this presentation?

A.   Yes, I was.

Q.   And is this a document that is publicly available?

A.   It is.  You can download it directly from our investor website.

Q.   Did you use any information from Ramaco to make this presentation?

A.   None whatsoever.  My very excellent team at USA Rare Earth had already put this flow sheet together before I arrived.

MOYES - DIRECT                                                    136

Q.   I'm going to ask you to turn to page 7, which I will put on the screen here.

Can you tell me what is represented on page 7 of this presentation?

A.   I can walk through it at a very high level.

So you heard a lot about Ramaco's crushing and fine grinding and calcination and cooking their ore.  We don't do any of that.  We mine the rock.  We crush it.  We make it very large, and we stack it into a big pile, and we do what is called a heap leach.

That heap leach lasts for anywhere from 120 to 180 days where we use dilute sulfuric acid, kind of like a drip line in your garden.  And it drips through the ore and is collected and goes into a big pond.  We call that pregnant leach solution.

That pregnant leach solution is then immediately pumped into our hydrometallurgical facility where it gets treatment for iron, but then it goes directly into solvent extraction.

And without going into too many details here, one of the primary things is our first solvent extraction -- we also have uranium and thorium at our Round Top mine, so we have to remove uranium and thorium, hafnium and zirconium, none of which --

(Reporter requested clarification.)

MOYES - DIRECT                                                    137

A.   Then we also remove what is called hafnium and zirconium in that first solvent extraction step, none of which those four elements exist at the Brook Mine.

From there, we go down and we do a bulk separation of our rare earth elements, our heavy rare earth elements, that is.  We're only producing heavy rare earth elements.  Again, without boring the audience, heavy rare earth elements are very specific, very different from the light rare earth elements.  So we separate all of our heavy rare earth elements, and then we get into individual separation of those heavy rare earth elements.  We pull dysprosium out; we pull terbium out; we pull yttrium out, and we pull gadolinium out.  And these are very complicated and sophisticated processes that take hundreds and hundreds of pieces of equipment to do so.  And we are one of the few companies in the world outside of China that have this capability.

Q.   Thank you, Dr. Moyes.

Earlier Ramaco referred to their process flow sheet as their Coca-Cola recipe, and the document that we're looking at here that says "Round Top process flow sheet," is there anything from Ramaco's flow sheet that is incorporated into this flow sheet?

A.   Not one thing.

Q.   When was this process flow sheet developed?

A.   Prior to my joining the company.

MOYES - DIRECT                                                    138

Q.   Were you involved in any way with the development of the Round Top process flow sheet?

A.   No.

Q.   Has the Round Top process flow sheet been changed to incorporate any information that you have learned from Ramaco since you joined?

A.   I don't know whatsoever.

Q.   In the complaint there was a reference to a press release that was issued by USA Rare Earth in December of 2025 -- yes, this has already been admitted as Plaintiffs' Exhibit 11.

Do you recognize this press release here?

A.   I do.

Q.   Okay.  And Ramaco's alleged that in December 2025 that USA Rare Earth had accelerated its timeline for development of the Round Top deposit by two years and has insinuated that that had something to do with information that came from Ramaco.

Would you agree with that allegation?

A.   No, it's completely false.

Q.   And why do you say that?

A.   Because the reason we accelerated had nothing to do with the development of our flow sheet.  It had to do with when I came on board and saw how impressive USA Rare Earth's laboratory facilities were, how impressive the team was, and all of the analytical work and the pilot work they had done -- they had excellent data, and so we determined that we should be

MOYES - DIRECT                                                     139

moving into our preliminary feasibility study.

And we wanted to accelerate, so typically what you would do, you'd do your preliminary feasibility study which is based on preliminary laboratory testing and usually some pilot work.  We already had that.  After you do the feasibility study is you'd do what is called a demonstration, a much larger scale -- you know, you're running much larger ore samples to prove that your process can scale.

And we chose to take some risk, you know, given -- given our results, and that we would run our preliminary feasibility study in parallel as we were doing our demonstration scale right there at our Wheat Ridge facility. We had acquired another 6,000 square feet of laboratory.  And so while we're doing the PFS, we're also actively in the process of running our commercial -- commercial-grade demonstration facilities.

So when our PFS concludes sometime in September, our demonstration scale work and all that data will conclude and we will be able to roll directly into our definitive feasibility study and start our early engineering work down at Round Top. So by running parallel versus sequential, we were able to compress our time frame, we think, by approximately two years.

Q.   Okay.  So if I can condense that answer down to maybe something a little bit more simplistic, you said you're running parallel processes.

MOYES - DIRECT                                                    140

A.   Correct.

Q.   The way that I take that is that you mean that you were running two different processes at once rather than changing one process.

     Is that -- is that an accurate characterization?

A.   That's an accurate characterization.

Q.   Okay.  There was also an allegation made in this complaint about a USAR investment that was announced in January of 2026 that included government funding and private investments.

     Are you familiar with that -- that investment?

A.   Yes, I am.

Q.   Okay.  And were you involved with USAR's efforts to secure those investments?

A.   Yes, I was.

Q.   Was there any Ramaco information that was used in the process of obtaining those investments?

A.   None whatsoever.

Q.   And can you describe generally what factors led to USA Rare Earth's earning that -- those investment funds?

A.   Yes.  We were engaged by the Department of Commerce, a group, as far as I know, Ramaco was never involved in.  And they were specifically looking to fund a company that was vertically integrated that had the ability to produce the magnets.  At the end of the day that's what they wanted was the magnets, so they wanted a company that could make the

MOYES - DIRECT                                                  141

high-performance rare earth magnets, a company that had the full ability to make the rare earth alloy metals, which there's no company outside of our company outside of China that can do that.

Then, of course, the icing on the cake was that we had the Round Top deposit and we could produce our own separated and purified oxides, which not many companies outside of China have the ability to do.

So they were looking for a fully vertically integrated manufacturing company to invest in.

Q.   And is Ramaco a full vertically integrated manufacturing company?

A.   No, they're a coal mining company.

Q.   I want to ask you now about some of the documents that have been specifically identified as being sent to your GMail account that Ramaco has alleged are confidential or trade secret.

And I'd like to start with the document that was entered as Plaintiffs' Exhibit 18A, which you will have on your screen here.

A.   Yes.

Q.   When Mr. Woloschuk was on the stand, he testified that the page that we're looking at here contained results from actual tests.

Do you agree with that assessment?

MOYES - DIRECT                                                    142

A.   I believe it is false.

Q.   And why do you say that?

A.   Because each one of these columns represents different experiments that were to be done, and if you see the bottom where he claimed those results, every single one of those numbers is the exact same.  And so those were predicted outcomes, predicted masses, basically information to help the laboratory understand what might be contained in the sample, but they are not results from those specific tests or else those numbers would all be different.

Q.   Okay.  And are you familiar with the content of this spreadsheet, just generally?

A.   Yes.

Q.   Okay.  And in terms of your knowledge of this spreadsheet here, are you -- is it your testimony that there is or is not any actual test results contained in this spreadsheet here?

A.   It is my testimony that there is not actual results contained in this spreadsheet.

Q.   Okay.  And so the record is clear, why did you forward this particular document to your GMail account?

A.   Yes.  Because, contradicting -- contradictory to what Mr. Woloschuk said, this -- I believe this document was actually created after the PEA.  Ramaco was not happy with our current third-party lab called Hazen, and so as we were looking to move forward, we wanted to, you know, take the one test that

MOYES - DIRECT                                                      143

underpinned the PEA and develop a test protocol for whichever new third-party lab we would hire to undergo these various experiments.

And, again, given the time I was spending, about 9 to 12 hours a day at the mine site, I had to catch up and make sure that I understood exactly the work that was getting proposed for any third-party analysis, particularly since I had been involved with from the beginning working with Fluor on designing these various experiments.

Q.   So you had work to do and you needed to work on it from home; is that why you forwarded it to your email?

A.   Yes, sir.

Q.   Was there any reason other than that?

A.   None.

Q.   Next I'd like to ask you about what has been entered as Plaintiffs' Exhibit 20A.  This has been identified as a model that you created.

Is that right?

A.   That's correct.

Q.   And do you recall why you would have sent this document to your personal email account?

A.   Yeah.  I had spent hundreds of hours and iterations.  I had emailed myself this document multiple times as I was continuously making it better.

At some point some -- some weeks before this, I was

MOYES - DIRECT                                                    144

admonished by Mr. Atkins, saying that this was no longer a relevant model and that the only model we would use for any kind of financial analysis or techno-economic analysis would be the Fluor one.

And so given my pride, I wanted to understand what was wrong with my model and compare it to the Fluor model.

Q.  So is it that you wanted to look at it further from home?

A.  Yes.

Q.  Is that why you sent -- was there any other reason that you needed to have this sent to your personal GMail account?

A.  None whatsoever.

Q.  I will now direct you to the spreadsheet that's been entered as Plaintiffs' Exhibit 20B, and this has been identified as a Fluor financial model that was included as part of the Fluor PEA.

Same question about this:  What was the reason that you sent this to your personal Gmail account?

A.  Yeah.  Since this was the model that the company wanted to use as the primary source of techno-economic analysis, I wanted to see, if I had the time at home, if I could figure out what was correct about their model and what was wrong about my model because I wanted to make sure I corrected mine.

Q.  Okay.  And did you have any other purpose for sending it to your personal Gmail account other than to be able to look at it from your home computer?

MOYES - CROSS                                                    145

A.   None whatsoever.

        MR. ELLIOTT:  Nothing further.

        THE COURT:  Thank you, Mr. Elliott.

        Ms. Hull, cross-examination.

**CROSS-EXAMINATION**

**BY MS. HULL:**

Q.   Dr. Moyes, when you left Ramaco on October 10th, 2025, did you keep your company computer or turn it in?

A.   I turned it in.

Q.   Why did you do that?

A.   They asked me to turn it in.

Q.   Okay.  And did you understand that the computer belonged to them?

A.   Of course, yeah.

Q.   Did you think that Ramaco's policies permitted you to take or attain other Ramaco property when you were no longer employed by Ramaco?

A.   No.

Q.   Okay.  I'd like to pull up Exhibit 2 here.

        Dr. Moyes, before you started working at Ramaco, you signed an employment offer letter; is that right?

A.   Correct.

Q.   And this is in addition to the NDA agreement that you looked at for a moment with your counsel?

A.   Correct.

MOYES - CROSS                                                    146

Q.  I'd like to take a quick look to the middle -- at the middle paragraph on the second page, if we could, Ms. Stutki.

And there's a paragraph that reads:  *You acknowledge* -- let's see where this is.

*You acknowledge that upon acceptance of your employment with Ramaco that you will have access to trade secrets and other confidential information of Ramaco and its affiliates.  Accordingly, you agree that you will not at any time disclose to others or use for your benefit or for the benefit of others any such trade secrets or other confidential information and that you will sign Ramaco's standard form of confidentiality agreement.*

Did I read that correctly?

A.  You did.

Q.  And is that your signature at the bottom of this page?

A.  It is.

Q.  I would like to now pull up Exhibit Number 4 and this is the Ramaco code of conduct.

Do you recognize this document, Dr. Moyes?

A.  I do.

Q.  And when you started at Ramaco, did you review this document?

A.  Yes, I skimmed it.

Q.  Okay.  Turning to pages 14 and 15 of the agreement, if we could, we see that there is what's been labeled "Annex A, Code

MOYES - CROSS                                                        147

of Conduct Certification."

And the first paragraph here says:  *I have read and understand the code of conduct of Ramaco Resources.  I agree that I will comply with the policies and procedures set forth in the code.*

Do you see that, Mr. Moyes?

A.   Yes, I do, on the left.

Q.   And on that second page here, is that your signature and handwriting for the date?

A.   Yes, it is.

Q.   When you signed the code of conduct, you understood that you were representing that you agree to comply with the code; is that correct?

