

**FILED**

**1:32 pm, 5/5/26**

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

RAMACO CARBON, LLC and
RAMACO RESOURCES, INC.,

Plaintiffs,

vs.

ALEX J. MOYES,

Defendant.

Case No.  26-CV-104-R

## ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION [4]

This matter is before the Court on Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction. [ECF No. 4]. Defendant filed a Response in Opposition [ECF No. 31], and the Court held a hearing on April 7, 2026. The Court, having carefully reviewed the Motion, Response, and hearing oral argument, denies Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction because Plaintiffs have not shown irreparable harm.

### BACKGROUND

Plaintiffs allege claims of misappropriation of trade secrets and breach of contract. *See* [ECF No. 1]. Plaintiffs hired Defendant in January 2024, and Defendant managed aspects of rare earth elements and critical minerals ("REE") at Ramaco's Brook Mine ("the

Brook Mine REE Project") during his employment. [ECF No. 5, at 1–2]; *see* [ECF No. 31, at 5]. The Brook Mine REE Project involves REE deposits at Ramaco's Brook Mine, which are found "in the coal and carbonaceous ore strata above and beneath the thermal coal deposit." [ECF No 5, at 4]. Ramaco developed technical data, processes, and financial models "to explore, identify, mine, and process REE from its Brook Mine." *Id.*; *see* [ECF No. 6, at 3]; [ECF No. 8, at 3]. Ramaco views the data, processes, and models as trade secrets. *Id.* To protect its trade secrets, Ramaco installed security cameras and alarm systems with after-hour key code entry at its Wyoming facility. [ECF No. 5, at 5]; [ECF No. 7, at 2]. Ramaco also protects its electronic trade secrets by using a "secure password-protected and monitored cloud-based environment that limits access to select employees with pre-approved access credentials." [ECF No. 5, at 5]; *see also* [ECF No. 7, at 2].

Defendant signed a non-disclosure agreement ("NDA") with Ramaco on December 15, 2023, while discussing employment opportunities. [ECF No. 5, at 5]; [ECF No. 31, at 6]. Defendant received an offer for a position as Director of Critical Minerals and Planning from Ramaco, and he accepted that offer on January 19, 2024. [ECF No. 5, at 5]. Plaintiffs contend that when Defendant signed the Offer Letter, he agreed to terms regarding Ramaco's trade secrets, including that "he would not disclose or use such information outside of his work for Ramaco." *Id.* During his employment, Defendant had "password-protected access to Ramaco's secure computer servers" and "was entrusted with using Ramaco's trade secrets to carry out Ramaco's business interests." *Id.* at 6. On September 25, 2025, Defendant gave notice to Ramaco that he was resigning from his position, and he falsely stated that he was resigning for personal reasons and had no plans for future

employment. *Id.* at 7; [ECF No. 6, at 7]; [ECF No. 6-7]. Ramaco sent Defendant a letter "reminding him of his ongoing confidentiality obligations" on his last day, October 10, 2025. [ECF No. 5, at 7–8]; [ECF No. 6-8]. Ramaco requested that he sign the letter to confirm that he understood those obligations, and Defendant did not do so but "assured Ramaco that he remained 'fully committed to maintaining the confidentiality of Ramaco's proprietary information.'" [ECF No. 5, at 7–8]; [ECF No. 6-8]; [ECF No. 6-9].

USA Rare Earth, Inc. ("USAR"), an alleged direct competitor of Ramaco, announced it hired Defendant as Vice President of Mining on October 29, 2025. [ECF No. 5, at 8]; [ECF No. 6-10]. During USAR's press release, it acknowledged Defendant's experience at Ramaco and stated "Dr. Moyes will use his expertise in geology, mining engineering, and techno-economic modeling to support USAR's efforts in developing new methods for exploration, extraction, and processing of rare earth elements." [ECF No. 5, at 8]; [ECF No. 6-10]. Ramaco then completed a forensic investigation of its computer systems and "discovered dozens of emails sent by Defendant from his Ramaco email account to his personal email account." *Id.* Defendant received and forwarded to his personal email account an email from USAR sent on July 8, 2025, that included a confidentiality agreement for "discussions relating to a potential role or engagement." [ECF No. 5, at 8–9]; [ECF No. 8, at 5]; [ECF No. 8-2]. Defendant then sent several documents, including alleged trade secret information, to his personal email between the time he received the email from USAR and his last day. [ECF No. 5, at 9]; [ECF No. 8, at 5–7]. Plaintiffs are most concerned with the email sent on his last day, which included the PEA Report. [ECF No. 5, at 9].

Plaintiffs "bring[] this Motion for Temporary Restraining Order and/or Preliminary Injunction ('Motion') under the Defend Trade Secrets Act ('DTSA'), 18 U.S.C. § 1836, and the Wyoming Uniform Trade Secrets Act ('WUTSA'), Wyo. Stat. § 40-24-103(a)." *Id.* at 3. Plaintiffs request an order from this Court "(1) requiring the immediate preservation and forensic imaging of all electronic devices . . . possessed by Defendant and others determined to possess Ramaco's trade secrets"; "(2) immediately enjoining Defendant from possessing or using Ramaco's trade secret information; and (3) requiring Defendant to certify under oath to the Court whether he has shared Ramaco's trade secret information with USAR or otherwise used Ramaco's trade secrets for the benefit of USAR in his new employment." *Id.* Defendant filed a response, arguing that Plaintiffs did not have a "substantial likelihood of success on the merits of any of its claims" and "no 'irreparable harm' is imminent or would occur absent an injunction." [ECF No. 31, at 2, 14–23]. The Court held a hearing on April 7, 2026. Plaintiffs requested leave to provide supplemental authority, and the Court granted that request. [ECF Nos. 39 & 40]. The Court now reviews Plaintiffs' request for a TRO or preliminary injunction.