A.   Absolutely.

Q.   Jumping back to page 7 here, we're going to see a Section called "Use of Company Property and Resources," and a subsection called "Protection and Proper Use of Company Assets."

The second paragraph there reads:  *The obligation of employees to protect the company's assets includes an obligation to protect the company's proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, databases, records, salary information, and any unpublished financial data and*

MOYES - CROSS                                                       148

*reports.  Unauthorized use or distribution of this information violates company policy and could also be illegal and result in civil or criminal penalties.*

Did I read that correctly?

A.  Yep.

Q.  And on page 9 there's a subsection called "Confidentiality."

The first sentence of that section reads:  *Directors, officers, and other employees shall maintain the confidentiality of information entrusted to them by the company or its customers, except when disclosure is authorized and legally mandated.*

Did I read that correctly?

A.  You did, yes.

Q.  And in the last sentence of the same paragraph we see:  *Any documents, papers, records, or other tangible items that contain trade secrets or proprietary information are the company's property.*

Do you see that?

A.  I do.

Q.  A few minutes ago you admitted to forwarding certain confidential Ramaco information to your personal email address; is that correct?

A.  Correct.

Q.  I want to talk about a few of those things that you already

MOYES - CROSS                                                         149

covered with your counsel, so I think we will be able to move through them pretty quickly.

First, on the PEA Report, you forwarded yourself a full, unredacted, unaltered version of that PEA Report, correct?

A.   Correct.

Q.   And you're aware of the full content of that report?

A.   I'd have to go back and reread it, but generally speaking, yes.

Q.   Do you believe that the PEA Report and its associated data, attachments thereto, contained trade secrets?

A.   I believe that it contained confidential information.

Q.   Okay.  Are you differentiating between confidential information and trade secrets?

MR. ELLIOTT:  Objection, Your Honor, to the extent this is calling for a legal conclusion.

THE COURT:  Overruled.  If he knows, he may answer.

A.   Yeah.  We had never had any conversations at Ramaco that any of those would be called trade secrets, just that they were confidential.

BY MS. HULL:

Q.   Okay.  Do you believe that there's any difference in the trade secret or the confidential status of the information contained within that PEA Report between today and the date that you resigned?

MOYES - CROSS                                                              150

A.   Can you say that one more time?

Q.   Sure.  Is there any difference in how you would categorize whether the information in the PEA Report is -- whether it is confidential or not based on the day that you resigned, so October 10th, and today?

A.   Sure.  No, I believe that it is still confidential, which is why I've maintained it purely confidential.

Q.   Okay.  And if we could pull up Exhibit 21 here.

     We'll see an email -- and the top email, we can see that you forwarded this to yourself on October 10th, 2025.

     That was the last day of your employment with Ramaco?

A.   Correct.

Q.   Okay.  And if we look at the email you were forwarding, it is called "Fluor PEA," and you were writing to two individuals and copying a Charles Atkins.

     But you drafted this base email on July 10th, correct?

A.   Yes, ma'am.

Q.   In the second sentence you wrote:  *This contains highly sensitive and confidential information*, correct?

A.   Correct.

Q.   Did you add the annotation that we see on that sentence?

A.   Yes.  And the reason I did so, we had not completed a resource report which should be accompanying a PEA.  That's standard practice.  And so the company was rushing to put a resource report together with our geological consultants.  And

MOYES - CROSS                                                    151

Fran and John were asking for the PEA, and -- for multiple days they did not want to provide the PEA to these consultants, and so finally convinced them.  And they said, As long as you put in there that it contains highly sensitive information, then you can send it to our geologic consultants so they can do their resource report.

Q.  So then you included that annotation; you made it bold; you made it underlined, and you made it italic?

A.  I was instructed to.

Q.  Who instructed you to do that?

A.  Charles Atkins.

Q.  And then the second -- the third sentence here, you write: *Please do not share or use this for anything other than getting the required information needed for TRS resource classification.*

Is that what you were just talking about that Fran and John were working on?

A.  Correct.

Q.  And why did you forward this specific email to yourself on the day of your resignation?

A.  It wasn't really the specific email.  I wanted to send myself the PEA because it was the first PEA I've ever completed in my professional career; I was proud of it, and I wanted to retain a copy for myself.

Q.  And you could have accessed the publicly available version

MOYES - CROSS                                                    152

of the PEA, correct?

A.  Correct.

Q.  Why did you want this unaltered, unredacted version?

A.  Because that was the one that had the blood, sweat, and tears in it.

Q.  Had you previously forwarded yourself a copy of the unredacted PEA before?

A.  I'm sure.

Q.  And yet you chose to forward it again on your last day?

A.  I couldn't remember if I had or not.

Q.  Have you personally viewed or otherwise accessed the PEA Report or any of its attachments since you resigned from Ramaco?

A.  No, ma'am.  In fact, I don't think I've accessed any of the documents I forwarded myself since I left Ramaco.

Q.  So let's talk briefly about some of those other documents. And I would like to save us all some time and not pull up the spreadsheets.  Helpful that you just looked at them.

     But I want to ask you, with respect to that series of spreadsheets, do you believe that any of those spreadsheets contain trade secret information?

     MR. ELLIOTT:  Same objection, Your Honor; calls for a legal conclusion.

     THE COURT:  Overruled.  He may answer if he knows.

A.  I believe that there was confidential information in there.

MOYES - CROSS                                                    153

THE COURT:  Do you know what the distinction in the industry is between a trade secret and confidential information based on your work?

THE WITNESS:  Not really.

THE COURT:  Does USA Rare Earth label documents in your present capacity as trade secrets?

THE WITNESS:  It does not.

THE COURT:  Confidential?

THE WITNESS:  Confidential, yes.

THE COURT:  Pardon the interruption.

MS. HULL:  No problem, Your Honor.

BY MS. HULL:

Q.  And same sort of question that I asked before:  Those spreadsheets, you understand that they contained this confidential information that was confidential as of the date that you forwarded them to yourself, correct?

A.  Correct.

Q.  Do you believe that the information contained within those spreadsheets is still confidential today?

A.  I believe that it -- I would still treat it as if it were confidential, as I have.

Q.  In addition to the PEA Report and the spreadsheets we specifically talked about, did you also send yourself other Ramaco data, information, throughout the course of your employment?

MOYES - CROSS                                                    154

A.   I did, yep.

Q.   And would you categorize any of that information as confidential like the PEA Reports, like the spreadsheets?

A.   I would, yeah.

Q.   Have you personally viewed or otherwise accessed any of the spreadsheets since your resignation?

A.   Not to my knowledge.

Q.   What about any of the other Ramaco information you forwarded?

A.   Not to my knowledge.

Q.   Have you shared any Ramaco confidential information with any party since your resignation?

A.   Never.

Q.   So talking -- turning for a moment back to kind of the email activity, you admit that you sent Ramaco files and information to your personal GMail account?

A.   Uh-huh.

Q.   Can you confirm what GMail account that is?

A.   moyesalexj@gmail.com.

Q.   Do you have any other personal email accounts that you use?

A.   I do.  I have my Apple ID.

Q.   Did you ever send any Ramaco information to your Apple ID?

A.   I did not, but I would send myself articles from my Apple ID to Ramaco, news articles.

Q.   What's your Apple ID?

MOYES - CROSS                                                             155

A.   woodcrestenergy@gmail.com.

Q.   How often would you say that you sent yourself Ramaco information from your Ramaco account to your GMail?

A.   Two, three times a week.

Q.   So over a hundred times total?

A.   Well over a hundred times, yeah.

Q.   And are you aware that Ramaco had a policy that prohibited forwarding Ramaco information to personal email like GMail?

A.   I understood there was a policy, but I misunderstood the context and -- and believed that if I was doing something wrong, as they have mentioned multiple times they were monitoring it, they would have pulled me aside and said, Hey, please don't do this.

Q.   Are you aware of Ramaco actively monitoring its employees' emails like that?

A.   I am not aware.

     MS. HULL:  If we could pull up Exhibit 28.

BY MS. HULL:

Q.   This is the Acceptable Use of Email Policy, and on the second page -- let's see here -- third -- second paragraph, Section 4.1.8, we see that:  *Users must not send, forward, or receive confidential or sensitive Ramaco information through non-Ramaco email accounts.  Examples of non-Ramaco email accounts include, but are not limited to, GMail, Hotmail, Yahoo Mail, and other email services provided by other Internet*

MOYES - CROSS                                                      156

*service providers.*

Did I read that right?

A.   You did.

Q.   Your testimony is that you read this policy or you skimmed this policy when you began employment at Ramaco?

A.   Correct.

Q.   Do you acknowledge that your practice of sending information to your personal email violated this policy?

A.   I acknowledge in reading it closely, yes.

Q.   In paragraph 11 of your declaration, you stated: *At no point during my employment was I told or instructed that sending documents to a personal email account was prohibited or against Ramaco's policy.*

Do you acknowledge now, having seen the policy, that that statement is not accurate?

A.   Agreed.

Q.   You also mentioned while testifying with your counsel a little bit ago that Mr. Atkins had sent you certain personal -- or certain confidential information to your personal email before you began working at Ramaco?

A.   Yes.

Q.   At that point you had already signed the NDA with Ramaco, correct?

A.   Correct.

Q.   And you did not yet have a Ramaco employee email address,

MOYES - CROSS                                                157

correct?

A.  Correct.

Q.  So there would have been no way for him to send you that information to a Ramaco email address at that point, correct?

A.  At that point.  He could have waited until I had one.

Q.  Your declaration also mentions a couple consultants who you mentioned used their own personal or professional email addresses, not Ramaco-issued emails?

A.  Correct.

Q.  Ramaco consultants do not receive Ramaco-issued email addresses, correct?

A.  They've asked for them and they don't get them.

Q.  And you were not a Ramaco consultant at any point, correct?

A.  No.

Q.  After you would forward yourself the personal -- or the confidential information to your personal email account, what devices would you use to access that information on?

A.  My desktop computer.

Q.  Okay.  Do you still have that computer today?

A.  I do.

Q.  Any other computers that you would access it on?

A.  No.

Q.  What about tablets, iPads, anything like that?

A.  No.

Q.  On your phone?

MOYES - CROSS                                                      158

A.   Yeah, on my phone.

Q.   Okay.  Do you still have the same cell phone that you used while employed by Ramaco?

A.   I do not.

Q.   Okay.  When did you get a different phone?

A.   I have no idea.  Several months ago.

Q.   Do you recall whether it was this year or last year?

A.   I don't recall.

Q.   Did you do anything to retain a copy of the information on your prior phone before getting a new one?

A.   Absolutely, yep.  And I complied with the letter sent December 17th to retain all of my digital information.

Q.   Did you receive that letter before you got a new phone?

A.   I don't believe so.

Q.   Okay.  But you still had the phone at the point that you received that letter?

A.   I want to make sure I'm not getting twisted up.  I believe that I had my new phone prior to receiving that December 17th letter.

Q.   Okay.  Do you still have access to your old phone?

A.   No.

Q.   Did you transfer data, apps, things like that, from your old phone to your new phone?

A.   I did, yeah.

Q.   Are there any other devices, external drives, cloud-based

MOYES - CROSS                                                        159

accounts, anything like that, that you used in connection with accessing, reviewing, revising Ramaco information?