### RELEVANT LAW

"The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (citing 13 JAMES WM MOORE, MOORE'S FEDERAL PRACTICE ¶ 65.36 (3d ed. 2014)). TROs chiefly differ from preliminary injunctions in duration and in that they may be granted without notice to the opposing party. *Id.*; FED. R. CIV. P. 65. The initial timeframe for a TRO is limited to fourteen days from

the hour it is issued with narrow exceptions for good cause or consent allowing an extension. FED. R. CIV. P. 65(b)(2). "[A] temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 86 (1974).

A TRO's *ex parte* nature and short duration represent its purpose to preserve the status quo between the parties by preventing irreparable injury until a court can rule on the merits of a preliminary injunction. *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001). "The status quo is defined as the last peaceable uncontested status existing between the parties before the dispute developed." *Miller v. Austin*, 622 F. Supp. 3d 1105, 1108 (D. Wyo. 2022). In contrast, preliminary injunctions "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "In both cases, however, injunctive relief is an extraordinary remedy." *People's Tr. Fed. Credit Union*, 350 F. Supp. 3d at 1138 (quotations omitted). This extraordinary remedy is not awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, courts are required to balance the competing claims of the injury while considering the effect of granting or denying the motion upon each party. *Id.* In doing so, courts utilize a four-prong test to determine if a party is entitled to a TRO or preliminary injunction. *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792, 797 (10th Cir. 2019).

First, the moving party must show a substantial likelihood of success on the merits. *Id.* Second, the movant must show it would suffer irreparable harm if the motion is denied. *Id.* Third, it must show the threatened injury outweighs the opposing party's injury if the injunction is granted. *Id.* Last, it must show that granting the injunction is not contrary to public interest. *Id.* Public consequences of granting the extraordinary relief are particularly important for the court's consideration. *Winter*, 555 U.S. at 22.

In the case of disfavored preliminary injunctions, "the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors" and "must make a 'strong showing' that these tilt in [their] favor." *Free the Nipple-Fort Collins*, 916 F.3d at 797 (citing *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." *Id.* (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005)). "Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* (citing *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)).

### RULING OF THE COURT

Plaintiffs contend, "the facts presented and the governing law demonstrate that Ramaco is entitled to a Temporary Restraining Order and a Preliminary Injunction." [ECF No. 4, at 2]. Plaintiffs request an order from this Court "(1) requiring the immediate preservation and forensic imaging of all electronic devices . . . possessed by Defendant and others determined to possess Ramaco's trade secrets"; "(2) immediately enjoining

Defendant from possessing or using Ramaco's trade secret information; and (3) requiring Defendant to certify under oath to the Court whether he has shared Ramaco's trade secret information with USAR or otherwise used Ramaco's trade secrets for the benefit of USAR in his new employment." [ECF No. 5, at 3]. The Defend Trade Secrets Act ("DTSA") allows courts "to enter injunctive relief in cases of actual or threatened misappropriation." *API Americas Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148 (D. Kan. 2019) (citing 18 U.S.C. § 1836(b)(3)(A)). Similarly, the Wyoming Uniform Trade Secrets Act ("WUTSA") allows courts to issue a preliminary injunction. *See* WYO. STAT. ANN. § 40-24-102. But Plaintiffs must still prove all four requirements have been met for a TRO or preliminary injunction. *See First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1143 (10th Cir. 2017). The Court will review each requirement in turn.[1]

### a. Success on Merits

Although Plaintiffs "must present a prima facie case" to show a likelihood of success, they "need not show a certainty of winning." *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1267 (D. Wyo. 2023) (quoting *City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1176 (D.N.M. 2021) (citation omitted)). Plaintiffs allege breach of contract claims and claims of misappropriation of trade secrets under the DTSA and WUTSA. *See* [ECF No. 1]. The Court will discuss the claims in turn.

---

[1] While Plaintiffs' requests include a disfavored injunction, this Court will review the four requirements necessary to receive a preliminary injunction under the normal standard of review because at least one request is not disfavored.

### i. Breach of Contract

To succeed on a breach of contract claim, Plaintiffs must show the following elements: "a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised . . . , and entitlement of [the] injured party to damages." *Halling v. Yovanovich*, 2017 WY 28, ¶ 13, 391 P.3d 611, 616–17 (Wyo. 2017) (quoting *Schlinger v. McGhee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012), *as amended on reh'g* (Feb. 7, 2012)). Plaintiffs contend Defendant breached two contracts, the NDA and Offer Letter. [ECF No. 5, at 18–19]. Defendant argues that the Offer Letter is not a contract at all. [ECF No. 31, at 20–21]. Even if the Offer Letter was a contract, Defendant contends Plaintiffs are not a party to the Offer Letter. *Id.* at 21. Defendant argues in the alternative that the NDA superseded the Offer Letter and any contractual terms merged into the NDA. *Id.* Finally, Defendant asserts Plaintiffs have not shown or even alleged that he breached the NDA. *Id.* at 18–19.