A.   None.

Q.   After you opened Ramaco information on your desktop computer, what would you do with the information?

A.   Typically, I would download it and work on the document and send it back.

Q.   How would you send it back?

A.   Usually to my Ramaco email address.

Q.   And you would send it from your personal email back to your Ramaco email?

A.   Yeah.

Q.   Did you ever send it from your personal email back to someone else at Ramaco?

A.   Never.

Q.   Why not?

A.   I didn't have any reason to.

Q.   Did you ever ask Ramaco employees to send you information on your personal email account?

A.   No.

Q.   Why didn't you access your Ramaco Outlook email using the Outlook browser on your desktop?

A.   I'm not sure how to do that.

Q.   Are you aware that was an option you could have used here?

A.   No.

MOYES - CROSS                                                    160

Q.   Let's keep talking about the equipment that was used here.

We've heard a lot about your laptop/tablet/computer. And I believe that your testimony on this earlier was clear, but just to make sure, when you were hired, did Ramaco provide you with the computer equipment that you requested?

A.   Correct.

Q.   And if we want to pull up Exhibit 22, I won't belabor the point, but essentially shortly before you started at Ramaco they reached out to you and asked you what your preferences were, correct?

A.   Correct.

Q.   And they gave you the equipment that you requested, correct?

A.   Correct.

Q.   Did you at any point request from Ramaco a home office setup?

A.   No.  I didn't have a very big home office and I had my desktop computer.

Q.   Did you ask for a separate docking station so that you could dock your laptop at home and use it in the same way that you used it in the office?

A.   No, I just used the docking station at the office in Sheridan.

Q.   Did you ever tell anyone at Ramaco that you were using your personal computer at home to conduct work?

MOYES - CROSS                                                          161

A.   I don't recall.

Q.   Did you specifically request monitors or a laptop for home use because your laptop there -- your Surface Pro was not sufficient for working at home?

A.   No, because I felt like I wasn't breaking any rule by using my personal computer at home and traveling with my tablet.

Q.   And in addition to the email that we're looking at right now where you requested your own setup, we also talked a little bit about Exhibit 23, which is the request for Sebastian and Grant and their computer setups.

A.   Yes.

Q.   In that email you do not include any request for yourself, correct?

A.   Correct.  I was still traveling at the time.

Q.   And you -- did you at any point in time go to your supervisor in the way that Grant and Sebastian came to you to request an upgrade or suggest that the equipment that you were working on was not sufficient to do the job?

A.   I did, beginning in probably early 2025.

Q.   Okay.  And who did you raise that to?

A.   Initially, Scott Kreutzer and then eventually to Drew Perry.  I also requested a plotter and company work truck, among other things that went unanswered.

Q.   And were either of those people your supervisor?

A.   Drew was not my supervisor.  Scott, I worked very close

MOYES - CROSS                                                           162

with.  They moved him out and I assumed he was going to be my supervisor.  It was never really clear to me who my direct supervisor was.  I feel like I had about six during my employment.

Q.  And after you raised requests, I think you said at the beginning of 2025, you weren't getting traction on those, did you ever go back to Jeremy, for example, and make a request there or go to higher-level leaders within the organization to indicate you felt as though your requests were not being fulfilled?

A.  I did not.

Q.  Did you ever enter into an NDA or a confidentiality agreement with USAR?

A.  Sorry.  Can you say the first part?

Q.  Did you ever enter into an NDA or confidentiality agreement with USAR?

A.  I did.

Q.  When did you sign that agreement?

A.  I don't remember the exact date.  I think it is listed on that document list.  I think it was July, sometime in July.

        MS. HULL:  Can you pull up Exhibit 16.

BY MS. HULL:

Q.  I think the email that we have here is USA Rare Earth sending you kind of the blank version; you forward it to yourself.

MOYES - CROSS                                                    163

Do you recall executing it on or about the same day?

A.   I imagine within a few days.

Q.   Okay.  And is what you executed substantially the same as the form of what we see attached to this email?

MS. HULL:  If you want to scroll down, I think.

A.   I believe so.

BY MS. HULL:

Q.   And you were still employed by Ramaco on July 8th, 2025, correct?

A.   Correct.

Q.   If we could pull up Exhibit 4, which is the Code of Conduct, I want to go back to a couple of provisions here.

On page 3 we see a section called "Conflicts of Interest."

MS. HULL:  If you could pull out that first paragraph of subsection A.

BY MS. HULL:

Q.   The first sentence reads:  *A conflict of interest occurs when an individual's private interest interferes in any way with the interests of the company as a whole.*

Is that -- did I read that accurately?

A.   You read it accurately.

Q.   And the first sentence of the next paragraph --

MS. HULL:  If you could go down, Ms. Stutki.

BY MS. HULL:

MOYES - CROSS                                                          164

Q.   -- reads that: *No director, officer, other employee, regardless of level, is permitted to engage in any business or conduct or enter into any agreement or arrangement that would give rise to an actual or potential conflict of interest. Directors, officers, and other employees should not permit themselves to be placed in a position that might give rise to the appearance that a conflict of interest has arisen.*

Did I read that correctly?

A.   I believe so.

Q.   Who introduced you to the opportunity at USA Rare Earth?

A.   I was reached out by a third-party recruiter.

Q.   Which recruiter was that?

A.   Recruiter was Korn Ferry.

Q.   And when did those discussions begin?

A.   They reached out to me sometime in May.

Q.   Okay.  And how many discussions were had between May and July when we saw this NDA?

A.   I'm not sure.

Q.   Did you speak with anyone directly at USA Rare Earth before the NDA email was sent?

A.   I'm not sure.

Q.   Who did you speak with at USA Rare Earth about your potential employment?

A.   They had me speak with some of their board of directors, their current CEO at the time, their CFO, and I think that's

MOYES - CROSS                                                165

primarily it.

Q.  Did you discuss your experiences at Ramaco with any of these people as part of the discussions about making a potential move to USA Rare Earth?

A.  Nothing specific about Ramaco.

Q.  And you were still employed by Ramaco at that point in time, correct?

A.  Correct.

Q.  Did you disclose to Ramaco at any point during your employment with them that you were pursuing a potential opportunity at USA Rare Earth?

A.  I didn't think that was their business, and I think it is normal practice that you are often head-hunted in high-demand industries.  And given that I wasn't violating any NDAs or anything, I didn't think it was a conflict of interest to have conversations.

Q.  When did you get a job offer from USA Rare Earth?

A.  I'm not sure of the exact date.

Q.  You resigned from Ramaco at the end of September.  Your last day was on October 10th.

Did you get an offer of employment from USA Rare Earth before you resigned from Ramaco?

A.  I did.

Q.  Had you accepted the offer at that point in time?

A.  I had accepted it just before I resigned or the same day.

MOYES - CROSS                                                       166

Q.   And did you receive -- was this offer a written offer from USA Rare Earth?

A.   It was.

Q.   Can you remind me of when you actually started in your role at USA Rare Earth?

A.   I believe it was October 27th.

Q.   So you had a short gap between?

A.   Yeah.

Q.   And I believe you testified that your current title is the FVP of Mining and Processing?

A.   Correct.

Q.   Did I get that right?

        Okay.  Who do you report to?

A.   Our CEO.

Q.   When you originally started, your title was VP of Mining; is that correct?

A.   Correct.

Q.   And so at some point you received a promotion?

A.   Correct.

Q.   When was that?

A.   About a month ago.

Q.   Did you report to the CEO before your promotion?

A.   I did.

Q.   Other than USA Rare Earth, did you talk with any other entities about potential employment while you were still

MOYES - CROSS                                                          167

working for Ramaco?

A.   Yes.  I explained when I was leaving Ramaco I had a couple of opportunities.

Q.   And when you explained to Ramaco that you were leaving, did you tell them that you had already accepted an offer at USA Rare Earth?

A.   I told them that I was exploring a couple of opportunities.

Q.   Okay.  But you had already accepted the offer?

A.   When I told them I was exploring other opportunities, I don't know that I had accepted the offer.

Q.   You testified that USA Rare Earth flow sheets in Exhibit W were prepared before you joined the company, correct?

A.   Correct.

Q.   Is the company continuing to refine its flow sheets or develop new flow sheets, or that is static flow sheets established and this is what it is?

A.   No.  They will continue to modify as we run our demonstration.  The flow sheet itself won't change, but certain operating conditions might change.  As you scale up, you have to make adjustments.

Q.   And you mentioned earlier in your testimony that you have a team of engineers that could, for instance, prepare a flow sheet for mining gallium at USA Rare Earth; is that correct?

A.   Uh-huh.

Q.   But USA Rare Earth does not currently have a flow sheet for

MOYES - CROSS                                                      168

extracting gallium; is that correct?

A.   Correct -- let me rephrase that.  I mentioned in my testimony that they are working on gallium but with a third party, so . . .

Q.   Okay.  You mentioned earlier the document preservation letter that Ramaco sent on December 17th.  I'm going to have us pull that up.  It is Exhibit 12.  And I would like to direct you to the last sentence on the last page here where the letter states:  *I look forward to hearing back from you or your attorney and/or USA Rare Earth and its attorneys regarding the steps that have been taken to comply with the preservations demands made in this correspondence.*

     Do you see that?

A.   I see it now, yeah.

Q.   Okay.  Sorry, a little bit of a lag there.

     Did you respond to this letter?

A.   No, because the way it reads, again, *If you're represented by counsel, please let me know immediately;* I wasn't represented by counsel.  *If not, and if you have any questions relating to this preservation notice, please feel free to contact me directly.*

Q.   And then the last sentence says:  *I look forward to hearing back from you or your attorney and/or USA Rare Earth and its attorneys regarding the steps that have been taken to comply with the preservation demands made in this correspondence.*

MOYES - CROSS                                                      169

But you did not respond and your attorney did not respond?

A.   Yes, I didn't have any questions and I was going to preserve all the data they requested me to preserve.

Q.   What steps did you take to preserve the data?

A.   I made sure none of my texts, GMail, anything, otherwise was set on auto delete and made sure nothing was deleted.  In fact, I have had to expand my GMail storage by another 15 gigs so that I can have all my 20,000 junk mails continue to pile up.

Q.   We talked about your cell phone that you replaced at some point that you no longer have.

Are there any other devices -- USB drives, computers, anything like that -- that you had access to while you were at Ramaco that you no longer have access to?

A.   No.

Q.   Did you include any sort of iCloud storage, other cloud-based storage, in the preservation steps you took?

A.   Yeah.  My -- my phone automatically has iCloud storage, and I didn't change anything on my iCloud storage.

Q.   Do you still have possession of all these devices?

A.   Yes, I do.

Q.   Have any of these devices been imaged?

A.   They have.  They have been turned over to a third party for direct imaging of my personal desktop at home, my USA Rare

MOYES - CROSS                                                          170

Earth laptop, and my personal cell phone.

Q. When were they turned over?

A. Shucks. Two weeks ago.

Q. Do you have them back today, or does that vendor still have them?

A. No, I have them.

Q. When did you get them back?

A. Probably a week ago.

Q. Which vendor was used to preserve?

A. The Berkley Research Group. I might look to my lawyer to make sure I said that right.

        MS. HULL: BRG?

        MR. ELLIOTT: Yes, BRG.

BY MS. HULL:

Q. And did you give them access to your full GMail accounts as well?

A. Of course.

Q. Do you know if USA Rare Earth has taken any steps to preserve data in connection with this lawsuit?

A. They have. Immediately after that December 17th letter, my legal --

        MR. ELLIOTT: Objection. To the extent that this is going to call for the company's attorney-client communications, it is not relevant and potentially privileged, so. . .

        THE COURT: Yeah, any conversations or communications

MOYES - CROSS                                                    171

with counsel regarding those efforts should not be disclosed, but generally, if you wish, you may speak to steps that were taken.

THE WITNESS:  Well, I will defer to my counsel on this one.

BY MS. HULL:

Q.  Do you know if any devices have been imaged in connection with that?

A.  Beyond my USA Rare Earth computer?

Q.  Was your USA Rare Earth computer imaged?

A.  Yes, ma'am.

Q.  Okay.  And who -- setting aside counsel, who at USA Rare Earth have you spoken to about this litigation?

A.  My CEO, my CFO, our chief legal counsel, the executive team I work with.

Q.  And, again, not interested in conversations with counsel at all, but what have the discussions about this litigation generally entailed?