Defendant signed the Offer Letter on December 23, 2023. [ECF No. 5, at 18–19]; [ECF No. 6-2]. Plaintiffs contend Defendant agreed to the terms of the Offer Letter when he signed it, including that he "will not, at any time, disclose to others, or use for [his] own benefit or the benefit of others, any such trade secrets or other confidential information and that [he] will sign Ramaco's standard form of confidentiality agreement." [ECF No. 5, at 19]. The NDA similarly provides that Defendant "shall not disclose [Ramaco's] Confidential Information to any third Party without [Ramaco's] prior written consent." [ECF No. 31, at 18] (alterations in original); *see* [ECF No. 6-1, at 3]. Regardless of whether the Offer Letter is an Agreement or whether it has been superseded by the NDA, Plaintiffs

8

do not provide any direct evidence Defendant has disclosed confidential information to others or used it to benefit himself or others.

Plaintiffs only provide circumstantial evidence that Defendant sent or used the confidential information, including that he sent confidential information to his personal email after receiving an offer to work for a competitor. *See* [ECF No. 5, at 18]. While the Court acknowledges Plaintiffs' concerns surrounding the circumstantial evidence, Defendant has provided alternative reasons for sending the information to his personal email. *See* [ECF No. 31-1, at 4, 10]; [ECF No. 41, at 92–93, 120–21]. Defendant testified he has not used, disclosed, or even accessed the documents since leaving. [ECF No. 41, at 121, 123]; [ECF No. 31-1, at 7–8]. He clarified that he sent the PEA Report to himself on his last day of work because he saw it as his work product, and he was proud of the work he completed on the PEA Report. [ECF No. 41, at 120–21]; [ECF No. 31-1, at 10]. Defendant testified that he sent the other documents to his personal email to work from home because his tablet was difficult to complete his work on. [ECF No. 41, at 90–93, 98, 130–31]; *see* [ECF No. 31-1, at 4–6]. While Defendant may have kept the documents, Plaintiffs have not met their burden in showing that he breached the terms in the Offer Letter or the NDA. Therefore, Plaintiffs have not shown a prima facie case for success on the merits as to the breach of contract claims.

### ii.  Trade Secrets (DTSA and WUTSA)

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To

9

succeed under the DTSA, a Plaintiff must show "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1087 (10th Cir. 2025) (quoting *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023)).

The requirements are essentially the same for a plaintiff to succeed under WUTSA. *Credit Sage LLC v. Credit Wellness LLC*, No. 1:23-CV-110-SWS, 2024 U.S. Dist. LEXIS 6124, at *8 (D. Wyo. Jan. 9, 2024) (citation omitted); *see Balfour Beatty Infrastructure Inc. v. Am. Track Generations LLC*, 533 F. Supp. 3d 1030, 1035 (D. Wyo. 2020). Under WUTSA, "[a] plaintiff must show the following elements: '(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means.'" *Credit Sage LLC*, 2024 U.S. Dist. LEXIS 6124, at *8 (quoting *Trial Laws. Coll. v. Gerry Spences Trial Laws. Coll. at Thunderhead Ranch*, 2022 U.S. Dist. LEXIS 172790, at *2 (D. Wyo. Sept. 22, 2022)). Because courts have recognized the requirements are essentially the same, the Court will review the claims under the DTSA and WUTSA together and will review each element in turn. *See Credit Sage LLC*, 2024 U.S. Dist. LEXIS 6124, at *7–8 (quoting *Trial Laws. Coll.*, 2022 U.S. Dist. LEXIS 172790, at *2).

### 1. Trade Secret

Under the DTSA, trade secrets include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques,

processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" when "the owner . . . has taken reasonable measures to keep such information secret" and "the information derives independent economic value." 18 U.S.C. § 1839(3). Under WUTSA, trade secrets similarly include "a formula, pattern, compilation, program device, method, technique or process" when it "[d]erives independent economic value . . . and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." WYO. STAT. ANN. § 40-24-101(a)(iv).

While Defendant argues that Plaintiffs have not identified the trade secrets with requisite specificity [ECF No. 31, at 5, 15], Plaintiffs provided testimony regarding the specific portions of the documents that they believe to be trade secrets and provided the documents for the Court's review. *See* [ECF No. 42]; Exs. 17A, 18A, 19A, 20A, 20B, & 21A (admitted under seal). While the Summary of the PEA Report is publicly available [ECF No. 8-1], the Court heard testimony about the information redacted from the publicly available summary. [ECF No. 42, at 5–15]. The Court also received comparisons of the publicly available summary to the full PEA Report. Ex. 27 (admitted under seal); *see* [ECF No. 42, at 15]. The redacted information included the extraction flow sheet or flow process. [ECF No. 42, at 6-13]; *see* Exs. 17A, at 10 & 21A, at 10 (admitted under seal). The unredacted PEA Report also includes pricing information and recommendations to explore other opportunities with the minerals available at Brook Mine. [ECF No. 42, at 13–14]; *see* Exs. 17A & 21A (admitted under seal). Plaintiffs also noted the Appendices to the PEA Report include trade secret information. [ECF No. 42, at 14]. One of the Appendices is a

11

"Block Flow Diagram," and another includes heating information. Exs. 17A, at 44–53 & 21A, at 44–53 (admitted under seal). Michael Woloschuk testified that the Appendices include the design for the entire extraction process. [ECF No. 42, at 14]. Beyond the PEA Report, Plaintiffs also contend spreadsheets attached to Defendant's emails include alleged trade secret information. *Id.* at 15–21; *see* Exs. 18A, 19A, 20A, & 20B (admitted under seal). The spreadsheets include test work plans, scenario analysis, and financial models. [ECF No. 42, at 15–21]; *see* Exs. 18A, 19A, 20A, & 20B (admitted under seal).