A.  That they support me.

Q.  Did you discuss with them the preservation requirements?

A.  My personal preservation requirements?

Q.  The preservation demand letter and the demand that went to USA Rare Earth to preserve relevant data.

A.  Yes, they've all seen it.

MS. HULL:  Nothing further.

MOYES - REDIRECT                                                    172

THE COURT:  Thank you, Ms. Hull.

Redirect, Mr. Elliott.

MR. ELLIOTT:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. ELLIOTT:**

Q.  A few brief questions for you, Mr. -- Dr. Moyes.

There were some questions that you were asked about various policies -- Code of Conduct, an offer letter, email policies, and there was also the mutual nondisclosure agreement -- that have all been discussed today.

The MNDA was a contract that you signed with Ramaco, wasn't it?

A.  Correct.

Q.  Was there any provision in the MNDA that prohibited the use of personal email?

A.  None.

Q.  The Code of Conduct is not a contract, is it?

A.  No.

Q.  And the company's email policy, is that a contract that you signed?

A.  I don't believe it is a contract.

MS. HULL:  Objection; calls for a legal conclusion.

THE COURT:  Sounds pretty legal to me.  I would sustain the objection.

**BY MR. ELLIOTT:**

Q.   Do you understand the email policy or the Code of Conduct to be contracts in your own understanding?

A.   I did not believe them to be contracts.

Q.   Okay.  You had testified a moment ago about consultants who received confidential Ramaco information on their personal email accounts; is that right?

A.   Yes.

Q.   Do you know if consultants signed nondisclosure agreements?

A.   I believe they have.

Q.   And is that good enough for Ramaco?

A.   Sure was, yeah.  We sent them numerous Department of Energy confidential grant information back and forth.

Q.   Did anybody at Ramaco ever tell you that your -- your NDA was not good enough for you to send documents to your personal email?

A.   No.

          MR. ELLIOTT:  No further questions.

          THE COURT:  Thank you, Mr. Elliott.

          Ms. Hull, any recross?

          MS. HULL:  Just one brief question, Your Honor.

                    **RECROSS-EXAMINATION**

**BY MS. HULL:**

Q.   Dr. Moyes, who paid for the imaging of the devices that has taken place thus far?

MOYES - RECROSS                                                    174

A.    I believe USA Rare Earth.

MS. HULL:  Nothing further.

THE COURT:  Thank you, Ms. Hull.

Dr. Moyes, thank you for your testimony.  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  Why don't we take a brief ten-minute recess.

I anticipate we've got one more witness to go.

Ms. Bowden, I might lean on you:  Timingwise what do we have left?

COURTROOM DEPUTY:  Your Honor, plaintiffs have 24 minutes; defendants have about 42 minutes.

THE COURT:  Very well.  I think there's a clock you all can see I can't see.

MS. HULL:  It is very nice.

THE COURT:  Good.

Okay.  Why don't we -- we'll scatter for ten minutes and then we'll resume.

(Recess taken 2:41 p.m. until 2:54 p.m.)

THE COURT:  Thank you.  Please be seated.

Okay.  I think we're ready for the plaintiffs' next witness.

MR. FOSTER:  Thank you, Your Honor, we will call Randy Atkins to the stand.

ATKINS - DIRECT                                                      175

THE COURT:  Very well, Mr. Atkins, please come forward to be sworn.

(Witness sworn.)

COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Randall Atkins, R-a-n-d-a-l-l A-t-k-i-n-s.

**RANDALL ATKINS, PLAINTIFFS' WITNESS, DIRECT EXAMINATION**

**BY MR. FOSTER:**

Q.  Can you tell the Court what your current responsibility is at Ramaco?

A.  I am the Chairman and Chief Executive.

Q.  You testified by way of a declaration in this case, correct?

A.  Yes.

Q.  Okay.  And you had Exhibits 13 -- 1 through 13 attached to your exhibit [sic], correct?

A.  Yes.

MR. FOSTER:  Your Honor, we offer his declaration as testimony in this proceeding.

THE COURT:  And is there a particular exhibit attached to that?  Again, it is in --

MR. FOSTER:  It is ECF 6.

THE COURT:  Very well.

MR. FOSTER:  And then the exhibits are attached

ATKINS - DIRECT                                                          176

thereafter as Exhibits 1 through 13 to his declaration, which are Exhibits 1 through 13 in this hearing today.

THE COURT:  Very well.  The exhibit is already part of the record, as you noted, ECF Number 6.

And any objection to the exhibit and its attachments at all, Mr. Elliott?

MR. ELLIOTT:  No objection, Your Honor.

THE COURT:  Very well.

You may proceed.  It is received.

(Plaintiffs' Exhibits ECF 6 received.)

BY MR. FOSTER:

Q.  Where do you reside?

A.  I reside in Sheridan, Wyoming.

Q.  We are limited on time, but tell the Court briefly about an introduction of the Brook Mine and the rare earth elements discovery that the company has had.

A.  Sure.  So we acquired the Brook Mine property from the Brinks company of armored car fame in 2011.  We acquired it as a reserve for thermal coal.  Our intention was to develop that as a thermal property permitted and then, frankly, sell it or joint venture it with another third-party coal company.

After about two years of doing development and planning, the coal industry itself began to change and the idea of being able to deploy capital to open up a brand-new thermal coal mine became somewhat problematic.

ATKINS - DIRECT                                                    177

So we pivoted, and I came up with the explanation, Isn't there something else we could do with coal other than simply burn it for thermal purposes or use it for metallurgic purposes for steel?  And I began sort of an odyssey of talking to a number of different people, one of whom was a gentlemen who ran a research institute connected to the University of Wyoming who had formerly worked for NETL.

And he said, basically, The interesting thing about learning how to use coal for different things starts back in a little town in Kentucky called Ashland.  And I said, This must be the spirits speaking to me, because I'm from Ashland, Kentucky.

And they had done a lot of research there, essentially, on coal to liquids back in the '70s when we were going to run out of oil or the Saudis were going to charge us $500 a barrel.  So we began, essentially, a technology approach designed to try to determine how you could use, in our case, carbon contained within coal to make high-value products. These are things like synthetic graphite and graphene, building products, whole variety of different things, including the possibility of rare earth.

This put us in touch with the -- ultimately, the National Labs as well as a number of universities and other research institutes that were exploring sort of similar ideas. We were the only coal group that -- at that point that was

ATKINS - DIRECT                                              178

exploring anything relating to the technology aspects of coal.

And so sort of to fast-forward from about 2013 through about 2016 or '17, we essentially did a lot of work with the National Labs, the Department of Energy, specifically NETL, as well as Oakridge National Lab, on a number of techniques to use coal for other products.

NETL had been tasked by the Department of Energy -- pardon me -- the Department of Defense in 2014 to determine if there were other areas in the United States that might contain rare earths.  They asked for samples from our mines, both in Wyoming as well as in West Virginia and Virginia, which we provided, came back to us about a year and a half later and they said, Look, we think we have found very high concentrations of heavy and medium magnetic rare earths in your deposit in Wyoming.

And I said, Is that a good thing?

And so we, obviously, determined that that was, indeed, something that was very important, and we began a wholesale pivot in about 2000 and --

Q.  That's excellent.  I appreciate that.  In the interests of time -- that's great background.  I think the Court has read enough of it and the details, but thank you for that background.

MR. FOSTER:  Ms. Stutki, could you pull up Exhibit 7 and go to page 2.

ATKINS - DIRECT                                                    179

BY MR. FOSTER:

Q. Page 1 is an email from Mr. Moyes indicating that -- it says "Resignation," subject line, and for page 2, he in the first paragraph resigns.

And then in the second paragraph he says: *At this point, however, I believe it is not the right long-term path for me and my family, and I will be taking time to plot my next course.* Then he provides a thank you.

One of the issues this Court is facing is what happened and what did he disclose to you after the resignation. So tell the Court what you did after you received this resignation.

A. Sure. So Alex was my sort of direct report, as you probably saw in his offer letter, so anything that had to do with complaints, opportunities, issues, et cetera, were supposed to be directed to me. So this came out of the blue when I received this letter.

And I called him that afternoon that I received it, and I, you know, was concerned. First of all, he told me he didn't know what he wanted to do; he was wanting to take time off.

I said, What's the problem? He couldn't give me any definitive answer as to what any issues were with respect to his current job.

I said, Look, take some time to think about this.

ATKINS - DIRECT                                                    180

This doesn't make any sense, particularly the part that he didn't have any idea what he was going to do, because he had just built a large multi-million dollar house in Sheridan.  He had two kids he had just moved out there from Virginia.

THE COURT:  Mr. Atkins, we are going to adjust your microphone.

THE WITNESS:  I'm probably too loud.

THE COURT:  No, I think it is rubbing against something.

(Discussion held.)

A.  So it didn't make any sense.  And so I changed my schedule.  I was supposed to go, frankly, out of the country the next week.  I changed it to fly to Sheridan from Kentucky to meet with him, which I did.

I met with him for probably about an hour.  He spoke at length without really giving me any real reason as to why he wanted to leave.  He made a number of comments that he was not considering any other alternative employment at that time.  He said he might even try to teach.  He wanted to take time off.  He went out of his way on two to three occasions to say that he had basically not any interest in working for a competitor at that time, that he really just wanted to take some time off.

I thought he was kind of having to be sort of euphemistic about it, sort of a mid-life crisis.  And I said, Look, Alex, think about this.  Don't make any rash decisions.

ATKINS - DIRECT                                              181

I offered him a consulting arrangement just because I was concerned that he had a young family, that he was doing something rash, and I wanted to make sure that he had the income to basically keep himself together.

I said, We'd be happy even if you don't show up that often.  I want to make sure at least your family is taken care of.  And I told him, Think about it and come back to me.

So when I left Sheridan that next day, I thought, candidly, he was on the fence.  And --

Q.   Turns out that wasn't the case?

A.   That wasn't the case.

Q.   Did he -- I assume from your testimony we can summarize and say he never disclosed the offers that he had or his acceptance of an offer --

A.   Never.

Q.   -- at USA Rare Earth?

A.   Never.  In point of fact, he said -- went out of his way more than once to say that he had not, basically, intended to do any work with a competitor, and so that came out of the blue.

Q.   I want to hit on some irreparable harm issues here quickly for the Court that was covered earlier, but I want to have some additional testimony from you.

Do you view USA Rare Earth as the competition in regard to rare earth elements and critical minerals?

ATKINS - DIRECT                                                      182

A.   They are a competitor, yes.

Q.   Okay.  And in what -- in what review -- or in what way are they competitors?

A.   Well, you know, it is the means and the end.  So the end is, obviously, products of rare earth.  The means are various forms of where you find it, how you mine it, and how you process it.  They have their deposit in hard rock mineral.  We have ours in coal, softer.

There are different techniques used to process it, but at the end of the day you have got the same customers.  Some customers buy rare earth mostly for magnets and they buy gallium and germanium, et cetera, for semiconductors.  So we have overlapping product lines.

Q.   You understand that Mr. Moyes is challenging every aspect of our motion, and if he is not enjoined, he will retain possession of the trade secrets that he acquired by improper means.

And if that happens, how will that affect the competition between you and USA Rare Earth and perhaps others?

A.   Well, it tilts the field.  Obviously, we're going to be in the posture of basically having our own information and trade secrets that we've spent a lot of money, a lot of time and effort generating, candidly, used against us competitively.

Q.   If you have to compete against your own technology, your trade secrets, because Mr. Moyes has it, retains it, and is

ATKINS - DIRECT                                                  183

able to control it, what would that do to your company?