Plaintiffs identified the alleged trade secrets with sufficient specificity for the Court "to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1089 (10th Cir. 2025) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)). Based on the documents and testimony provided, the full PEA Report and excel spreadsheets include financial information, tests, and flow processes not included in the publicly available Summary of the PEA Report. At least some of this redacted information is "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." *See* 18 U.S.C. § 1839(3).

The alleged trade secret information must also "derive[] independent economic value." 18 U.S.C. § 1839(3); WYO. STAT. ANN. § 40-24-101(a)(iv)(A). Plaintiffs contend that Ramaco developed technical data, processes, and financial models "to explore,

identify, mine, and process REE from its Brook Mine." [ECF No 5, at 4]; *see* [ECF No. 6, at 3]; [ECF No. 8, at 3]. Plaintiffs argue their alleged trade secrets derive independent economic value, as they relate to the success of their REE mine project and their position in the market. [ECF No. 5, at 16]. "[A] trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Double Eagle Alloys, Inc.*, 134 F.4th at 1092 (alteration in original) (quoting *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003)). Plaintiffs explained the flow process and other portions of the unredacted PEA Report provide detailed information about Plaintiffs' process for extracting REE that could be useful to others. [ECF No. 42, at 5–32]. Thus, the Court finds Plaintiffs have shown that at least some of the alleged trade secrets derive independent economic value.

As the PEA Summary was redacted to protect certain alleged trade secret information, Plaintiffs undertook efforts to retain its secrecy. Plaintiffs also undertook efforts to maintain their secrecy beyond the redaction. Ramaco's facilities are protected by security cameras, alarm systems, and an after-hour key code entry system. [ECF No. 5, at 5]; [ECF No. 7, at 2]. Plaintiffs' trade secret information was also "store[d] in a secure password-protected and monitored cloud-based environment that limits access to select employees with pre-approved access credentials." [ECF No. 5, at 5]; *see* [ECF No. 7, at 2]. While the Court notes that whether information qualifies as a trade secret is a question of fact, Plaintiffs have made a prima facie showing. *See Credit Sage LLC*, 2024 U.S. Dist. LEXIS 6124, at *4 (quoting *ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*, 407 F.

13

Supp. 3d 1186, 1198 (W.D. Okla. 2019)) (Furthermore, "the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder[.]").

Therefore, Plaintiffs have met their burden on this element.

## 2. Misappropriation

"The [DTSA] defines misappropriation as . . . 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]'" *First Interstate BancSystem, Inc. v. Hubert*, 615 F. Supp. 3d 1270, 1282–83 (D. Wyo. 2022) (quoting 18 U.S.C. § 1839(5)). The DTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(6)(A). Meanwhile, "improper means" "does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]" 18 U.S.C. § 1839(6)(B).

WUTSA similarly requires a showing of "the acquisition, use, or disclosure of the trade secret without consent" and "that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means." *Credit Sage LLC*, 2024 U.S. Dist. LEXIS 6124, at *8 (quoting *Trial Laws. Coll.*, 2022 U.S. Dist. LEXIS 172790, at *2); WYO. STAT. ANN. § 40-24-101(a)(ii)(A). WUTSA defines "improper means" to include "'theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy or espionage through electronic or other means' or acquisition 'under circumstances . . . or from or through a person who owed a duty to the

person seeking relief to maintain its secrecy or limit its use.'" *Credit Sage LLC*, 2024 U.S. Dist. LEXIS 6124, at *24–25 (quoting WYO. STAT. ANN. § 40-24-101(a)(i) and (a)(ii)(B)).

Here, Plaintiffs contend that a forensic investigation "revealed . . . Defendant sent dozens of emails from his Ramaco email to his personal email attaching Ramaco's most important and proprietary trade secrets that he knew or reasonably should have known to be trade secrets." [ECF No. 5, at 17]. Plaintiffs also contend that Defendant signed three documents (the NDA, his Offer Letter, and the Code of Conduct), where he "knowingly [took] on obligations of confidentiality with respect to Ramaco's trade secrets." *Id.* Defendant also signed an acknowledgment that he received Ramaco policies, including an "Acceptable Email Use Policy." [ECF No. 41, at 64–67]; Exs. 28 & 31. Plaintiffs are especially concerned about the timing of his emails, as the emails were sent after he was emailed about a job opportunity with USAR. *Id.* Defendant also emailed the unredacted PEA Report from his work email to his personal email on his last day of work. [ECF No. 5, at 9]; [ECF No. 8, at 7]; [ECF No. 8-7].

In *API Americas Inc. v. Miller*, the court held that the plaintiff met the second element of misappropriation by showing that the defendant sent himself materials that contained trade secrets to his personal email without permission. *API Americas Inc. v. Miller*, 380 F. Supp. 3d 1141, 1149–50 (D. Kan. 2019). The court noted the defendant did not return the emails and documents at the end of his employment. *Id.* at 1149. Although the defendant tried to argue that he had consent to send documents to his personal email due to his work-from-home arrangement, the court noted that the defendant provided no evidence of consent after his employment ceased or any reason for sending the specific

documents to his personal account. *Id.* Here, Plaintiffs allege that Defendant similarly sent documents containing trade secrets to his personal email after he received an opportunity for employment with a competitor. [ECF No. 1, at 13–14].