A.   It would no doubt detrimentally impact it.

Q.   And you heard Mr. Woloschuk testify about speed to market arms race.  How does possession of that and potential use, if there is no injunction, affect your ability to get to market first where you may, as Mr. Woloschuk testified, be able to supply the entire market for a certain critical mineral or rare earth element?

A.   Couple of quick points.  We don't know the extent of what he's got because he has got it on his own computer, which we found out later which was a big surprise.

     But secondly, in terms of sort of the arms race of getting product to market, obviously those trade secrets could be very valuable in the hands of a competitor to be used against us to get certain overlapping products developed quicker.

Q.   Talk a minute a little bit about the goodwill of the company and its reputation with potential customers and those in the rare earth element and critical minerals market that it has developed, and -- number one, and then I have a follow-up question.

A.   Sure.  We've developed, I would say, a fair amount of goodwill, certainly, with the government because of our experience of being actually involved with two partnerships. They're called CRADAs, Cooperative Research and Development

ATKINS - DIRECT                                                    184

Agreements, that we've had with these two labs I've mentioned now for over two years.  We have done other work with the Department of Energy.

And at least commercially, you know, we have a sister operation, which is a metallurgical business in the East, which has been around for a very long time and is very successful.

And so, you know, we have developed a good reputation. We certainly treasure that and don't want to have it diminished or tarnished, if you will, by someone taking things from us.

Q.  Your testimony is that this is the first rare earth element operation -- or discovery in 70 years?

A.  First new rare earth mine in 70 years, first new coal mine in Wyoming in 50.

Q.  50 years for the coal mine, 70 years for the rare earth. Okay.

And do you believe you have a reputation of being a leader in that field?

A.  I think we do, yes.

Q.  And how will that be affected, your reputation and the goodwill that you've worked all these years to develop, by the possession and potential use of your trade secrets against you?

A.  It would negatively impact it, no doubt.

Q.  What about the relationship with your government contacts? How would their possession and -- your government relationships in respect to rare earth elements and critical minerals be

ATKINS - DIRECT                                                185

affected by their possession and potential use of your trade secrets if Mr. Moyes is not enjoined?

A.   There will be confusion and has been confusion with our government partners as to how someone would take information from us.   In many cases, candidly, it is information we've developed jointly under confidentiality agreements with the government, so there's some concern there may be government material that's also been taken.

Q.   There's been a little bit of testimony -- the focus is, obviously, Mr. Moyes is with USA Rare Earth.

What do you know about his history of employment of late and is there a risk that he could go somewhere elsewhere these trade secrets could be useful as well?

A.   Sure.   Well, when we hired Mr. Moyes, he had been at several different firms before he came to us.   His background is really in geology.   It is not in processing.   It is not in other aspects of rare earth development.

And, certainly, when we announced our moving forward with rare earth development there were at least two other coal groups that have operations in Wyoming -- one of which is Peabody and the other is an old affiliate of Arch Coal which is now called Core -- both of whom have said they think they might have rare earths as well, so there's a potential competitive aspect there with another group that would mine from coal.

Q.   Okay.   I guess the last question that I have for you is

ATKINS - DIRECT                                              186

you've put a lot into this industry and you've put a lot into bringing this matter.  You have an opportunity to tell the Court why the injunctive and preservation relief is important to the company.

Tell the Court why it is so important and why you're here.

A.  We're here for a number of reasons.  Obviously, we are deeply disappointed that an employee would sort of do a wholesale violation of most of the code of conducts and various other provisions of employment that we have everybody agree to before they come to work for us, basically, so they understand the rules of the road for, obviously, the way we'd like to operate.

And also as a public company, we have certain aspects we obviously have to cover as well.

I think this will create a, as I said, issue for us, both competitively in terms of potential financing with the government -- obviously, USA Rare Earth, as I said, has had competing different types of elements that we would be jointly trying to develop.  I also feel that, you know, financially whoever gets to market first is probably going to be able to win the prize, so . . .

MR. FOSTER:  Thank you very much.

THE COURT:  Thank you, Mr. Foster.

Cross-examination, Mr. Elliott.

ATKINS - CROSS                                                    187

MR. ELLIOTT:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. ELLIOTT:**

Q.  Good afternoon, Mr. Atkins.

I'd like to start by asking you some questions to clarify statements you made in your examination just a moment ago by plaintiffs' counsel.

You offered some speculation that perhaps Dr. Moyes had taken some government information that would be confidential or something of that nature.

Is that right?  Did you say that?

A.  He certainly had access to it, yes.

Q.  Okay.  And we heard earlier today from Mr. Perry that Ramaco had commissioned a third-party forensic inspection of Mr. Moyes's computer at -- from his workplace and that there was no indication of any exfiltration of information from that computer and no indication that any confidential information was sent to any source that was unauthorized except Mr. Moyes's email.

Do you have any other information?

A.  Whatever Mr. Perry testified to, I will certainly let that go, whatever he said.  But, obviously, we've got a situation where there was wholesale transmittal of information that was on our server to his personal account, which today I still can't understand why he didn't simply use his own Outlook

ATKINS - CROSS                                                    188

account that was on his computer at his home.  It just doesn't make sense to me.

Q.  So you've been in court all day today, haven't you, and you've heard all the witnesses?

A.  I have.

Q.  And you've seen all the exhibits that have been shown of the information that was sent to Dr. Moyes's GMail account, haven't you?

A.  I certainly have been sitting here, yes.

Q.  Yes.  And in any of that information did you see any confidential government information that was shown to this Court?

A.  I frankly couldn't see the screens that well, but whatever you want to represent is fine.

Q.  That's not my testimony, sir.  I'm just asking you.

A.  My testimony is that I haven't seen any documents that -- I believe I saw some document that said "NETL" on it, yes.

Q.  There were also a number of testimony -- number of statements today given about Ramaco's email policies.

Are you familiar with Ramaco's email use policy?

A.  Yes.

Q.  And do you follow it?

A.  Yes.

Q.  I'm going to put up on your screen here Plaintiffs' Exhibit 28, which has already been admitted, and this is on the first

ATKINS - CROSS                                                    189

page of the employee email protocols.

Section 4.1.4 says:  *All confidential or sensitive Ramaco material transmitted via email outside Ramaco's network must be encrypted.  Passwords to decrypt the data should not be sent via email.  To encrypt an email, include the term "encrypt" or "secure" in the subject line, including the brackets.*

Mr. Atkins, when you send confidential or sensitive information outside of the Ramaco network, do you encrypt your emails in this manner?

A.   I usually would say if it was confidential.

Q.   Okay.  But you don't follow this procedure that's laid out in 4.1.4?

A.   Well, in whatever way that our email that goes out under our own server encrypts things or puts whatever data descriptions on it, I use our company email.

Q.   Okay.  But there are -- there are very clear instructions in this policy that Ramaco is making a very big deal of today, and it sounds like you don't follow those instructions, do you?

A.   Well, I certainly follow them as best I can.

Q.   Is it possible that there are some policies that Ramaco has that basically nobody follows?

A.   Not that I am aware of.

Q.   So are you aware of other employees at Ramaco who follow this policy of putting "encrypt" in the subject line and

ATKINS - CROSS                                                      190

sending passwords separately?

A.   I don't follow the emails of other employees.

Q.   Okay.  So you just don't know.

     What percentage of Ramaco's revenue comes from the sale of rare earth elements?

A.   Today, none.

Q.   So does all of Ramaco's revenue come from metallurgical coal?

A.   Yes.

Q.   Has Ramaco ever produced any rare earth elements, to your knowledge?

A.   We have certainly produced feedstock of rare earth elements.

Q.   Okay.  What's the difference between feedstock and rare earth elements?

A.   I'm not sure that there is one.

Q.   So -- but you drew a distinction.  I'm just trying to understand what the distinction is.

A.   Actually, you drew the distinction.  I didn't.

Q.   You said that rare -- strike that.

     Explain to me what is feedstock.  What is feedstock?

A.   Well, in this case it is coal and the clay and shale above it.

Q.   And the rare earth elements are found in the clay, the shale, or the coal?

ATKINS - CROSS                                                    191

A.   I'm sorry.  Is that a question?

Q.   Yes.  Which one?

A.   I believe it is found in all three.

Q.   Okay.  Does Ramaco manufacture magnets or any other products that use rare earth elements?

A.   We do not manufacture magnets, no.

Q.   Does Ramaco have a hard rock mining permit for Brook Mine?

A.   We do not possess hard rock.  We are mining coal.  We have a coal permit.

Q.   Okay.  So when we talk about the shale and the clay, that's not coal, is it?

A.   It is commingled.

Q.   All of it?

A.   I'm sorry.  I don't understand your question.

Q.   So is it your testimony that Ramaco is permitted to mine the clay and the shale?

A.   Yes.

Q.   Okay.  Does Ramaco have any rare earth element projects outside of the Brook Mine?

A.   No.

Q.   I have on the screen in front of you the declaration that you submitted in this case, and I'd like to draw your attention to paragraph 6, and in particular a sentence --

     THE COURT:  Sorry for the interruption.  Just for reference sake, this is Document Number 6 in CM/ECF?

ATKINS - CROSS                                                    192

MR. ELLIOTT:  Document Number, yes, 6.  Correct.

BY MR. ELLIOTT:

Q.  In this declaration you wrote:  *In contrast, the REE deposits discovered at Ramaco's Brook Mine are found in the coal and carbonaceous ore strata above and beneath the thermal coal deposit.*

So it looks like there is minerals that you are -- find in rare earth that are above and below the thermal coal deposit; is that right?

A.  Yes.

Q.  Okay.  And you -- you're permitted to mine those?

A.  Yes.  Basically, you will have multiple coal seams and they continue to repeat themselves.

Q.  Are rare earth elements extracted from coal?

A.  Typically, I would say the answer is no.  We are, I believe, unique in that respect.

Q.  Are you aware of any mines in the United States other than Brook Mine where rare earth element is now being extracted and processed from a coal-based geologic formation?

A.  No.

Q.  Do you have knowledge generally about the Round Top Mine Project?

A.  Not really.

Q.  Do you know anything about it at all?

A.  Not really.

ATKINS - CROSS                                                   193

Q.  You haven't read any information about this formation?

A.  I haven't studied the geology of the mine, no.

Q.  So you wouldn't have any way to offer any sort of testimony about whether the processes that are developed at the Brook Mine would be relevant or applicable in any way to extraction of rare earth elements at the Round Top Mine?

A.  I think Mr. Woloschuk's testimony would be far more compelling than mine.

Q.  Okay.  I would like to return back to your declaration previously admitted in this case and direct your attention to paragraph Number 9.

You wrote here:  *Ramaco has spent millions of dollars to refine its REE data and processes, and in so doing has developed an extensive database of ICP-MS and XFR data for a REE deposit with more than 6,000 unique ICP-MS test results.*

I don't know what that means, but can you explain for the Court in plain English what that paragraph represents?

A.  I think plain English is the only way I would know how to explain it.

So the ICP and XRF -- or XFR are two different types of tests.  The XFR is what I call a ray gun.  It is something that you can basically take and hold over a coal seam or a piece of material, and it has got a -- it is almost like a Geiger counter.  You can get a reaction from it.  It is not as sensitive as some other types of devices, which is what the ICP

device is.  That's a much more precise device, I'm told, that can basically delineate sort of a thousand different types of material.  So one is much more sensitive than the other.

Of the numbers of tests we've got, and it shows 6,000 here up to the ICP.  And I think when you look at the XFR test, we've probably got more like 35,000 tests of those, which means some person had to sit there and shoot a gun at 35,000 times, you know, on various pieces of material.

So we have a huge database which, candidly, is, you know, extremely valuable.  Think of it sort of like, you know, when you read about the AI people now where they're basically trying to mine data from different -- you know, all the books that have ever been written, et cetera.  So this database is probably one of, if not the largest collection of data for rare earth testing that exists.