Plaintiffs also provided supplemental authority relating to the issues of misappropriation and irreparable harm. [ECF No. 39, at 1]. Plaintiffs cited *AUA Private Equity Partners, LLC v. Soto* as supplemental authority, noting the court found the "misappropriation element satisfied by fact that defendant 'forwarded emails from her [company] email account to her personal email address' in violation of [the] plaintiff's policy against 'conducting business through any communications network not maintained by [the plaintiff]' . . . and citing Black's Law Dictionary to define 'acquisition.'" *Id.* at 2 (first and third alteration in original) (quoting *AUA Private Equity Partners, LLC v. Soto*, 2018 WL 1684339, *2–3 (S.D.N.Y. April 5, 2018)). Because "[t]he DTSA does not define 'acquisition,' the Court looked to Black's Law Dictionary to define the term. *AUA Private Equity Partners, LLC*, 2018 WL 1684339, at *5. "Black's Law Dictionary defines 'acquisition' as 'the gaining of possession or control over something.'" *Id.* (quoting *Acquisition*, BLACK'S LAW DICTIONARY (10th ed. 2014)). The court concluded the defendant acquired "the trade secrets by improper means, *i.e.* theft and in breach of her duty to maintain secrecy." *Id.* at 7.

Defendant argues he believed the PEA Report to be his personal work product, and he kept it as part of his professional portfolio that has not been shared with anyone. [ECF No. 31-1, at 3, 6, 10]. Defendant further testified he kept the unredacted version of the PEA Report because he was proud of his work product. [ECF No. 41, at 120–21]. Defendant

also contends he sent the other documents to his personal email account so he could complete his work on his personal computer because Plaintiffs did not provide him with a work laptop. *Id.* at 90–93, 98, 130–31; [ECF No. 31-1, at 4–6]. Defendant alleges the tablet Ramaco provided for him became insufficient to complete his work because of the tools and software he needed. [ECF No. 41, at 92]; [ECF No. 31-1, at 4]. He therefore states that he used his personal email to send himself documents to work from his personal computer. [ECF No. 41, at 91–92, 98, 130]; [ECF No. 31-1, at 4].

Similar to Defendant's argument in this case, the defendant in *Sheffield Metals Cleveland, LLC v. Kevwitch* argued that she emailed herself because she did not have a work laptop. *Sheffield Metals Cleveland, LLC. v. Kevwitch*, No. 1:17 CV 1120, 2018 WL 1290990, at *3 (N.D. Ohio Mar. 13, 2018). Both the plaintiff and the defendant filed motions for summary judgment, and the plaintiff "relie[d] on the facts that defendant 1) sent the work emails to her personal email account, 2) attachments to the emails contained confidential and trade secret information, and 3) when asked to return or destroy any confidential information, defendant failed to respond." *Id.* at *8. The court concluded there was "insufficient evidence to establish an issue of fact as to misappropriation" and granted the defendant's motion for summary judgment. *Id.* But *Sheffield Metals Cleveland, LLC* is distinguishable from this case because Ramaco had a policy prohibiting the use of personal email to send confidential information.

Defendant acquired the alleged trade secrets by "gaining possession or control over" them. *AUA Private Equity Partners, LLC*, 2018 WL 1684339, at *5 (quoting *Acquisition*, BLACK'S LAW DICTIONARY (10th ed. 2014)) ("[A]cquisition" is defined "as 'the gaining

of possession or control over something.'"). Like the defendant in *AUA Private Equity Partners, LLC*, Defendant had a reason to know that sending confidential information to his personal email accounts was unauthorized because there is a policy that he signed and acknowledged. [ECF No. 41, at 64–65]; Exs. 28 & 31. Defendant's actions can amount to theft. *See AUA Private Equity Partners, LLC*, 2018 WL 1684339, at *7. Both the DTSA and WUTSA include theft under their definitions of "improper means." 18 U.S.C. § 1839(6)(A); WYO. STAT. ANN. § 40-24-101(a)(i) and (a)(ii)(B). "The [DTSA] defines misappropriation as . . . 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]'" *First Interstate BancSystem, Inc. v. Hubert*, 615 F. Supp. 3d 1270, 1282–83 (D. Wyo. 2022) (quoting 18 U.S.C. § 1839(5)). As Plaintiffs provided evidence that Defendant acquired the alleged trade secrets by improper means, they have shown a prima facie case of misappropriation under the DTSA and WUTSA.

### 3. Interstate or Foreign Commerce (DTSA Only)

The DTSA requires the trade secret "relate[ ] to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *see Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, 2018 WL 3437083, at *4 (N.D. Okla. 2018); *Arctic Energy Servs., LLC v. Neal*, 2018 WL 1010939, at *2 (D. Colo. 2018). Plaintiffs argue that the use of its trade secrets in interstate commerce is established. [ECF No. 5, at 17]. Plaintiffs specifically contend, "REE exploration and processing carries significant value to national security and military endeavors, given the role the REE play in connection with hypersonic missiles, military aircraft, 6G drones, and many other

electronic devices." *Id.* Defendant does not contest this. Therefore, the Court finds Plaintiffs have shown a prima facie case of misappropriation under the DTSA and WUTSA, showing a likelihood of success

## II.    Irreparable Harm

The Tenth Circuit has held a demonstration of probable irreparable harm is the single most important factor to consider before issuing a preliminary injunction. *Hunter v. Hirsig*, 614 F. App'x 960, 962 (10th Cir. 2015) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). Consequently, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.* "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). "'[M]erely serious or substantial' harm is not irreparable harm." *Id.* at 1267 (alteration in original) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). "[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* at 1267 (quoting *Heideman*, 348 F.3d at 1189).