And to be able to use that data to do correlations, if you can find something here that is -- you know, it basically has for, certainly, geologists and chemical processing people an ability to be able to be used to make some really interesting correlations which currently don't exist.

So it is a very valuable database.  That's, obviously, one of our trade secrets.

Q.  Okay.  A moment ago when you were testifying, I believe you said something to the effect that when you hired Dr. Moyes that he wasn't that knowledgeable or experienced about mining rare

ATKINS - CROSS                                                          195

earth elements.

Is that correct?

A.   Yes.

Q.   Are you aware of Dr. Moyes's Ph.D.?

A.   Yeah.  That was the only thing that he really had on his resume that connected him to the rare earth industry.

Q.   Okay.  And what was -- what was his Ph.D.?

A.   I think it was using oil and gas techniques to do in situ rare earth mining at depths.  In other words, to maybe simplify it, it was the idea you could use something I would call fracking to try to get rare earth deposits that might be at deep levels.  Obviously, the stuff that we are mining is at relatively shallow levels.

Q.   So if Dr. Moyes contends that his Ph.D. is in mining rare earth elements, you would dispute that?

A.   I'm sorry.  Is his in mining rare earth elements?

Q.   Correct.

A.   I would say, basically, fracking techniques are not what I would call mining.

Q.   So you're saying he does not have a Ph.D. in rare earth elements and that's your testimony?

A.   I think I just gave you my testimony.

Q.   Okay.  I think your testimony is that he doesn't have that.

MR. FOSTER:  Objection.

A.   My testimony is that his rare earth experience was in his

ATKINS - CROSS                                                          196

Ph.D. work which related not to shallow mining of rare earths, but to some novel technique of using, eventually, fracking to do deep level mining or deep level processing or extraction of rare earth.

**BY MR. ELLIOTT:**

Q.   Okay.  Do you have any information that would show that Dr. Moyes has actually disclosed any confidential information to any other person?

A.   Again, the purpose of this hearing is to determine what he might have disclosed to others beyond what he had from the devices that we have in our possession.

Q.   I'm going to ask the question again.

     Do you have any information that Dr. Moyes has actually disclosed Ramaco's confidential information to any other person?

A.   Not until we see his devices.

Q.   Did Dr. Moyes have a noncompete agreement with Ramaco?

A.   We don't have noncompete agreements.

Q.   Did he have any agreement that would prohibit him from soliciting customers?

A.   Soliciting customers?

Q.   Yeah.

A.   If he solicited customers, that would be outside the bounds of his area of responsibility.

Q.   I mean post-employment.

ATKINS - CROSS                                                197

A.   I'm not following your question, sir.

Q.   If he wants to solicit customers as part of his job with USA Rare Earth, you don't have any contract that would stop him from doing that, do you?

A.   I have obviously no contractual relationship with him at this point, no.

Q.   Ramaco -- Ramaco has no contractual relationship that would prohibit that?

A.   I said I don't have.  I meant Ramaco.

Q.   There's no contractual restriction on Dr. Moyes working with the federal government in his capacity with USA Rare Earth, is there?

A.   I am not aware.

Q.   So as far as Dr. Moyes is concerned, he could freely resign from Ramaco anytime he wanted to for any reason, right?

A.   That is correct.

Q.   And there was nothing stopping him from going to work for a competitor, correct?

A.   Except if he was taking trade secrets with him.

Q.   Your declaration on paragraph 22, you stated:  *As part of his work, Moyes worked directly and extensively with the people at Fluor to develop the PEA for the Brook Mine, including the development of technical feasibility models (the process flow sheets) as well as financial models to confirm the profitability of the project.*

ATKINS - CROSS                                               198

The process flow sheets have changed at this point; isn't that right?

A.   Well, the process -- again, I would refer to Mr. Woloschuk's testimony as probably the definitive comments on that, but the process flow sheets I would call it more have evolved and then been optimized, so it is kind of a living document, so to speak.

Q.   Okay.  And does Dr. Moyes have access to any of those living documents subsequent to his departure?

A.   Sounds like he does.

Q.   How would you say so?

A.   Well, he's got the original source document, which was the Fluor PEA.

Q.   I'm referring to the documents that have evolved in the time that he's been gone.

Would he have access to any of those?

A.   I don't believe he does or shouldn't.

Q.   Ramaco did change its operative process flow sheets after Dr. Moyes left Ramaco?

A.   Well, we're still, you know, developing the flow sheets.

Q.   Okay.  So I understand that after your interactions with Dr. Moyes, and the testimony here is conflicted about what those communications were, but that you ordered an investigation into his computers and email.

Is that right?

ATKINS - CROSS                                                    199

A.   Sure.  I will be happy to give you the explanation there.

So, obviously, you know, as I mentioned, I think it is the 26th he sent me the letter; I met with him the following week, you know, sorry to see him go.  I had no idea what he was going to do based on the comments that he had made to me about he was trying to find himself, so to speak.

So he left on the 10th, and then, you know, two weeks later he pops up -- we find in a press release that he's been hired by a competitor.  I said, That sort of has a certain suspicious ring to it, and I asked, you know, our legal team to look into it.  And they, I believe, then asked our IT people, Mr. Perry, to start to look at his prior email activity to see if there was anything that looked untoward.

Q.   And how soon after you requested that did Ramaco become aware of the emails that were sent to Dr. Moyes's email account?

A.   I can't give a precise date.  It was an evolving thing. Obviously, we had to go first to get the device back and then do whatever forensic work that, again, Mr. Perry oversaw.

Q.   You retained counsel to send Dr. Moyes a letter in December instructing him to preserve evidence; isn't that right?

A.   Yes.

Q.   Okay.  And why didn't the letter ask him to return any of the information that you claimed to be missing?

A.   I wasn't involved in the preparation of the letter, so I

ATKINS - CROSS                                                    200

can't really give you any legal explanation.

Q.  Okay.  To your knowledge, did anybody ever directly ask
Dr. Moyes to return anything?

A.  I think the letters probably speak for themselves.

Q.  Well, I would like to direct you to Plaintiffs' Exhibit 12,
which I have displayed here.  And we had this letter here and
I've read it several times --

A.  You want to flip to the last paragraph?

Q.  Yes.

        Is this where it says that Dr. Moyes should return
information?

A.  Well, they certainly asked for him -- to hear back from
him.

Q.  Well, that is certainly your interpretation, but there is
no statement in here requesting the return of anything, is
there?

A.  I think the letter will probably speak for itself.

Q.  Well, I'm asking you, since you said it is in the letter,
do you see anything in here that says he should return
information?

A.  I'm referring you to this paragraph where it basically
says, We look forward to hearing back from you.

Q.  Okay.  I can read that.

        So this letter was sent on December 17th, and did you
consider the issue of the information in Dr. Moyes's GMail

ATKINS - CROSS                                                           201

account to be of great urgency?

A.   I felt that the issue of what Mr. Moyes potentially may be doing was of not only somewhat urgency, but concern, and we wanted to basically explore the appropriate legal approach to do this exploration, if you will.  So we not only had this counsel in Oklahoma that our internal legal team first contacted because of the fact that Mr. Moyes was employed in Oklahoma at that time, but then as this developed further and we became further concerned that USA Rare Earth was accelerating, you know, development of their -- their assets, this created further suspicion in our mind that there was something untoward going on.

So we approached our normal corporate counsel in Washington to review this because it might have public company implications.

They, then, determined that the issues involved would probably be best served in a Wyoming setting because of the presence of, obviously, the mine out here and where his activity occurred.

So we then determined to do -- to retain a local counsel, and we chose the counsel that we have used for a lot of intellectual property work over the years, which is the Dorsey firm here.

Q.   So my question actually was in December of -- December 17th of 2025, did you consider this issue to be urgent?

ATKINS - CROSS                                                        202

A.   The answer is yes.  And we tried to proceed with all due dispatch to basically put ourselves in the position to obtain whatever information was appropriate for us to understand what Mr. Moyes had done --

Q.   Okay.  But --

A.   -- particularly because of the fact that we then discovered that, again, he was obviously doing something with a computer which was not under the control of the company.

Q.   So this letter was sent in December, and you told Dr. Moyes that he was going to be sued.  And then you took no action for three months after that period.

A.   Well, I think we were taking a lot of action, actually.  We were basically doing a lot of forensic work.  We had two different forensic computer groups trying to go through and determine what was on that computer, what might have been taken off that computer.

        And then, of course, we had to bring another counsel up to speed to be able to bring this action.

Q.   And so after you did all that forensic work, the conclusion that they came to was exactly the same conclusion you had at the beginning, which was that all the email was in his GMail account; there wasn't any -- any exfiltration of any information found anywhere else.

        That was Mr. Woloschuk's testimony, wasn't it?

A.   Mr. Woloschuk was not involved --

Q.  I mean, Mr. Perry.

A.  Mr. Perry basically said, as we do now, we don't know what he's got because we don't know what's on the computer that he, essentially, was using his -- sounds to me like, his primary work computer.  It still makes no sense to me why, since he had an Outlook account on the same computer with a GMail account or whatever, that he would have required to send one to another on the same computer.  It just doesn't make sense.

Q.  Okay.  You said that you -- you were prompted or more concerned by USAR's press releases regarding their investments and business activity.

        Is that accurate?

A.  I think they came out with a release in December saying that they were accelerating their development and that occurred, you know, literally weeks after Alex joined the company.

        So, you know, the fact that first Alex said he was leaving and wasn't going to -- you know, had no idea what he was going to do; then two weeks later he shows up at USA Rare Earth, and less than a month later they say, Gee whiz, we're accelerating our exploration, or whatever they were accelerating, it all seemed a little too coincidental and obviously heightened our suspicions.

Q.  But your conclusion was based on the timing and sequence of events; you don't have any information other than that, right?

ATKINS - CROSS                                                    204

A.   That's what we're seeking today.

Q.   Okay.  But as you sit here right now, you don't have any additional information other than the timing and sequence of those two events?

A.   I think as I've testified, until we can see what information he may have on his computer or may not, that that is probably the probative information that would determine what he may or may not have done.

Q.   It is a fairly simple question:  You don't have any additional information; you want more information, you want to review things, but you don't have anything else right now, right?

A.   Correct.

Q.   You also noted the government funding and private investment that was noted in the USA Rare Earth's press release.

     Were those investments that Ramaco was pursuing?

A.   Yes.

Q.   And can you explain what -- what process Ramaco went through to pursue those investments?

A.   Well, basically, the primary investment that USAR received was from the CHIPS Act, which was administered by the Commerce Department.  In the press release itself, it determines -- lays out that they're very interested in, basically, the materials that would be produced by USA Rare Earth for use in

ATKINS - CROSS                                                           205

semiconductors.  That's gallium and germanium.  It is not the heavy rare earths.  So that's, therefore, identical to what we're trying to do as well with the same group.

Q.  And is it -- do you dispute Dr. Moyes's statement earlier that the investment was related to USA Rare Earth's ability to serve as a vertically integrated operation that produce magnets versus just the raw rare earths?

A.  I would dispute Mr. Moyes's aspect of that because the Commerce Department has nothing to do with magnets.  Magnets are not used in semiconductors.  The CHIPS Act is focused on semiconductors, and that's what gallium and germanium is all about.

Q.  Okay.  And did you have any conversations with anybody from the Department of Commerce about why Ramaco didn't receive that investment?

A.  I have not.

Q.  Do you have any information from anybody about why Ramaco didn't receive the investment that USA Rare Earth received?

A.  Not at this time.

Q.  Ramaco submit any formal application for that investment?

A.  We are having conversations with the Commerce Department, yes.

Q.  How would you characterize the discussions?

A.  Preliminary.

        MR. ELLIOTT:  Nothing further, Your Honor.