Even though Plaintiffs have shown a likelihood of success on the merits, they have not shown irreparable harm. To determine whether there is irreparable harm, courts "compare[] (i) what would happen if the preliminary injunction[s] were not granted; with (ii) what would happen if the preliminary injunction[s] were granted; and then (iii) ask[]

19

whether the difference between (i) and (ii) is irreparable." *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1029–30 (D.N.M. 2016) (quoting *Dine Citizens Against Ruining Our Env't v. Jewell*, 2015 WL 4997207, at *48 (D.N.M. 2015)). This Court will review each of Plaintiffs' requests in turn.

### a. Preservation and Forensic Imaging

Plaintiffs first request "the immediate preservation and forensic imaging of all electronic devices . . . possessed by Defendant and others determined to possess Ramaco's trade secrets." [ECF No. 5, at 3]. Defendant received a letter on December 17, 2025, alleging Defendant misappropriated trade secrets and breached contracts. [ECF No. 31, at 9]. The letter also requested Defendant preserve evidence relating to these allegations. *Id.* Defendant contends that "the relief is unnecessary and moot because Defendant has already affirmatively preserved, through data collection and forensic imaging of computers, all of the identified data sources." *Id.* at 26. Specifically, a third-party forensic technology firm, BRG, obtained evidence and completed forensic imaging for preservation purposes. [ECF No. 31-5, at 2].

Defendant also argues "'[p]reservation of evidence' is fundamentally different from ordering discovery designed to help Plaintiffs develop evidence on the merits." [ECF No. 31, at 26–27] (citing *Blue Star Land Servs., LLC v. Coleman*, No. CV-17-931-R, 2017 WL 10378236, at *2 (W.D. Okla. Dec. 8, 2017) and *John Zink Co., LLC v. Robertson*, No. 22-CV-525-JFH-CDL, 2022 WL 17547786, at *8 (N.D. Okla. Dec. 9, 2022)).While Plaintiffs cite cases where courts have granted similar injunctions, Plaintiffs have not shown that irreparable harm would occur in this case if the Court did not grant Plaintiffs' request. [ECF

No. 5, at 22–23]. Defendant's counsel declared under penalty of perjury that Defendant already preserved and completed forensic imaging of the requested electronic devices. [ECF No. 31-5, at 2]. Plaintiffs' concerns appear to be rooted in their lack of access. *See* [ECF No. 41, at 182–83, 187, 190]. While Plaintiffs may want access to this evidence, that is a discovery issue. *See Hampton Roads Connector Partners v. Land to Sand Site Servs., Inc.*, No. 2:23CV174, 2023 WL 8539536, at *11 (E.D. Va. Oct. 17, 2023) ("The proper method for Defendants to obtain the materials in question, assuming they are relevant to their claims, was and remains the civil discovery process."). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier*, 427 F.3d at 1258 (10th Cir. 2005) (quoting *Univ. of Tex.*, 451 U.S. at 395). Therefore, the Court finds Plaintiffs have not shown irreparable harm in relation to this request.

### b.  Enjoin From Further Possessing or Using

Plaintiffs also request the Court "immediately enjoin[] Defendant from possessing or using Ramaco's trade secret information." [ECF No. 5, at 3]. But any evidence Plaintiffs provide regarding harm from possessing or using Ramaco's trade secrets is speculative. First, Plaintiffs provide only circumstantial evidence that Defendant has used or disclosed the trade secrets. Plaintiffs argue they have "definitively prove[d] that Defendant sent Ramaco's trade secret information to his personal email mere weeks before he resigned from Ramaco and became USAR's Vice President of Mining." *Id.* at 20. However, Defendant provides alternative reasoning why he sent himself the documents as discussed above. [ECF No. 31-1, at 3, 4–6, 10]; [ECF No. 41, at 90–93, 98, 120–21, 130–31].

Defendant testified under oath that he has not disclosed or even accessed the documents since leaving Ramaco. [ECF No. 41, at 121, 123]; [ECF No. 31-1, at 3, 6].

Second, Plaintiffs fail to show non-speculative irreparable harm. *See Schrier*, 427 F.3d at 1267 (quoting *Heideman*, 348 F.3d at 1189) ("To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."). Plaintiffs contend that disclosure "threatens irreparably harming Ramaco's advantageous market position and potentially diverting critical investment and business opportunities away from Ramaco." [ECF No. 5, at 2]. While "lost market share," "price erosion, loss of goodwill, damage to reputation, and loss of business opportunities" can lead to irreparable harm, Plaintiffs have not shown that any of these are applicable beyond mere speculation. *See Avus Designs, Inc. v. Grezxx, LLC*, 644 F. Supp. 3d 963, 991 (D. Wyo. 2022) (citing *J&M Indus., Inc. v. Raven Indus., Inc.*, 574 F. Supp. 3d 941, 957 (D. Kan. 2021)).

Plaintiffs have not shown "evidence of head-to-head competition and lost market share." *Id.* (citing *J&M Indus., Inc.*, 574 F. Supp. 3d at 957). Plaintiffs repeatedly stated they have a leading position in the marketplace, but they have provided no evidence of their position in the market, such as sales, customers, or investments. [ECF No. 5, at 10, 16, 21, 25]; [ECF No. 42, at 27, 29]. In fact, no one is currently producing gallium domestically, and Plaintiffs are concerned about being the first to the market. [ECF No. 42, at 28–29]; [ECF No. 41, at 152]. Plaintiffs provide supplemental authority to support their contention that they will be irreparably harmed. [ECF No. 39, at 1]. But all the cited cases are distinguishable.