CLOSING - FOSTER                                                     206

THE COURT:  Thank you, Mr. Elliott.

Redirect, Mr. Foster.

MR. FOSTER:  Nothing further, Your Honor.

THE COURT:  Very well.  Thank you, Mr. Atkins, for your testimony.  You may step down.

Any other witnesses for the plaintiff today?

MR. MILLER:  None, Your Honor.

THE COURT:  All right.  Any additional witnesses on behalf of Mr. Moyes?

MR. ELLIOTT:  No additional witness, Your Honor.

THE COURT:  Okay.  I think there's a little time left. I'm happy to hear any summation or argument regarding the evidence presented today, so I'll hear from plaintiff first, please.

MR. FOSTER:  This is going to be fast, the fastest preliminary injunction closing argument I've done.

THE COURT:  The good news is it has been well briefed and I've got a record of today's testimony, but . . .

MR. FOSTER:  Thank you very much.

Ms. Stutki, would you pull up the PowerPoint.

We're grateful for the time here today, grateful for the Court's attention.

Go to page 2, please.

We have proven that Ramaco owns trade secrets.  The testimony of Mike Woloschuk was very compelling, and even on

CLOSING - FOSTER                                              207

cross-examination, Mr. Moyes in his own words acknowledged all of the things that he sent himself contained confidential information. And while he may want to split hairs on what trade secrets are, that's enough to be -- to establish in this hearing, particularly in view of the -- of the evidence presented, primarily through Mr. Woloschuk.

It was the information in his testimony, exceptional efforts to redact information from the PEA Report that was not public to the public.

The leach process, and the caustic leach process took eight to nine months with much higher extraction, test Number 12, that was kind of the aha moment for the enterprise, and getting from less than 20 percent up to 70 percent or better in the harvesting of the rare earth element.

The flow sheets were described as the secret sauce, so to speak, or the Coca-Cola recipe.

The extensive financial testing, the test data, even Mr. Moyes testified that one of the -- just one of the spreadsheets he spent hundreds and hundreds of hours on it and admitted that it was confidential.  Those are -- those are trade secrets.

And we have established that the exhibits -- 17A, 18A, 19A, 20A, 20B, 21 -- all show the difference between the public and the private and the appendixes that were voluminous.

The trade secret statute defines the trade secret as

CLOSING - FOSTER                                                    208

exactly the kind of information that we have direct and, really, uncontroverted testimony on.

As to misappropriation -- if you could go to slide 2 -- you know, Mr. Moyes, his testimony, from my perspective, in his declaration was false. We will get to that. And his testimony after he realized that there was an email policy, even today in the court, meandered a little bit where he said he skimmed it and signed a lot of documents and then, Yeah, as I read it clearly today -- this is crystal-clear he signed it. And what he did in forwarding emails was a violation of the policies of the company.

And if you go to slide Number -- the next slide -- yes, thank you -- this is where that policy derives from is the obligation of employees to protect the company's assets, including an obligation to protect the company's proprietary information. That's carried out in the email policy. The attempt to try to compare an encryption of emails by the CEO, who is still the CEO and hasn't gone to USA Rare Earth and is carrying that business, to a former employee's systematic distribution of 45 -- 47 emails that contained by his own admission confidential information are not apples to apples.

To the next line down, any documents, papers, records, or other tangible items that contain trade secrets or proprietary information are the company's property: He admitted on cross-examination that he did not -- was not

CLOSING - FOSTER                                                      209

entitled to take any property, and yet he emailed these, possesses them.

And even if a part of it -- the part he wants to use and keep in his portfolio, if that contains confidential information or proprietary information in part, that is the company property.  And he took it and it was as though he was taking the computer and taking it and converting it, conversion of the company asset.  It is very clear he signed it on the right-hand side.  You can see that.  That is misappropriation by inappropriate -- by not legitimate means.

The other element here is that -- this is his declaration testimony -- he said:  *I consider the PEA Report to be a record of my work and wish to maintain a copy as part of my own private portfolio.*

They want to say he didn't use it.  He's using it as part of his private portfolio.  He possesses it.  He keeps it. He wants to keep it.  And later in that same paragraph he says: *This structure was my work product and is no one's trade secret*, but we just saw in the prior agreement that he signed it is the property of the company.  It is not his property, no matter what his contributions were.

Additionally, in the letter agreement, you see the highlighted portion on the bottom, it -- he was prohibited from using our property, our trade secrets, for his own benefit, and he did that.

CLOSING - FOSTER                                              210

Let's go to the next slide.

And in every trial or preliminary injunction trial, credibility is important. And getting back to the email policy, that's the foundation of his defense. And he says: *At no point during my employment was I told or instructed that sending documents to a personal email account was prohibited or against Ramaco's policy.*

That's not fluffy language of, I don't recall; I saw a lot of papers when I -- it was very matter of fact.

And then: *I'm not aware of any existence -- the existence of any Ramaco policy or agreement,* he was trained and the agreement is here. This is not -- this is -- this creates a credibility issue for him.

Let's go to the next one.

This is -- this is the computer issues. He testified that Ramaco refused to provide him with the right computer. And we had the testimony from Mr. Perry showing the email where he had delineated exactly what he wanted and got exactly what he wanted. And when his team members had a need, he figured out how to email them and ask for assistance, and in four minutes he got it.

And we have no corroboration for his naked claim that the company refused to give him what he wanted, and we have compelling proof that he got exactly what he asked for.

Let's go to the next slide.

CLOSING - FOSTER                                                      211

This is part of the issue of trust as well, the gallium issue:  *None of the information I learned at Ramaco is relevant to USAR's extraction or production of rare earth elements,* and yet in Exhibit 21A, you can see the -- we show gallium in our work product, and this Exhibit 10 shows gallium is part of it -- of what the rare -- USA Rare Earth is working on.  There is a correlation, and Mr. Woloschuk's testimony was compelling.

Go to the next slide please.

Here is the timeline.  We don't have time to fly through this, but this shows a compelling story of the trade secret misappropriation.

And as to the -- there's really no dispute about protections.  There's no questions, there's no argument in the brief about protections that we took that were reasonable to protect the secrets.  That's really kind of undisputed.

But irreparable harm, we've got the elements.  We've got reputational harm.  We have market share issues.  We have customer issues.  We have reputational issues.  The case law establishes that those are issues of criticality for irreparable harm.

I think Mr. Woloschuk's testimony of what it would do in -- where there's a race to the market and we might be able to fulfill the entire market and that's irreparable harm.

Competing against your own technology is irreparable

harm.  In the patent realm it is strong evidence when you can be exclusive in a market because of your technology, it is irreparable harm if somebody infringes.

The same is true for a trade secret in this setting. If they use our trade secret, we lose exclusivity, and when there's race to the market, we have irreparable harm.

I thank the Court for its time and attention to these matters.  We look forward to the ruling.  We will answer any questions the Court has at this time or following.  Thank you.

THE COURT:  Very well, Mr. Foster.  Thank you.  I will give you a further response following Mr. Elliott.  I recognize you were out of time, but, nonetheless, it will be important to hear any response.

Mr. Elliott -- excuse me.  Mr. Owen.

MR. OWEN:  It will be me briefly, Your Honor.  Thank you.

So we are here at the very beginning of the case.  We are here for a preliminary injunction and a TRO.  And the burden on the person seeking the TRO is incredibly high.

You don't get to assume the critical connection.  You don't get to get on the stand and say, What we're really looking for is some discovery so we can make our case, because there was some real timing issues that we didn't like, and we didn't like that he forwarded emails.

And, actually, as we learned in the testimony today,

CLOSING - OWEN                                                    213

they have done two forensic exams -- well, at least one. Mr. Perry testified to one. There was mention of another. We don't know because, again, we are here before there's been any discovery; we have no discovery. We're at the very beginning of the case, and they're essentially asking to jump the line.

So as we think about this case and the issues in this case, I would encourage the Court to pivot the attention away from sort of the grand conspiracy theories that are being presented and that are -- I can address a few of the points, but, really, much of it is far beyond the scope of what we're asking about today and what we're trying to figure out today.

We, of course, dispute much of it, but the three things that Ramaco asked for is, one, the immediate preservation of forensic imaging of all electronic devices possessed by defendants.

The testimony today is undisputed that that evidence has been preserved. We didn't hear testimony that -- of anyone from Ramaco saying that they thought it was insufficient. Didn't hear testimony from anyone suggesting that hadn't been done incorrectly. Didn't hear any testimony that the Haynes Boone lawyers were not willing to preserve the information.

A letter was sent on December 17 that said preserve the information. Dr. Moyes preserved the information. That's been done. There's no -- there's been no testimony that's not been done. That's been done. It is not necessary to change

CLOSING - OWEN                                                    214

the scope and structure of the Federal Rule Rules of Civil Procedure and the nature of a case to say, We get to mandate preservation just on our hunch that because you forwarded work emails, we now get to have some sort of ambiguous deal that is not even clear what would be different to what they have.

THE COURT:  Would they be entitled during the course of discovery to the forensic analysis that was already done by BRG at a later date and time?

MR. OWEN:  Yes.

THE COURT:  Why not disclose that?

MR. OWEN:  Well, we don't have a complete forensic analysis.

THE COURT:  Maybe I misunderstood.

MR. OWEN:  I was talking about preservation.

THE COURT:  Hold on.  All the devices of Mr. Moyes have been forensically examined, if I heard the testimony correct, through BRG:  phone, home computer -- I think those are the two primary devices.  And maybe there's not a final report, but would that not be helpful in terms of the effort, time, money, and so forth spent in this, even though, technically, if this isn't granted as the plaintiffs' request, this will come out during the course of routine discovery request?

MR. OWEN:  Certainly, Your Honor.  So that actually sort of relates to -- I think -- I was talking about

preservation.

THE COURT:  No, I know what you were talking about, but to take it a step further, the concern we just heard from Mr. Atkins and others that have testified is they don't know what are on these devices.  Short of the Court ordering it in this setting, is there a reason that can't be shared or provided subject to a protective order or some sort of agreement by the parties?

MR. OWEN:  Well, yeah.  The disconnect -- just to get right to it, the disconnect is whether the control of that process is turned over to a third party that isn't managed by counsel.  So it is an extraordinarily different circumstance if you say, rather than our -- our expert analyzes the data; we agree on search terms -- that's typically how you do it; you work together and agree on search terms and then you run the analysis; there's an analysis done; our expert does that. We've offered -- I mean, that's essentially where we're at. We're willing to do that.

Moving the control of that process from us to a third party is, candidly, just massively more expensive and intrusive.

THE COURT:  I'm not talking about a third party.  I'm talking about what occurred with BRG.

MR. OWEN:  Right, but they're not asking -- my understanding, they're not asking for what we have with BRG

CLOSING - OWEN                                                216

because that would come out in the normal course of discovery. There's no need for us to be here today.

The difference is BRG is who we retained, just like they had their own expert who didn't find anything on Mr. Moyes's Ramaco devices, so I guess -- I don't know if I'm answering your question, but I think --

THE COURT:  I just wonder if it would have been fruitful, in light of the concerns of what -- and again, it is not an independent forensic analysis.  It is not their own forensic evaluator -- would that be helpful in terms of helping them understand what is or isn't on those devices.

MR. OWEN:  Sure.  And I was out of the country for some of those negotiations, so I may need to tag in Mr. Elliott for what the negotiations were.  But, essentially, we have no intention of resisting discovery in the ordinary course, and we would have more time to do that if we weren't preparing for a TRO hearing that was seeking something very different and much more unusual than have an expert look at a device and then produce documents as you're required to under the Federal Rules of Civil Procedure and as an officer of the court.

So it is -- there are two different questions, and I'm -- my point with the preservation and with the analysis is that it is not like we've said we're going to flout our discovery obligations.  The documents have been preserved.