22

For example, Plaintiffs cite to *Life Spine, Inc. v. Aegis Spine, Inc.*, where the court found "irreparable harm from the potential loss of customers and market share 'in the same finite pool of hospitals and surgeons' and because defendant's unimpeded access to plaintiff's trade secrets would 'undercut' the plaintiff's marketing, 'thereby damaging [plaintiff's] goodwill and reputation.'" [ECF No. 39, at 2–3]; *see Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545–46 (7th Cir. 2021). But the court explained that the plaintiffs "presented evidence that it would lose customers and market share." *Id.* It also explained that the plaintiff "'had some likelihood' of proving irreparable harm stemming from the loss of goodwill and reputation" because the plaintiff "worked to develop 'niche contracts' with hospitals[.]" *Id.* at 546. Plaintiffs have not provided any similar evidence to show that they would lose customers, market share, or niche contracts.

In *Maxim Healthcare Staffing Servs., Inc. v. Mata*, one of the defendants and the plaintiff were actively competing for the same contract, and the court granted an injunction preventing the defendant "from directly or indirectly using or divulging or threatening to use or divulge, for any reason, [p]laintiff's trade secrets and confidential information." *See Maxim Healthcare Staffing Servs., Inc. v. Mata*, No. SA-21-CV-01100-XR, 2022 WL 106153, at *6 (W.D. Tex. Jan. 11, 2022). Plaintiffs similarly contend they were pursuing the same investments. [ECF No. 41, at 173]. Plaintiffs allege "USAR's ability to accelerate its planned REE operations positions USAR to attract private and governmental financial investments and opportunities" and conclude "[a]ny diversion of investments resulting from a competitor's use of Ramaco's trade secrets could diminish Ramaco's ability to conduct research and development and cause Ramaco to lose business and investment

opportunities, the long-term consequences of which cannot be remedied by monetary damages alone and cannot be adequately quantified." [ECF No. 1, at 18]. But *Maxim Healthcare Staffing Servs., Inc.* is distinguishable because it was undisputed that the defendant received the trade secret information, as the plaintiff's previous employee sent several emails containing the information to employees of the defendant. *Maxim Healthcare Staffing Servs., Inc.*, 2022 WL 106153, at *1. The court found it undisputed that the defendant was in possession of the information and "in a position to use it." *Id.* at 6.

Here, there is only one defendant, Plaintiffs' previous employee. USAR is not currently a defendant, and Plaintiffs' admitted that they do not have definitive proof that USAR is in possession of any of Plaintiffs' trade secret information. [ECF No. 41, at 172–73]. Defendant also testified to why they received these investments, and Defendant's testimony and USAR's press release contradict Plaintiffs' assumption that USAR is using their trade secrets to accelerate their timeline. [ECF No. 41, at 109–10, 173–74]; [ECF No. 6-13, at 2]. Defendant testified that none of Ramaco's information was used to secure the investments, and the Department of Commerce was interested in funding USAR because it is vertically integrated with the ability to produce magnets. [ECF No. 41, at 109–10]. Further, the USAR press release quotes United States Secretary of Commerce Howard Lutnick stating, "USA Earth's *heavy* critical minerals project is essential to restoring U.S. critical mineral independence." [ECF No. 6-13, at 3] (emphasis added). USAR's press release goes on to quote Bill Frauenhofer, the Director of the CHIPS program, stating, "Yttrium, gallium, terbium, and the other nine critical and strategic minerals that will be

24

mined in Texas, along with the Oklahoma magnet production, provides U.S. semiconductor companies a reliable domestic source and removes choke points in their manufacturing supply chain that enable chemical vapor deposition, high-k materials, compound semiconductors, dopants, and other foundational applications." *Id.*

While USAR's press release briefly mentions "the capital is expected to accelerate and de-risk USAR's growth objectives . . . and support[] a business that by 2030 will . . . process . . . gallium" along with a long list of other REE [ECF No. 6-13], any claims that USAR received this funding or accelerated its timeline by using Plaintiffs' trade secrets are speculative. *See* [ECF No. 41, at 173–74]. Thus, Plaintiffs have not shown a causal connection between losing the contract to USAR, especially because USAR's flow process existed before Moyes starting at USAR, and USAR is not currently planning to produce gallium under its PFS. *Id.* at 96–97, 103–07; [ECF No. 6-11, at 2].

The Court heard testimony that USAR is not looking to produce gallium at this time [ECF No. 41, at 96–97], and USAR's earlier press release from December 10, 2025, does not mention extracting gallium. [ECF No. 6-11]. While Plaintiffs appear to be concerned that USAR is using their trade secrets because USAR has moved its timeline for production up by two years, the production in question concerns heavy REE, particularly dysprosium and terbium that are essential for high-performance magnets. *Id.* at 2. It also mentions that it will extract additional critical minerals, "including hafnium and zirconium." *Id.* The press release explains what accelerated USAR's timeline by two years, beginning its operation of the Hydromet demonstration facility. *Id.* "The Hydromet facility will operate five solvent-extraction (SX) circuits continuously, for 2,000 to 4,000 hours, to generate the

operational data required to proceed with commercial plant design." *Id.* This press release coincides with Defendant's description of USAR's current plans and the reason for the accelerated timeline. *See* [ECF No. 41, at 96–97, 103–09].