There's no testimony to suggest otherwise.  There's no evidence from their own analysis to suggest that any -- any trade secrets was downloaded.

They did their own forensic analysis on their device.  We heard that today for the very first time.  And the only thing they discovered was that the emails we already knew had been forwarded from the very first day Dr. Moyes worked at Ramaco until his last day at Ramaco -- they had been forwarded to his personal email, not to someone else, not to a third party, not to USA Rare Earth.  There's no testimony it has actually been disclosed to anyone besides Dr. Moyes.  He possesses them.

THE COURT:  I get that they would want more.  My point is what you do have may have sort of negated some of these concerns about what are on those devices.  And then they can fight it out.  But my point is what you do have may be helpful.

MR. OWEN:  I suspect so.  I don't -- and we haven't proposed providing that.  There's no discovery request because we're here in the wrong order of operations.

THE COURT:  I get it.  We're not -- we're not in discovery.  There's no obligation.  You haven't been ordered to provide that or to produce it.  The Court has ruled on this issue before the Court with respect to the request to preserve and the other two requests from the plaintiff.

I am just saying outside of the box, outside of this

CLOSING - OWEN                                            218

courtroom, would it have been helpful to provide what you do have to plaintiffs?

MR. OWEN:  And I want to just make clear that I'm not trying to be cute to say we're just going to wait until discovery.  The request from us was not --

THE COURT:  I think that's exactly what you're saying.

MR. OWEN:  Well, no, because there's a disconnect in the relief requested.  They want to have the third-party forensic person do it.  We have our own.  We haven't done the analysis.  But we can turn that over.  We -- I feel confident we'd turn that over before any more -- like, that wasn't the sticking point.  The sticking point was who hired the expert.

THE COURT:  I understand.  Thank you, Mr. Owen.

MR. OWEN:  The other two pieces at issue here, immediately enjoin defendant from possessing or using Ramaco's trade secret, there's undisputed testimony that Dr. Moyes has not used that evidence.  The only testimony we have was the Ramaco witness speculated that perhaps there was a situation where it could be harmful if this information was used by USA Rare Earth; USA Rare Earth received some investment and they didn't like the timing.  No one connected those dots.

For the extraordinary relief and the timing we have here, they have not met their burden.  That is not what a TRO or this posture is for.

And, finally, the certification that it has not been

REBUTTAL - MILLER                                                 219

used, Dr. Moyes got on the stand and said he hadn't, and so on that piece I don't know that there's any daylight between what they potentially want and what has already happened since we've had a full-blown hearing.

So appreciate your time.

THE COURT:  You've got more time -- well, looks like you do have a little bit.  I didn't mean to cut you off.

MR. OWEN:  I will give the four minutes back to the Court.  Appreciate your time.

THE COURT:  Thank you, Mr. Owen.

Mr. Foster, any follow-up -- excuse me.  We will switch to Mr. Miller.

MR. FOSTER:  We will tag-team, if that's okay with the Court.

THE COURT:  You bet.

MR. MILLER:  I just want to briefly address the preservation issue.  So when it comes to the preservation of the evidence, when I was talking to opposing counsel, what the issue came to is they -- we don't have any information about what has happened.  They want to create the appearance of transparency, but so far they're just pulling the curtain back and not letting anybody see what's inside.

So when we were requesting, Well, we would like our expert to be able to have access to the images, they said, That's a nonstarter.  That will never happen.

REBUTTAL - MILLER                                                    220

We don't even have a declaration in this proceeding from a BRG witness.  Now, BRG, this is their job.  They do expert declarations all the time.  But we have a declaration from counsel that doesn't say what all the devices are, doesn't say what protocol was followed to make the images, do these images preserve everything in all areas of the devices and the hard drives.   There's various different protocols that can be followed.  We don't know.

And then we were told that we can't ask counsel about it; he would not take the stand or be cross-examined, so we had no avenue to explore what was actually happening with these images.

THE COURT:  To the point they make in discovery, if this motion is denied, right?

MR. MILLER:  And the point of discovery is what we were asking for is this is not -- they want to make it a typical ESI discovery and that's it, just like your everyday ESI discovery.  And this is far more like a situation that I experience a lot as a patent litigator.  We have situations where software is at issue in a patent case, and when software is at issue, you don't want to just turn things over.  It is not just produce the documents.  It is your expert gets to access the software and explore it themselves and find out what's in there.

And here it is not sufficient to say, Hey, just throw

REBUTTAL - ELLIOTT                                            221

some search terms over the curtain and the Wizard of Oz will let you see what we find.  It is, We get to explore the logs and activity.  There's bread crumbs and footprints:  Were any of these confidential documents re-saved as a different file name?  Was anything cut-and-pasted from these documents and put in something else?

This is not just find a document with a search term and then give us that document.  It is -- there is data and metadata that will indicate what, if anything, was done with these documents.  If the metadata shows the document sat there and was never accessed, then there you go.  But what we should be able to do is allow our forensic expert to be given access for a day -- we pick a day; we make a schedule, and they get to explore those issues that go beyond just search terms and documents.

So that's the preservation issue that causes us concern, which is why we would prefer to make sure that the protocol of the images is acceptable, the Court-appointed expert to image the devices perhaps a second time, and then each party's experts can explore those images.

THE COURT:  Thank you, Mr. Miller.

Mr. Owen or Mr. Elliott, anything you would like to add?

MR. ELLIOTT:  Your Honor, to respond very briefly, I think everything plaintiffs' counsel just discussed with

REBUTTAL - ELLIOTT                                                          222

respect to discovery of electronically stored information, review of data, all of those are potentially appropriate issues to be resolved in the course of normal discovery.

In this case there is absolutely no dispute that the data is preserved. We haven't had time to do analysis of the data. They had time to do analysis of their data and came to court and told the Court that they didn't find anything else except for emails that were forwarded to GMail over the course of Dr. Moyes's career.

It would be a very different story if they had come in and said, Well, we looked at his computer from work. It appears that in the last week of his employment he inserted a flash drive and mass downloaded a terabyte of data and now that data is just in the wild.

That's what you typically see when an employee leaves a company with a bad intention. Here, you don't have any evidence of any bad intentions. So they're trying to transform what is a fairly routine preliminary injunction process where in the ordinary course the defendant, if the plaintiffs prove their burden, may be prohibited from using information in his possession but not a full-blown discovery order which should be more fully developed during the course of the litigation with appropriate discussion and safeguards, and to the extent we have to get into those sorts of issues with the Court, then those can be addressed in due course.

REBUTTAL - ELLIOTT                                              223

But that doesn't have any bearing on what the burdens are on the plaintiffs' side nor the standards that are applicable to the kind of really extraordinary relief that they're asking for, which is actual access to Mr. Moyes's private data, which also includes information of his employer who they say is a competitor.

And I don't think that there is any way that the Court can enter any sort of injunctive relief that provides them that, even if they had met their burden, which we would argue strongly they haven't done.

THE COURT:  Does there have to be proof of disclosure of some of these sensitive or confidential or trade secret documents?

MR. ELLIOTT:  Well, the standard for, you know, likelihood of success on the merits for a misappropriation claim would be acquisition by improper means or unauthorized disclosure.  And so they have no evidence of any improper acquisition because he acquired the stuff while he was working. You know, they can say that he shouldn't have done that or that that was contrary to the policy, but certainly he didn't acquire it improperly.

He signed an NDA and they gave him access to the information.  He had it.  He had it the whole time he worked there.  And he still has it now, but he's testified that he hasn't looked at it, hasn't given it to anybody.

224

So in order to reach that first hurdle, they have to -- they have to show the likelihood that they're going to succeed on that, and they haven't.  And, you know, there are many other elements that go into that, but that's, I think, an important stumbling block.

THE COURT:  Mr. Elliott, thank you.

MR. ELLIOTT:  Thank you, Your Honor.

THE COURT:  Well, Counsel, thank you for your presentation today.  You were able to kind of condense it and get it within the allotted time frame, so I commend you for that.

I'll certainly take a closer look, not only at the briefing, the exhibits that have been presented today, other exhibits that have been offered, and try to get you some guidance as quickly as we can.

I'm not going to rule from the bench.  There's too much to think about here, and so, unfortunately, you will travel home without sort of an ultimate resolution on the plaintiffs' motion.

But I do appreciate all your efforts.  I think, without exception, all of you have traveled from somewhere, so we brought you a fairly decent day in Southeast Wyoming.  Safe travels back.

Anything else I can address for the plaintiff today, Mr. Foster?

225

MR. FOSTER:  Not for the plaintiffs, Your Honor.

THE COURT:  Mr. Elliott or Mr. Owen?

MR. ELLIOTT:  No, Your Honor, thank you.

THE COURT:  Thank you, everyone.

Court will stand in recess.

(Proceedings concluded 4:10 p.m., April 7, 2026.)

226

**C E R T I F I C A T E**

I, JANET DAVIS, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Federal Certified Realtime Reporter, and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true and correct transcript.

Dated this 10th day of April, 2026.

/s/ *Janet Davis*

_____

*JANET DAVIS, RDR, FCRR, CRR*
*Federal Official Court Reporter*

227

<u>I N D E X</u>

**<u>OPENING STATEMENTS</u>**                                          **<u>PAGE</u>**

Mr. Foster                                                      5
Mr. Elliott                                                    11


**<u>PLAINTIFFS' WITNESSES</u>**                                       **<u>PAGE</u>**

MICHAEL WOLOSCHUK
    Direct - Mr. Miller                                        19
    Cross - Mr. Elliott                                        51
    Redirect - Mr. Miller                                      53
    Continued Direct - By Mr. Miller                           55
    Cross - Mr. Elliott                                        56
    Redirect - Mr. Miller                                      85
    Recross - Mr. Elliott                                      88
DREW PERRY
    Direct - Mr. Miller                                        90
    Cross - Mr. Owen                                          110
RANDALL ATKINS
    Direct - Mr. Foster                                       175
    Cross - Mr. Elliott                                       187


**<u>DEFENDANT'S WITNESS</u>**                                        **<u>PAGE</u>**

ALEX MOYES
    Direct - Mr. Elliott                                      118
    Cross - Ms. Hull                                          145
    Redirect - Mr. Elliott                                    172
    Recross - Ms. Hull                                        173

228

| PLAINTIFFS' EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 2 | Employment Offer Letter | 145 | |
| 4 | Ramaco Code of Conduct | 146 | |
| ECF 6 | Declaration w/Attachments 1-13 | 176 | 176 |
| 14 | Email Chart | 90 | 91 |
| 17A | Fluor PEA | 86 | 87 |
| 18A | Spreadsheet | 37 | 38 |
| 19 | Email Attachment | 38 | |
| 19A | Spreadsheet | 39 | 40 |
| 20 | Email w/attachments | 40 | |
| 20A | Spreadsheet | 41 | 41 |
| 20B | Spreadsheet | 41 | 42 |
| 21A | Email re Fluor Report - PEA | 24 | 25 |
| 22 | September 2023 Email String | 104 | 105 |
| 23 | Email | 106 | 108 |
| 24 | Comprehensive Email List | 100 | 100 |
| 25 | Email Volume Report | 101 | 101 |
| 27 | Fluor PEA Summary | 25 | |
| 28 | Acceptable Use of Email Policy | 96 | 98 |
| 31 | Acceptable Use of Email Policy Signature Page | 97 | 98 |

229

| DEFENDANT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| A | Declaration of Moyes | 119 | 120 |
| V | Press Release | 71 | 76 |
| W | Moyes Presentation | 135 | |
| X | Round Top PEA | 47 | |

| CLOSING ARGUMENTS | PAGE |
|---|---|
| Mr. Foster | 206 |
| Mr. Owen | 212 |
| Rebuttal - Mr. Miller | 219 |
| Rebuttal - Mr. Elliott | 221 |