Defendant further testified if USAR did pursue gallium extraction, the differences in the mines and processes means USAR has no use for Plaintiffs' trade secret information. *Id.* at 96–98, 105–06. Specifically, as USAR is primarily focused on heavy REE, gallium would need to be extracted from the waste stream. *Id.* at 96–97. Plaintiffs contend there are other competitors in the market that the trade secret information can be shared with, but it is speculative whether Defendant has or will share Plaintiffs' trade secret information. *See Id.* at 154, 173; [ECF No. 42, at 9]. Plaintiff has signed an NDA, acknowledged his duty to keep the trade secret information confidential, and testified under oath that he has not disclosed the information or even accessed it since his departure from Ramaco. [ECF No. 41, at 121, 123]; [ECF No. 31-1, at 7–8].

Even if Plaintiffs' harm from not being first to market was not speculative, the harm appears to be quantifiable because Michael Woloschuk testified that gallium accounted for an estimated thirty percent of their revenue and $300 million annually. [ECF No. 42, at 29]. While he argued that the impact of USAR beating Ramaco to market would be significant, *id.* at 30, "'[m]erely serious or substantial' harm is not irreparable harm." *Schrier*, 427 F.3d at 1267 (quoting *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250); *see Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir. 1976)) ("[I]rreparable harm is often suffered when 'the

injury can[not] be adequately atoned for in money[.]'"). Thus, Plaintiffs have not shown irreparable harm would occur from lost market share.

Plaintiffs also argue that USAR getting to market first could lead to "a loss of reputation as the leader and developer of new REE technologies for unconventional REE deposits in thermal coal deposits." [ECF No. 5, at 21]; *see* [ECF No. 41, at 152–54]. But this argument relies on getting to market first, which is speculative, as discussed above, in part because USAR is not currently looking to enter the market. Beyond Plaintiffs' reputational concerns from potentially not being first to market, the only other reputational concern Plaintiffs noted was that their reputation may be tarnished because Defendant took information. [ECF No. 41, at 153–54]. While that may cause irreparable harm, Plaintiffs do not show how this injunction will prevent it. *See Schrier*, 427 F.3d at 1267 (quoting *Heideman*, 348 F.3d at 1189) ("[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."); *Logan*, 163 F. Supp. 3d at 1029–30 (quoting *Dine Citizens Against Ruining Our Env't*, 2015 WL 4997207, at *48 (To determine whether there is irreparable harm, courts "compare[] (i) what would happen if the preliminary injunction[s] were not granted; with (ii) what would happen if the preliminary injunction[s] were granted; and then (iii) ask[] whether the difference between (i) and (ii) is irreparable."). Because Plaintiffs' injuries are too speculative or otherwise inapplicable to this injunction, Plaintiffs have not shown irreparable harm would occur if the Court did not enjoin Defendant from further possessing or using Plaintiffs' alleged trade secret information.

27

### c.  Certification Under Oath

Plaintiffs do not provide any argument as to why the certification under oath is necessary to prevent irreparable harm. Further, no irreparable harm would occur if the Court did not grant this request, as Plaintiffs can still get information through the discovery process and go to trial.  Therefore, Plaintiffs have not met their burden to show irreparable harm would occur if the Court did not issue this injunction.

### III.    Threatened Injury Outweighs the Opposing Party's Injury

### a.  Preservation and Forensic Imaging

Plaintiffs argue that their request for preservation and forensic imaging is merely inconvenient to Defendant, but as noted above, Defendant already preserved the evidence and completed forensic imaging. Plaintiffs have not shown irreparable harm, and Defendant notes concerns regarding his procedural rights and attorney-client privilege along with non-party USAR's property and confidentiality rights. [ECF No. 31, at 24, 26]. Therefore, the threatened injury does not outweigh the opposing party's injury.

### b.  Enjoin From Further Possessing or Using

As discussed above, Plaintiffs fail to show irreparable harm. Enjoining Defendant from further possessing or using the alleged trade secrets would at most be a minor inconvenience. But because Plaintiffs fail to show irreparable harm, the threatened injury does not outweigh the opposing party's injury.

### c.  Certification Under Oath

Plaintiffs provided no discussion regarding irreparable harm or balance for their request that Defendant provide a certification under oath. This request is disfavored

because it mandates action, changes the status quo, and theoretically grants the relief Plaintiffs would seek at trial. In the case of disfavored preliminary injunctions, "the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors" and "must make a 'strong showing' that these tilt in [their] favor." *Free the Nipple-Fort Collins*, 916 F.3d at 797 (citing *Fish*, 840 F.3d at 724). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." *Id.* (citing *Schrier*, 427 F.3d at 1258–59). "Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* (citing *Awad v. Ziriax*, 670 F.3d at 1125). Plaintiffs request "mandates action," "changes the status quo," and "grants . . . relief that the moving party could expect from a trial win." As this could cause substantial harm to Defendant and Plaintiffs have not met their burden to show irreparable harm, the threatened injury does not outweigh the opposing party's injury.

## IV.    Not Contrary to Public Interest

Plaintiffs argue that there is a public interest in upholding contracts and protecting trade secrets. [ECF No. 5, at 24–25]. While the Court generally agrees, Plaintiffs have not shown irreparable harm. Further, Plaintiffs' specific requests for a forensic examination and certification may be contrary to the public interest as applied. Requiring Defendant to turn over all of his devices and all of USAR's allegedly implicated devices to a third-party without considering discovery restrictions and is contrary to public interest. It is also

contrary to public interest to order Defendant to certify under oath that he has disclosed trade secrets when he has denied doing so under oath.

## CONCLUSION

Because Plaintiffs have not shown all four requirements for a TRO or preliminary injunction are met, the Court denies Plaintiffs' Motion.

**NOW, THEREFORE IT IS ORDERED** Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction [ECF No. 4] is **DENIED**.

Dated this 5th day of May, 2026.

Kelly H. Rankin
United States District Judge